# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
October 23, 2026
Thomas B. Plunkett, III
Clerk

No. 26-50183

Ignacio Sosnava Rodriguez,

*Petitioner—Appellee*,

*versus*

Miguel Vergara, *in his official capacity as Director of the San Antonio Field Office of I.C.E. Enforcement and Removal Operations*; Markwayne Mullin, *Secretary, U.S. Department of Homeland Security*; Todd Wallace Blanche, *U.S. Attorney General*; Department of Homeland Security; DOJ Executive Office for Immigration Review,

*Respondents—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
Civil Action No. 1:26-CV-273

consolidated with

No. 26-50219

Alejandro Villegas Angel,

*Petitioner—Appellee*,

*versus*

Markwayne Mullin, *Secretary, U.S. Department of Homeland Security*; Todd Wallace Blanche, *U.S. Attorney General*; Miguel Vergara, *Director, San Antonio Field Office for Enforcement and Removal*; United States Department of Homeland Security; United States Immigration and Customs Enforcement; Executive Office for Immigration Review,

*Respondents—Appellants*.

---

Appeal from the United States District Court
for the Western District of Texas
Civil Action No. 1:26-CV-384

---

consolidated with

---

No. 26-50221

---

Miguel Angel Gomez Alvarado,

*Petitioner—Appellee*,

*versus*

Miguel Vergara, *in his official capacity as Director of the San Antonio Field Office for U.S. Immigration and Customs Enforcement*; David Venturella, *in his capacity as the Acting Director for the U.S. Immigration and Customs Enforcement*; Markwayne Mullin, *Secretary, U.S. Department of Homeland Security*,

*Respondents—Appellants*.

---

Appeal from the United States District Court
for the Western District of Texas
Civil Action No. 1:26-CV-309

---

Before ELROD, *Chief Judge*, and JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*, joined by ELROD, *Chief Judge*, and JONES, SMITH, RICHMAN, WILLETT, HO, DUNCAN, ENGELHARDT, and OLDHAM, *Circuit Judges*:*

Petitioners, three aliens who had been living unlawfully in the United States for many years, were detained by immigration authorities pending removal proceedings pursuant to 8 U.S.C. § 1225(b)(2)(A). All three sought habeas relief, *inter alia*, on the ground that their detention violated their right to due process under the Fifth Amendment to the United States Constitution. In each case, the district courts agreed. The courts ordered Petitioners to be released and enjoined federal authorities from further detaining them without first conducting bond hearings to assess their individual dangerousness and flight risk.

A panel of this court consolidated the ensuing appeals and expedited briefing and argument. A divided panel of this court affirmed, concluding that the Fifth Amendment conferred a right on these aliens to receive individualized hearings on their dangerousness and flight risk. The panel majority also imposed a novel rule that such hearings must be conducted within 90 days of an alien's confinement, even as removal proceedings remain ongoing. Although the district courts' grants of habeas to two of the

---

* JUDGE RICHMAN concurs in the judgment.

Petitioners were premature under this 90-day rule, the panel nevertheless upheld the habeas relief.

This court *sua sponte* ordered rehearing en banc, again expedited briefing and argument, and stayed the underlying district court orders granting habeas relief. We now conclude that Petitioners were not entitled to individual hearings on their dangerousness or flight risk before they could be lawfully detained by immigration authorities pending their removal proceedings. Moreover, the duration of Petitioners' detention presented no constitutional issues warranting habeas relief. Accordingly, we reverse the district courts' decisions and vacate their grants of habeas relief.

## I.

Ignacio Sosnava Rodriguez is a Mexican national who has resided in the United States without inspection or admission for over twenty-two years. In December 2025, Sosnava was detained by United States Immigration and Customs Enforcement (ICE) following a traffic stop. He filed a habeas petition on February 13, 2026, which the district court granted on February 25, 2026.

Alejandro Villegas Angel is a Mexican national who has resided in the United States without inspection or admission since 2011. He has two children who are American citizens. In February 2026, Villegas was stopped by police for driving without a license and was transferred to ICE custody. He filed a habeas petition on February 17, 2026, which the district court granted on March 3, 2026.

Miguel Angel Gomez Alvarado is a Honduran national who has resided in the United States without inspection or admission since 2012. He has one child who is an American citizen. In November 2025, Gomez was detained by ICE following a traffic stop. He filed a habeas petition on February 6, 2026, which the district court granted on March 2, 2026.

These three men were placed in federal custody pursuant to 8 U.S.C. § 1225(b)(2)(A), which mandates that "an alien seeking admission [who] is not clearly and beyond a doubt entitled to be admitted . . . shall be detained" pending removal proceedings. Section 1225(b)(2)(A) "says [no]thing whatsoever about bond hearings." *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 502 (5th Cir. 2026) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018)). In their habeas petitions, however, Petitioners asserted that their detention under § 1225(b)(2)(A), absent bond hearings to determine individual dangerousness or flight risk, violated their Fifth Amendment right to due process. *See* U.S. CONST. amend. V.

In three substantively similar orders, the district courts treated Petitioners' claims as an assertion of their right to procedural due process and concluded that bond hearings on dangerousness and flight risk were constitutionally required, even if such procedural steps are not encompassed by § 1225(b)(2)(A). Accordingly, the district courts ordered Petitioners released and enjoined federal immigration authorities from further detaining them without first conducting such bond hearings. Petitioners were released from detention shortly after their respective habeas petitions were granted.

Respondents—a collection of federal immigration authorities—timely appealed these rulings. A motions panel of this court granted the Respondents' motions to expedite the appeals on April 6, 2026, and ordered expedited briefing and argument. Because the cases presented similar questions concerning the constitutionality of detention pending removal proceedings pursuant to § 1225(b)(2)(A), the panel also consolidated them for hearing and decision.

A merits panel heard oral argument in April 2026. In July, the panel upheld the district courts' rulings. The panel majority determined that a mix of procedural and substantive considerations guaranteed Petitioners a bond

hearing on their dangerousness and flight risk within, at most, 90 days of their detention under § 1225(b)(2)(A). *Sosnava Rodriguez v. Ortega*, 180 F.4th 702, 727–28 (5th Cir.), *vacated and reh'g granted*, 181 F.4th 608 (5th Cir. 2026). The majority then affirmed the district courts' habeas grants, reasoning that, had Petitioners still been detained without a bond hearing at the time of the panel's decision, the timeline espoused by the majority would require their release. *Id.*

The en banc court *sua sponte* ordered rehearing. *See Sosnava Rodriguez*, 181 F.4th at 609. The court again expedited briefing and thereafter stayed the district court judgments pending rehearing. The court heard en banc argument on September 24, 2026.

## II.

Before 1996, the Immigration and Nationality Act (INA) treated aliens differently depending on whether an alien presented himself at a port of entry or simply entered illegally into the United States. *See* 8 U.S.C. §§ 1225(a), 1251(a) (1994). Under this older framework, an alien's physical entry into the country controlled what removal proceedings would apply and whether the alien would be detained during those proceedings. *See Buenrostro-Mendez*, 166 F.4th at 498. Aliens who arrived at a port of entry were subject to mandatory detention during their exclusion proceedings, whereas aliens who evaded inspection and entered the country illegally "could seek release on bond" while deportation proceedings were ongoing. *Id.* Over time, this statutory scheme produced "th[e] unintended and undesirable consequence" of allowing illegal entrants to "take advantage of . . . greater procedural and substantive rights afforded in deportation proceedings" than those who properly presented themselves to authorities at a port of entry. *Martinez v. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012).

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) to remedy this discrepancy. Pub. L. 104-208, 110 Stat. 3009 (Sept. 30, 1996). IIRIRA aimed to "ensure[] that *all immigrants who have not been lawfully admitted, regardless of their physical presence in the country*, are placed on equal footing in removal proceedings under the INA." *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc) (emphasis added); *see also Buenrostro-Mendez*, 166 F.4th at 499 (IIRIRA "aimed to reduce this incongruity" of treatment). To that end, IIRIRA established one set of removal procedures for aliens who have been "admitted" to the United States and another for those who have not. Three sections of Title 8 solidify this distinction:

8 U.S.C. § 1225(a) deems any alien "present in the United States who has not been admitted or who arrives in the United States" as an "applicant for admission." 8 U.S.C. § 1225(a)(1). "Admission" is "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). Our court has recently clarified that, as used in the statute, "alien seeking admission" and "applicant for admission" are synonymous. *See Buenrostro-Mendez*, 166 F.4th at 503 (citing 8 U.S.C. § 1225(a)(3), (b)(2)(A)).

8 U.S.C. § 1225(b) mandates that "if the examining immigration officer determines that an alien seeking admission is *not clearly and beyond a doubt entitled to be admitted*, the alien *shall* be detained for a [removal] proceeding." *Id.* § 1225(b)(2)(A) (emphasis added). Federal regulations provide additional procedures for immigration officers to follow in making this determination and list relevant documentation that aliens may use to establish either their past admission or present admissibility. *See, e.g.*, 8 C.F.R. §§ 1235.4, 1235.6, 1235.8–1235.11.

8 U.S.C. § 1226 establishes removal procedures for aliens generally, including those who may not specifically qualify as "applicants for admission" (*e.g.*, aliens who have overstayed a visa). Such aliens "may be arrested and detained pending a [removal] decision" following issuance of a warrant by the Attorney General. *Id.* § 1226(a). However, the Attorney General retains discretion to "continue to detain the arrested alien" or to release the alien on bond or parole. *Id.* § 1226(a)(1)–(2).

After IIRIRA went into effect, the Immigration and Naturalization Service and its successor agencies within the Department of Homeland Security (DHS), as well as many immigration judges, tended to treat aliens apprehended in the interior of the United States as "aliens" subject to discretionary detention under § 1226(a), as opposed to "applicants for admission" subject to mandatory detention under § 1225(b)(2)(A). *See Buenrostro-Mendez*, 166 F.4th at 500. But in July 2025, DHS "revisited its legal position on detention and release authorities." Immigr. & Customs Enf't, Interim Guidance Regarding Detention Auth. for Applications for Admission (July 8, 2025), https://perma.cc/2V6H-FHVD. The agency determined that aliens who qualify as "applicants for admission," including those apprehended in the interior, "are subject to detention under [§ 1225(b)(2)(A)] and may not be released from ICE custody except by [discretionary] parole." *Id.* Thus, unlike "aliens admitted to the United States and chargeable with deportability," applicants for admission are not "eligible for a custody determination and release on recognizance, bond, or other conditions[.]" *Id.* This understanding has since been adopted by the Board of Immigration Appeals. *See In re Yajure Hurtado*, 29 I. & N. Dec. 216, 228 (B.I.A. 2025).

Earlier this year, our court held that the definition of "applicants for admission" under § 1225 extends to aliens residing in the United States who have never been lawfully admitted to the country. *See Buenrostro-Mendez*,

166 F.4th at 506–07; *see also Avila v. Bondi*, 170 F.4th 1128, 1133 (8th Cir. 2026) (same). In *Buenrostro-Mendez*, this court upheld the mandatory detention of "applicants for admission" under § 1225(b)(2)(A), noting that the provision does not "say[] anything whatsoever about bond hearings." 166 F.4th at 502 (quoting *Jennings*, 583 U.S. at 297). This reading, which harmonizes the treatment of unadmitted aliens regardless of their physical entry into the country, best aligns with the statutory text and "better honors [the] predominant goal in the enactment of [the] IIRIRA." *Buenrostro-Mendez*, 166 F.4th at 508.

## III.

With this statutory framework and precedent in mind, we assess Petitioners' habeas claims. We review *de novo* a district court's grant of a petition for a writ of habeas corpus under 28 U.S.C. § 2241. *Pack v. Yusuff*, 218 F.3d 448, 451 (5th Cir. 2000). "[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (quotation and citation omitted). Habeas relief obtains only when detainees are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see also id.* § 2254(a). Thus, to prevail on habeas review, Petitioners must demonstrate that their detention under § 1225(b)(2)(A) is the result of a constitutional violation. *See Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993).

Petitioners do not dispute that they are "applicants for admission" within the meaning of § 1225 and thus subject to mandatory detention pending their removal proceedings under the statute. Petitioners instead urge that their detention without a bond hearing violates their rights under the Fifth Amendment's Due Process Clause, even if § 1225(b)(2)(A) does not require any such hearing before imposing detention. We disagree.

**A.**

The district courts treated Petitioners' claims as assertions of a right to procedural due process, a framing which Petitioners re-urge on appeal. A procedural due process challenge asserts that "the established state procedure . . . destroys [a plaintiff's] entitlement *without according him proper procedural safeguards*." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (emphasis added) (quotation omitted). Thus, Petitioners' procedural due process challenge is not an assertion that Congress lacks the power to detain illegal aliens such as themselves, but only that the procedure they received was insufficient to justify that detention.

In assessing Petitioners' claims, the district courts applied the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which

> generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (citation omitted). The district courts concluded that Petitioners' interest in physical liberty was profound and that an appreciable risk of erroneous detention could be negated by bond hearings on Petitioners' dangerousness and flight risk. Waving aside the Government's interest in ensuring prompt removal of illegal aliens following their removal proceedings, the district courts found that the *Mathews* factors clearly

favored Petitioners, such that their continued detention absent such bond hearings was unconstitutional.[1]

There is no dispute that Petitioners enjoy the protections of the Fifth Amendment. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976). So the issue in this case is not *whether* Petitioners are entitled to due process. Rather, the question is what *specific* process is due for unadmitted aliens pending their removal proceedings—bearing in mind that Congress enjoys "broad power over naturalization and immigration" and "regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 79–80.

The answer to that question is straightforward: Because Petitioners have never been admitted to the United States, due process does not entitle them to additional proceedings beyond what Congress has provided before they may be detained pending removal. And even granting that such a challenge is possible, the facts Petitioners seek to prove at their bond hearings are irrelevant to detention under § 1225(b)(2)(A), such that the absence of those hearings did not render their detention constitutionally defective. It was thus error to grant habeas relief on procedural due process grounds.

**1.**

Aliens seeking admission to the United States have only a limited ability to challenge their admission process on constitutional grounds. In *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), the Supreme Court recognized that "the Constitution gives [Congress] plenary authority to decide which

---

[1] Judge Pitman's order in Sosnava's case treated all three *Mathews* factors as decisively favoring Sosnava. Judge Ezra's orders in Villegas's and Gomez's cases determined that the first two factors (weight of private interest and likelihood of erroneous deprivation) weighed strongly in their favor, but concluded that the third was "neutral" given the Government's interest in ensuring that the aliens appeared for their removal proceedings and did not pose a danger to the public.

aliens to admit and a concomitant . . . power to set the procedures to be followed in determining whether an alien should be admitted." *Id.* at 139 (citations omitted). When "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law" interact with those procedures, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Id.* at 138 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)) (emphasis added).

Thuraissigiam was apprehended twenty-five yards inside the border, shortly after crossing, and the Supreme Court treated him as if he had been stopped at the border. The Court observed that "an alien who tries to enter the country illegally is treated as an 'applicant for admission,' § 1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.'" *Id.* So "an alien like [Thuraissigiam] is 'on the threshold,'" *id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)), and therefore "has only those rights regarding admission that Congress has provided by statute." *Id.* at 140; *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

Petitioners' illegal entry did not change their status as "applicants for admission," as recent precedent makes clear. *Buenrostro-Mendez*, 166 F.4th at 499 ("Following the passage of IIRIRA[,] an alien's status as an applicant for admission does not turn on where or how the alien entered the United States."); *id.* at 502 ("The petitioners are deemed, by statute, to be

applicants for admission pending the resolution of removal proceedings.").[2] Nor has Petitioners' unlawful residence in the United States unlocked the right to a bond hearing pending their removal proceedings.

For over a century, the Supreme Court has suggested that aliens who enter and live in the United States, even unlawfully, may possess some constitutional due-process protection beyond whatever Congress provides by statute. *See, e.g.*, *Mezei*, 345 U.S. at 212 (1953); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). But in *Thuraissigiam*, the Supreme Court emphasized that admission status—not physical presence—informs what procedural rights are available to an alien. *See* 591 U.S. at 139 (explaining that the plenary-power doctrine would be "meaningless if it became inoperative as soon as an arriving alien set foot on U. S. soil"); *see also Vartelas v. Holder*, 566 U.S. 257, 262 (2012) ("In IIRIRA, Congress . . . made 'admission' the key word" in deciding what process an alien received. (citation omitted)). And Congress (per its plenary power over immigration), rather than the judiciary,

---

[2] JUDGE HIGGINSON, much like JUDGE DOUGLAS, urges the full court to overrule *Buenrostro-Mendez*'s interpretation of 8 U.S.C. § 1225(b)(2). *Post*, at 142. But this court already declined to do so by denying the en banc petition filed in that case. *Buenrostro-Mendez v. Bondi*, No. 25-20496 *consolidated with* No. 25-40701, (5th Cir. Apr. 9, 2026) (per curiam) (denying petition for rehearing en banc).

Regardless, another point about JUDGE HIGGINSON's opinion—and its grounding in the canon of constitutional avoidance—bears mentioning. The "canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings*, 583 U.S. at 297 (citing *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). There is no such textual ambiguity in § 1225(b)(2), as this court explained in *Buenrostro-Mendez*. Therefore, our dissenting colleague's appeal to that canon is altogether misplaced. Indeed, the Supreme Court in *Jennings* rejected the Ninth Circuit's use of the canon of constitutional avoidance for similar reasons. *Jennings*, 583 U.S. at 296 (stating that the Ninth Circuit "misapplied the canon" of constitutional avoidance because its "interpretations of the provisions" at issue in that case were "implausible").

demarcates the parameters of admission status. *Thuraissigiam*, 591 U.S. at 107.

This understanding accords with established precedent instructing that only "once an alien *gains admission* to our country and begins to develop the ties that go with permanent residence [does] his constitutional status change[] accordingly." *Plasencia*, 459 U.S. at 32 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)) (emphasis added).

Petitioners are concededly "applicants for admission" under § 1225(b)(2)(A), and they may not assert a right to further process governing their admission beyond what Congress has provided in § 1225(b)(2)(A). *Thuraissigiam*, 591 U.S. at 138; *accord Jennings*, 583 U.S. at 303 (The language of "§ 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute."); *but see Lopez-Campos v. Raycraft*, 175 F.4th 713, 759 (6th Cir. 2026) (MURPHY, J., dissenting) (recognizing that the Supreme Court has "suggested that immigrants in the country might have some basic due-process rights apart from any statute" but concluding that § 1225(b)(2) does not violate the Due Process Clause). The Constitution does not entitle them to a bond hearing.

The Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).[3]

---

[3] Discounting Congress's authority in this sphere, JUDGES SOUTHWICK and HIGGINSON, in their dissents, cite *Zadvydas v. Davis* (discussed *infra* at Section III.B.3) for the proposition that Congress's "plenary power" over immigration is "subject to

Manifestly, IIRIRA "aimed to reduce [the] incongruity" whereby "greater procedural and substantive rights" were afforded to "aliens who bypassed entry procedures" than to those who endeavored to follow lawful procedures at their initial entry. *Buenrostro-Mendez*, 166 F.4th at 498–99. Yet by ignoring *Thuraissigiam*'s indication that unadmitted aliens may be limited to the admission procedures that Congress provides, the district courts here reintroduced the very procedural backwardness Congress sought to resolve in enacting IIRIRA. Those courts were not free to circumvent Congress and engraft the pre-1996 regime and its perverse incentives back onto IIRIRA by invoking the Due Process Clause. Nor may this court.

Petitioners have received the process due to unadmitted aliens, and granting habeas relief based on the district courts' contrary conclusion was erroneous.

**2.**

Even granting that Petitioners may challenge the admissions process Congress has provided, their claims would still fail because procedural due process does not require bond hearings centered on assessing dangerousness and flight risk in the context of § 1225(b)(2)(A).

"In *Mathews v. Eldridge*, the Court set forth [the] factors that normally determine whether an individual has received the 'process' that the Constitution finds 'due.'" *City of Los Angeles v. David*, 538 U.S. 715, 716

---

important constitutional limits." 533 U.S. 678, 695 (2001); *see also post,* at 116-17, 147 (Judges Southwick and Higginson, dissenting).

Judge Southwick asserts, *ipse dixit*, that the hearing Petitioners desire is one such limit. But that framing begs the threshold question at which we and the primary dissent diverge—and it omits that *Zadvydas* cabins its holding to aliens whom "the Government finds itself unable to remove" and who otherwise face "an indefinite term of imprisonment within the United States." That is, to aliens not in Petitioners' shoes.

(2003). But "[p]laintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant *under the statutory scheme*." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 8 (2003) (emphasis added). Here, they are not.

*Doe* illustrates this principle well. In *Doe*, a convicted sex offender asserted a right to a hearing on his individual dangerousness before being forced to register as a sex offender. *Id.* at 6. The Court rejected his challenge, holding that the respondent's dangerousness was "of no consequence" to the statute, which required registration of *all* convicted sex offenders without reference to individual dangerousness. *Id.* at 7. Because the statute rendered respondent's dangerousness irrelevant to his registration, his procedural due process claim was a substantive due process claim "recast in procedural due process terms." *Id.* at 8 (quotation omitted). And unless he could show that the "*substantive* rule of law [was] defective . . . , any hearing on current dangerousness [was] a bootless exercise." *Id.* at 7–8. JUSTICE SCALIA's concurrence in *Doe* elucidates that many statutes, by their nature, may only be challenged on the grounds of *substantive*, rather than *procedural*, due process:

> [E]ven if the requirements of [a] law implicate a liberty interest[,] the categorical abrogation of that liberty interest by a validly enacted statute suffices to provide all the process that is "due"—just as a state law providing that no one under the age of 16 may operate a motor vehicle suffices to abrogate that liberty interest. Absent a claim . . . that the liberty interest in question is so fundamental as to implicate so-called "substantive" due process, *a properly enacted law can eliminate it.* That is ultimately why, as the Court's opinion demonstrates, a convicted sex offender has no more right to additional "process" enabling him to establish that he is not dangerous than . . . a 15-year-old has a right to "process" enabling him to establish that he is a safe driver.

*Doe*, 538 U.S. at 8–9 (Scalia, J., concurring) (emphasis added); *see also id.* at 8 (majority opinion) (Doe's claim was a substantive due process claim "recast in procedural due process terms." (quotation omitted)).

While the statutory scheme considered in *Doe* differs from the immigration law at issue here, *Doe* highlights the problem with Petitioners' claims. Just as the statute in *Doe* mandated registration for sex offenders without any hearing on individual dangerousness, 8 U.S.C. § 1225(b)(2)(A) mandates detention for "an applicant for admission, if the examining immigration officer determines that [the alien] is not clearly and beyond a doubt entitled to be admitted," with no reference to an alien's individual dangerousness or flight risk. An alien is either "clearly and beyond a doubt entitled to be admitted" or not. If not, he may be detained pending removal proceedings. *Id.*; *see also Buenrostro-Mendez*, 166 F.4th at 502. Petitioners do not assert that the process they received was insufficient to prove that they are "entitled to be admitted," and any determinations made at the bond hearings imposed by the district courts would be irrelevant to the lawfulness of Petitioners' detention under § 1225(b)(2)(A). *See Buenrostro-Mendez*, 166 F.4th at 502; *accord Jennings*, 583 U.S. at 307–12 (concluding that the text of § 1225 cannot be read to require bond hearings on the propriety of release).

This mismatch is brought into sharp relief by the fact that neither the district courts, nor the Petitioners, cite any authority indicating the need for individual bond hearings pending removal proceedings, much less under § 1225(b)(2)(A) in particular. At most, Petitioners offer that limiting aliens' dangerousness or flight risk is a central justification for detention. But they cite no authority suggesting the Government may *only* detain aliens pending removal when such risks are established via individual hearings. Indeed, the Supreme Court has repeatedly made clear that Congress may mandate detention for certain classes of aliens *without* individual determinations of the type Petitioners seek. *See Demore v. Kim*, 538 U.S. 510, 513 n.1, 518, 525–28

(2003); *see also id.* at 523, 525 ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process," even where "[t]here [is] no 'individualized finding' of likely future dangerousness[.]" (quoting *Carlson v. Landon*, 342 U.S. 524, 543 (1952) (citation modified))); *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993) (rejecting the call for "fully individualized custody determinations").

Petitioners, and our dissenting colleagues, downplay *Doe* by asserting that the liberty interest at stake here is more profound than the reputational interests invoked by the respondent in *Doe*. But this is the precise argument the court of appeals espoused—and the Supreme Court rejected—in *Doe*. There, the court of appeals reasoned that the respondent had a substantive liberty interest at stake and was entitled to additional procedures to vindicate that interest. *See Doe*, 538 U.S. at 6 ("The Court of Appeals reasoned that the law implicated a 'liberty interest' . . . . From this liberty interest arose an obligation, in the Court of Appeals' view, to give respondent an opportunity to demonstrate that he was not 'likely to be currently dangerous.'"). But the Supreme Court determined that the significance of the asserted liberty interest was "unnecessary" to ascertain because "even assuming, *arguendo*, that respondent has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute." *Id.* at 7. If the liberty interest argument was irrelevant in *Doe*, it must be irrelevant here.

Even assuming *arguendo* that the asserted liberty interest's significance matters, this argument does not cure the problem with Petitioners' claims. The significance of Petitioners' liberty interest might be germane in weighing what due process requires with respect to the substantive determinations of § 1225(b)(2)(A). *See Mathews*, 424 U.S. at 335. But procedural "due process does not entitle [Petitioners] to a hearing to establish a fact that is not material under [the] statute." *Doe*, 538 U.S. at 7.

*Doe* indicates what the proper result should be in weighing the *Mathews* factors: Granting that § 1225(b)(2)(A) deprives the Petitioners of an important liberty interest, there is *no* risk of "erroneous deprivation" of that interest that would be cured by hearings on dangerousness or flight risk. Neither factor has any bearing on whether Petitioners are "entitled to be admitted" to the country. 8 U.S.C. § 1225(b)(2)(A); *Mathews*, 424 U.S. at 335. Indeed, hearings on Petitioners' family connections in the United States, or their earning potential, or whether they drive American-made automobiles would be just as relevant to whether they may be detained under § 1225(b)(2)(A). Which is to say, not relevant at all. The district courts' *Mathews* analysis ignores this disconnect entirely.[4]

At bottom, the district courts erred in their *Mathews* analysis by failing to address how bond hearings on dangerousness or flight risk could be relevant to Petitioners' classification as "applicants for admission," which Petitioners do not contest, and their resultant detention under § 1225(b)(2)(A). Because the notional hearings would be irrelevant to those determinations, the lack of hearings did not render Petitioners' detention unconstitutional as a matter of procedural due process. The district courts erred in granting habeas relief based on the denial of process not due.

---

[4] The balance of these factors demonstrates why § 1225(b)(2)(A) would comply with procedural due-process principles even if Petitioners, because of their unlawful entry into the interior of the country, gained additional procedural due-process rights apart from any statute. *Cf. Rodriguez v. Olson*, 814 F. Supp. 3d 945, 963 (N.D. Ill. 2026) (concluding that while § 1225(b)(2) does not, by itself, resolve the procedural due process question, § 1225(b)(2) does not violate the Due Process Clause under the *Mathews* analysis). *But see W.M.M. v. Trump*, 154 F.4th 207, 295 n.29 (5th Cir. 2025) (OLDHAM, J., dissenting) (noting that an "adverse-possession theory of due process," advocated by aliens who have entered the United States illegally, strains due process considerations), *rev'd en banc*, 187 F.4th 232 (5th Cir. 2026).

**B.**

Because the district courts' conclusion that procedural due process entitled Petitioners to additional hearings was erroneous, this court could reverse and vacate the grants of habeas on the basis of that error alone. However, because Petitioners' challenges "call[] into question not the adequacy of procedures [employed] but . . . the adequacy of the 'fit' between the classification and the policy that the classification serves," their claims "must ultimately be analyzed . . . as a matter of substantive due process." *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989) (plurality opinion).

Petitioners acknowledge that they are "applicants for admission," and thus are subject to mandatory detention under § 1225(b)(2)(A). They nonetheless assert that Congress may not detain them without individualized findings on their dangerousness and flight risk.[5] Put differently, Petitioners' procedural due process claims largely collapse into substantive due process because they assert a right to procedure that Congress has not provided in the statute, per its plenary power over immigration. To prevail on a substantive due process claim, Petitioners must show that they have a protected interest in freedom from custody, even conceding that they are not

[5] Petitioners have never articulated how their situations relevantly differ from those of other aliens detainable under § 1225(b)(2)(A), and they have never articulated a specific application of § 1225(b)(2)(A) that would be constitutionally sound. So, if Petitioners may only be detained after the Government proves their individual dangerousness or flight risk, then all aliens detained under the statute would be entitled to individualized hearings on those considerations, even though the statutory text attaches no weight to either factor. It is thus clear that Petitioners' substantive due process claim is tantamount to a facial challenge to § 1225(b)(2)(A), not an as-applied challenge based on their own treatment. *See Freedom Path, Inc. v. I.R.S.*, 913 F.3d 503, 508 (5th Cir. 2019) ("[A] facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (quotation omitted)).

entitled to admission to the United States, and that Congress may not categorically detain them on the basis of their unadmitted status.

**1.**

Petitioners anchor their entitlement to due process in the Fifth Amendment's right to "liberty." U.S. CONST. amend. V. They reason that because their right to "freedom from physical restraint" is a core liberty interest enumerated in the amendment, Congress may not abridge their due process rights before depriving them of that interest. Relatedly, they urge that this court's task is to vindicate their substantive right to liberty, not to recognize a novel substantive due process right.

But Petitioners frame their asserted liberty interest at too high a level of abstraction. "Life in the United States, though highly prized, cannot be defined as a universal liberty." *Castellano v. Strong*, 840 F. Supp. 3d 456, 470 (N.D. Tex. 2026). It is at best doubtful that Petitioners may assert an unfettered liberty interest in "freedom from physical restraint" as unadmitted aliens, because such an interest runs headlong into Congress's plenary power—also rooted in the Constitution—to "set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139; *see* U.S. CONST. art. I, § 8. That power allows Congress to "make[] rules" in the immigration context "that would be unacceptable if applied to citizens." *Diaz*, 426 U.S. at 79–80. Petitioners' proffered cases referencing the enumerated right to physical liberty are not to the contrary—indeed, they are manifestly inapt because, with one exception we discuss *infra*, they pertain to the rights of *American citizens*, not unadmitted aliens.[6] *See Buele Morocho v. Warden Phila. FDC*, 189 F.4th 287,

[6] *See, e.g.*, *Kerry v. Din*, 576 U.S. 86, 89–90 (2015) (involving U.S. citizen asserting that the denial of her foreign husband's visa application violated her due process rights);

332–33 (3d. Cir. 2026) (MASCOTT, J., dissenting) (rejecting a similar argument).

Add to the equation that the Supreme Court has long held that aliens do not gain a blanket "liberty" interest by entering the United States or by continuing to reside here after entry. *See Nishimura*, 142 U.S. at 659–60; *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893); *see also Lopez-Campos v. Raycraft*, 175 F.4th 713, 759 (6th Cir. 2026) (MURPHY, J., dissenting). To the contrary: "[A] universal liberty" to remain in the United States—even after illegal entry—"cannot belong to every human being on this planet, and it cannot be acquired by adverse possession." *Castellano*, 840 F. Supp. 3d at 470; *see also W.M.M. v. Trump*, 154 F.4th 207, 295 n.29 (5th Cir. 2025) (OLDHAM, J., dissenting) (questioning the "adverse-possession theory of due process"), *rev'd en banc*, 187 F.4th 232 (5th Cir. 2026); *cf.* Walter Berns, *Judicial Review and the Rights and Laws of Nature*, 1982 SUP. CT. REV. 49, 51 n.9 (framing the idea that aliens benefit from the "principle of equal citizenship" despite "lack[ing] citizenship in the narrow sense" as similar in kind to an argument that a "definition of cat that excludes dog is a narrow definition of cat"). Against this backdrop, Petitioners' contention that they possess a core, enumerated interest in "freedom from physical restraint," accruing because of the length of their residence here and their significant ties to the country and their communities, becomes untenable.

It is also surpassing strange. Petitioners identify no other liberty interest akin to the one they invite the court to espouse, in which the person holding the right can vindicate it by simply walking out of detention. In other words, to the extent Petitioners seek to vindicate a liberty interest to be free

---

*Hamdi v. Rumsfeld*, 542 U.S. 507, 510–11 (involving American citizen-detainee). *Zadvydas v. Davis*, 533 U.S. 678 (2001), which involves a non-citizen's due process rights, misses the mark for other reasons that we describe in Section III.B.3, *infra*.

from physical restraint in the most abstract sense, they can do so at any moment by agreeing to leave the country. In no other context implicating a core liberty interest does the detainee hold the keys to his confinement. Crediting their framing of the asserted liberty right at issue, Petitioners go a long way toward arguing themselves out of court.[7]

Beyond these problems, Petitioners' attempt to vindicate a broad interest in "freedom from physical restraint" runs into an even more fundamental problem—sovereignty. Congress's plenary authority to set policy regarding alien admission and removal is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (citing *Fiallo*, 430 U.S. at 792). It follows that the political departments "necessarily . . . have some control" over the removal authority's contours "and the procedures by which removal is carried out." *Buele Morocho*, 189 F.4th at 333 (MASCOTT, J., dissenting). Congress exercised this authority in passing § 1225(b)(2)(A). Petitioners' attempt to define their implicated liberty interest so broadly as to impinge upon the political branches' fundamental sovereign prerogatives, and thereby override Congress's

---

[7] JUDGE SOUTHWICK dismisses this point because, were Petitioners to agree to leave, they would be forced to concede removability and abandon their pending relief applications. They would also potentially be barred from returning to the United States for ten years. *See post*, at 118. Respectfully, this demonstrates that Petitioners seek to vindicate an unenumerated interest. To the extent Petitioners truly assert an enumerated liberty interest in freedom from physical restraint *qua restraint*, their ability to walk out of detention undermines it. To the extent they assert an interest in something else—such as the ability to remain free in the United States and maintain their pending removal proceedings, the claims for relief they assert, and the granular rights Congress has afforded them under the immigration laws, despite being in the country illegally—they are seeking to vindicate an unenumerated right. Ultimately, neither the Petitioners, nor the primary dissent, can have it both ways.

constitutional power to regulate admission and removal of aliens as it deems warranted, must give way.

**2.**

Correctly viewed, Petitioners seek to vindicate an unenumerated liberty interest. Petitioners concede that they have no right to admission, such that a precise description of the right they assert is the right to freedom from custody pending removal proceedings. *Cf. Dep't of State v. Muñoz*, 602 U.S. 899, 909–11 (2024) (recasting a petitioner's asserted "right to liberty" or "right to marriage" as a narrower right to the admission of a noncitizen spouse). The Supreme Court has instructed that analyzing these claims requires a "careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quotation omitted). "Identifying unenumerated rights carries a serious risk of judicial overreach," meriting "utmost care whenever [courts] are asked to break new ground in this field." *Muñoz*, 602 U.S. at 910. "Our Nation's history, legal traditions, and practices . . . provide the crucial guideposts for responsible decisionmaking that direct and restrain our exposition of the Due Process Clause." *Glucksberg*, 521 U.S. at 721 (quotation omitted).

Any assertion of a fundamental right to freedom from custody pending removal proceedings fails. "[P]rior to 1907 there was no provision permitting bail for *any* aliens during the pendency of their deportation proceedings." *Demore*, 538 U.S. at 523 n.7 (citing Immigration Act of 1907, Pub. L. 59-96, 34 Stat. 898, 905 (Feb. 20, 1907)). Similarly, the 1952 amendments establishing the modern alien inspection process required detention pending inquiries into an alien's admissibility, with no provision for bond hearings or release on bail. *See* Immigration & Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, 198–99 (June 27, 1952). And even where release on bail was permitted for some excludable aliens prior to IIRIRA, the availability of

release was entrusted to the discretion of the Attorney General. *See id.* at 202; 8 U.S.C. § 1252(a)(1) (1994). Thus, any right to seek release pending removal proceedings is not "objectively, deeply rooted in this Nation's history and tradition" and cannot be a substantive due process right. *Glucksberg*, 521 U.S. at 720–21 (quotation omitted); *accord Muñoz*, 602 U.S. at 910–12 (holding that a citizen had no substantive due process right to the admission of a noncitizen spouse as such protections had never been consistently offered by federal immigration law).

Petitioners proffer little persuasive evidence to the contrary. At most, they assert that pre-adjudication release by federal courts or immigration authorities has historically existed in practice, even if the right to seek release was not formally encoded in federal law. *See* Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. 1533, 1586–90 (2026). But even granting that release was afforded to some immigrants at agency discretion, federal immigration law explicitly addressing aliens who have never lawfully entered the country has consistently required detention pending removal. *See* 66 Stat. at 198–99 (Immigration & Nationality Act of 1952); 110 Stat. 3009-582 (IIRIRA).[8] And even if federal legal tradition and practice could be viewed to imply a consistent right of those aliens to request release on bond, Congress would retain "plenary authority to decide which aliens to admit and . . . to set the procedures to be followed in determining whether an alien should be admitted[.]" *Thuraissigiam*, 591 U.S. at 139. In other words,

[8] Petitioners also cite Blackstone's *Commentaries* for the proposition that, at the Founding, bail was allowed in every civil and most criminal cases. *See* 4 William Blackstone, *Commentaries* *294 (1769). But Blackstone is less clear on this topic than Petitioners allow. The *Commentaries* also acknowledge—though Petitioners fail to mention—Parliament's ability expressly to prohibit bail in cases where it was otherwise guaranteed. *Id.* Therefore, to the extent that Blackstone might inform the reach of Congress's power to require detention of unadmitted aliens pending removal proceedings, the historical record derived from that venerable treatise is, at best, mixed.

even if Congress intermittently granted unadmitted aliens a right to seek release, "such solicitude is 'a matter of legislative grace rather than fundamental right,'" *Muñoz*, 602 U.S. at 916 (quoting *Kerry v. Din*, 576 U.S. 86, 97 (2015)), and Congress could reform the admission process—as IIRIRA did—without affecting an unadmitted alien's fundamental rights.[9]

If Petitioners have no substantive due process right to freedom from custody pending removal proceedings, their detention is subject only to rational-basis review. *Glucksberg*, 521 U.S. at 728. Under this standard, detention pursuant to § 1225(b)(2)(A) is permissible so long as it is "rationally related to legitimate government interests." *Id.*

Petitioners' detention easily clears this bar. Congress enjoys "broad power over naturalization and immigration" and "regularly makes rules that would be unacceptable if applied to citizens." *Diaz*, 426 U.S. at 79–80. More pointedly, "[d]etention during removal proceedings is a constitutionally permissible part of that process," and "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore*, 538 U.S. at 526, 531. As the Supreme Court long ago

---

[9] Contrary to the assertions made by Petitioners and JUDGE SOUTHWICK, Congress need not substantiate its reasons for enacting a law mandating detention of certain aliens to activate its power over immigration. Congress's legislative power does not wax or wane according to the "evidentiary" record that it compiles on a subject. *See Mansell v. Mansell*, 490 U.S. 581, 592 (1989) ("Congress is not required to build a record in the legislative history to defend its policy choices."). And, even crediting JUDGE SOUTHWICK'S position that more is required, the congressional record behind IIRIRA includes ample findings that justify Congress's delineation of detention contained in § 1225(b)(2)(A). *See Torres*, 976 F.3d at 928 (citing Congressional House Report). Detention pending removal proceedings "necessarily serves the purpose of preventing deportable . . . aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 528. That justification, which the Supreme Court legitimated in *Demore*, is not premised on the deportable alien's criminal history and thus equally bolsters § 1225(b)(2)(A).

noted, "deportation proceedings 'would be [in] vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id.* at 523 (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Petitioners' detention pending removal proceedings did not violate any substantive due process right, and habeas relief is inappropriate under such a theory.

**3.**

Assuming *arguendo* that Petitioners may seek to vindicate an unqualified interest in physical liberty, even after conceding that they are not entitled to admission into the country, Petitioners would need to demonstrate that the substantive determinations leading to detention under § 1225(b)(2)(A) are inadequate to justify detention "*at all*, no matter what process is provided." *Flores*, 507 U.S. at 302. Such a claim also must fail.

The district courts leaned on *Zadvydas v. Davis*, 533 U.S. 678 (2001), for the proposition that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). But *Zadvydas* communicates no substantive due process right to avoid custody while one's removal proceedings are pending. The Supreme Court suggested (without holding) that the Constitution may limit the permissible length of an alien's detention *after* he is ordered removed. *Id.* at 690–99. And while *Zadvydas* indicates that post-removal order detention may not continue indefinitely, the opinion expresses no such reservations regarding detention *pending* removal, which has been squarely held to be "a constitutionally permissible part of [the removal] process." *Demore*, 538 U.S. at 531; *see also Zadvydas*, 533 U.S. at 701 ("[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable

future."). Indeed, *Zadvydas* centered on a different provision of the INA, 8 U.S.C. § 1231(a), and the Court concluded that the statute could not authorize unlimited detention. 533 U.S. at 698–99. By contrast, the Court has not read § 1225(b)(2)(A) to impose temporal limits on detention while removal proceedings are ongoing. *See Jennings*, 583 U.S. at 297–303 (distinguishing § 1225(b)(2)(A) from the statute at issue in *Zadvydas*).

Beyond that, the Court in *Zadvydas* gave weight to the fact that the petitioners there "were *admitted* to the United States but subsequently ordered removed." 533 U.S. at 682 (emphasis added). In observing that "indefinite detention" of such aliens would raise constitutional concerns, it distinguished "aliens who ha[d] not gained initial admission to this country," noting that such circumstances "would present a very different question." *Id.* As such, "the constitutional concerns addressed in *Zadvydas* differ markedly from those presented here, given that § 1225(b)(2)(A) applies to 'applicants for admission' who . . . have *not* been admitted to the United States." *Herrera Estrada v. Thompson*, 2026 WL 2000097, at *3 (S.D. Tex. Apr. 27, 2026).

Even assuming that *Zadvydas* implies some limits on pre-removal detention of unadmitted aliens, today's cases do not present the sort of constitutional violation envisioned in that case. In *Zadvydas*, the petitioners' removal was "no longer practically attainable," such that continued detention did not serve its purported immigration purpose. 533 U.S. at 690. Here, Petitioners' removal remains "attainable," and their detention under § 1225(b)(2)(A) is neither "indefinite" nor "permanent." *Id.* at 690–91. Indeed, their detention will last only for the duration of "a [removal] proceeding under [8 U.S.C. §] 1229a." 8 U.S.C. § 1225(b)(2)(A); *see also Jennings*, 583 U.S. at 297 ("Once [removal] proceedings end, detention under § 1225(b) must end as well."). There is no allegation, much less any showing, that Petitioners' removal is "no longer reasonably foreseeable," as

*Zadvydas* suggests would create constitutional problems. 533 U.S. at 699; *see also Banyee v. Garland*, 115 F.4th 928, 933–34 (8th Cir. 2024) (holding that a lawful resident alien could be detained pending removal for over a year as long as "deportation remain[ed] a possibility"). Detention still "necessarily serves the purpose of preventing" Petitioners "from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, [they] will be successfully removed." *Demore*, 538 U.S. at 528.

More pointedly, the *Zadvydas* Court expressed that six months' detention following a removal order should be treated as presumptively constitutional. *See* 533 U.S. at 701. While we reject *Zadvydas*'s six-month timeframe as a hard limit on *pre-removal* detention for the reasons just discussed, *cf. Banyee*, 115 F.4th at 933–34, Petitioners had not been detained anywhere near that long, either: Petitioner Gomez was detained for three months; Sosnava, for roughly two months; and Villegas, just three weeks. Thus, the duration of Petitioners' pre-removal detention presented no constitutional defects justifying habeas relief.

To be clear, we do not dismiss the idea that distinct due process questions might arise if Petitioners' detention no longer served its immigration purpose or if Petitioners' removal proceedings were used as a façade "to incarcerate [them] for other reasons." *Demore*, 538 U.S. at 533 (KENNEDY, J., concurring); *see also Banyee*, 115 F.4th at 934 (suggesting that excessive delay in removal proceedings could violate detainees' due process rights). We do not address those questions here, however. Petitioners have not challenged the duration of their detention as unconstitutional; nor have they asserted that their removal is "no longer practically attainable." *Zadvydas*, 533 U.S. at 690. On the record before us, Petitioners' detention in itself does not present a constitutional violation warranting habeas relief.

## IV.

The Government asks us to determine at what point, if ever, an alien's detention without a bond hearing under § 1225(b)(2)(A) violates the Due Process Clause. The issue has been fully briefed by both parties, and was squarely addressed by the panel, so we address it. *See Sosnava Rodriguez*, 180 F.4th at 727–28.

*Demore* provides the answer. So long as an alien's detention pending removal "ha[s] a definite termination point"—removal or release—his or her continued confinement without bond hearing does not offend due process. *Banyee*, 115 F.4th at 932 (citing *Demore*, 538 U.S. at 529). To be sure, the Government may not delay removal merely as a means of punishment. *See Wong Wing*, 163 U.S. at 235, 237 (holding that Congress could not subject "person[s] of Chinese descent" to up to a year of "imprison[ment] at hard labor" before their "remov[al] from the United States" (quoting Act of May 5, 1892, § 4, 27 Stat. 25, 25)); *but see id.* at 235 (distinguishing "detention . . . necessary to . . . [the] expulsion of aliens," which is "clear[ly] . . . valid"). And an issue may arise if the Government continues to detain an alien after it becomes clear that removal is only a remote possibility. *See Demore*, 538 U.S. at 527. But so long as removal remains a viable prospect, continued detention, or renewed detention in the case of an alien previously released, does not violate due process.

## V.

Petitioners, having never been lawfully admitted to the country, are not entitled to additional process concerning their admission beyond what Congress provided in § 1225(b)(2)(A). Even assuming they were, procedural due process would not entitle them to a bond hearing to assess dangerousness or flight risk, factors that are immaterial to Petitioners' detention under

§ 1225(b)(2)(A). Further, the duration of Petitioners' detention presents no constitutional defect requiring habeas relief to correct it.

None of that is to say that habeas relief would not be appropriate in circumstances different from these cases, *e.g.*, based on factual questions relevant to whether "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted," 8 U.S.C. § 1225(b)(2)(A), or other legal grounds not before us. But Petitioners, who are indisputably "applicants for admission" within the meaning of § 1225, have not established that their mandatory detention under § 1225(b)(2)(A) violated their rights to due process. The district courts erred in granting habeas relief on that basis, and those grants of habeas should be vacated.

Controlling illegal immigration is, no doubt, an important and controversial issue of public policy. But the Constitution entrusts broad authority to delineate immigration policy, and to design proceedings to effectuate those policy choices, to Congress—not courts. *See* U.S. CONST. art. I, § 8; *Fiallo*, 430 U.S. at 792 ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (quotation omitted)). Neither we nor the district courts are free to ignore that bedrock principle and rewrite the immigration policy Congress has enacted.

The judgments of the district courts are REVERSED and the orders granting habeas relief to Petitioners are VACATED.

The mandate shall issue FORTHWITH.

James C. Ho, *Circuit Judge*, concurring:

A nation ceases to be a nation if it can't protect its borders. Congress has chosen to police our borders by detaining illegal aliens found in our country pending their removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(A).

According to our dissenting colleagues, however, illegal aliens have not only a *de facto* constitutional right to remain in our country unlawfully, but an *incentive* to make this their home. That's because, to quote the principal dissent, once an alien has "acquired a domicil or residence" in America, it no longer matters that they are breaking the law to be here—their detention becomes an offense to "'liberty' . . . at its core," and an affront to freedom "at its most basic," namely, "freedom from physical restraint." *Post*, at 101, 102, 115 (Southwick, J., dissenting). So they must have "the power of locomotion" and the right to roam freely "to whatsoever place one's own inclination may direct." *Id.* at 102, 103 (quoting 1 William Blackstone, Commentaries on the Laws of England 130 (1769)).

Alas, such passion for liberty has been lacking when *U.S. citizens* have been detained for expressing opinions disfavored by government officials. *See*, *e.g.*, *Villarreal v. City of Laredo*, 134 F.4th 273 (5th Cir. 2025), *reaff'g* 94 F.4th 374 (5th Cir. 2024); *Gonzalez v. Trevino*, 60 F.4th 906 (5th Cir. 2023); *see also Mayfield v. Butler Snow, L.L.P.*, 78 F.4th 796 (5th Cir. 2023).

My point is not to relitigate those cases, but to contrast the dissent's votes in those cases with its views today. It's to point out that liberty wasn't favored for citizens who seek to vindicate their constitutional rights—but it's cherished for illegal aliens who seek to violate our national sovereignty.

I nevertheless welcome the dissent's embrace of liberty today, because it powerfully illustrates what's at stake in this case—our national sovereignty, and our fundamental right to enforce our country's borders.

**I.**

Since our Nation's Founding, the American people have known—and the Supreme Court has repeatedly affirmed—that "the right to exclude or to expel aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, is an inherent and inalienable right of every sovereign and independent nation." *Wong Wing v. United States*, 163 U.S. 228, 231 (1896).

And this power to exclude aliens resides in the political branches—not the judiciary. "The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." *Id.* at 233. "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953).

Moreover, the power to exclude governs not just aliens at the border, but also aliens who have unlawfully made their way into the interior of our country. "No limits can be put by the courts upon the power of congress to protect, by summary methods, the country from the advent of aliens . . . *or to expel such if they have already found their way into our land, and unlawfully remain therein*." *Wong Wing*, 163 U.S. at 237 (emphasis added). "It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within

powers expressly conferred by Congress, are due process of law." *Yamataya v. Fisher*, 189 U.S. 86, 98 (1903).

And most relevant here, the power to remove aliens from our country necessarily includes the power to detain them pending their removal, as § 1225(b)(2)(A) dictates. "Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation." *Wong Wing*, 163 U.S. at 235. "Detention is necessarily a part of this deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings." *Carlson v. Landon*, 342 U.S. 524, 538 (1952).

What's more, the detention of aliens under § 1225(b)(2)(A) is further bolstered today by the war power. *See* Proclamation No. 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) ("I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border."); Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025); *see also*, *e.g.*, *W.M.M. v. Trump*, 184 F.4th 780, 793 (5th Cir. 2026) (Ho, J., concurring) ("Detention is a fundamental incident of waging war.") (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (plurality opinion of O'Connor, J.)) (cleaned up); *United States v. Texas*, 173 F.4th 659, 673 (5th Cir. 2026) (Ho, J., concurring) (same).

## II.

The dissenters' conception of liberty runs headlong into the plenary power to exclude aliens. After all, in their view, illegal aliens have the right to roam freely "to whatsoever place" their "own inclination may direct; without imprisonment or restraint." *Post*, at 103 (Southwick, J., dissenting).

So we should be open and honest with the American people about what Petitioners seek here. If we're going to adopt Petitioners' vision, then we should stop saying that Congress has the constitutional power to enforce our Nation's borders and restrict the entry of foreigners into our country.

This case amounts to a clear and stark choice. Either our Nation has the sovereign power to enforce its borders—or it doesn't. Foreigners can either claim a constitutional right to travel across our country, unrestricted, and regardless of whatever laws Congress may wish to pass—or they can't. It can be one, or it can be the other. It cannot be both.

Counsel has admitted as much. During oral argument, counsel was invited to affirm the Government's longstanding authority to close its borders to all foreigners—and to reconcile its legal theory with Congress's plenary powers. But counsel declined to do so. *See* Oral Arg. at 28:20–30:10.

Counsel's response is understandable, because the conflict is irreconcilable. Petitioners aren't claiming a right to liberty. They're claiming a right to unlawful entry. Because the Government isn't trying to incarcerate Petitioners. It's trying to remove them from our country.

As the majority reminds us, Petitioners are free to return to their native countries at any time. And the dissent acknowledges this—that what's challenged here is not a mandatory incarceration regime, but a voluntary departure or detention regime. The dissent nevertheless objects that the decision to voluntarily depart "comes with significant penalties." *Post*, at 118 (Southwick, J., dissenting). But again, we're talking about aliens who are here unlawfully. How Congress chooses to penalize unlawful entry is precisely the kind of political question on which the Constitution defers to the people—not a legal question to be dictated by life tenured federal judges.

So what Petitioners seek is not liberty, but license to violate our national sovereignty. This case is not about freedom—it's about an assault

on the authority of the American people to decide whether and to what extent our borders shall be open or closed to foreigners.

**III.**

Petitioners attempt to cabin the scope of their theory of liberty by claiming that Congress can still exclude aliens *at the border*. They simply theorize that, once an alien has penetrated our borders, however unlawfully, the will of Congress must give way to the will of the judiciary—and the alien can assert a constitutional right not to be detained, so long as a sympathetic federal judge is willing to release them. *See* Oral Arg. at 29:50–30:50.

So Petitioners would ask us to run roughshod over century-old, unanimous Supreme Court case law prohibiting courts from interfering with "the power of congress," not only to exclude aliens at the border, but also "to expel such if they have already found their way into our land, and unlawfully remain therein." *Wong Wing*, 163 U.S. at 237. *See also*, *e.g.*, *United States ex rel. Turner v. Williams*, 194 U.S. 279, 291 (1904) (same).

But our country's sovereignty is not a national game of red rover. Our Constitution does not reward aliens for breaking through our border. As Judge Hendrix has aptly noted, "[l]ife in the United States . . . cannot belong to every human being on this planet, and it cannot be acquired by adverse possession." *Castellano v. Strong*, 840 F. Supp. 3d 456, 470 (N.D. Tex. Aug. 3, 2026).

The point is well taken. And it's reminiscent of a similar observation once made by Justice Scalia—that the President cannot claim new rights by adverse possession, that is, by violating the law repeatedly over time. *See NLRB v. Noel Canning*, 573 U.S. 513, 570 (2014) (Scalia, J., concurring in the judgment) (rejecting an "adverse-possession theory of executive authority," under which "Presidents have long claimed the powers in question, and the Senate has not disputed those claims with sufficient vigor").

Americans like to boast that we live in a country where no one is above the law, not even the President. But if that is so, then there's no denying that these habeas petitions, far from affirming American liberty, are profoundly un-American—because they send the message that the only people who are above the law in our country are the ones who violated our laws to get in.

## IV.

Both Petitioners and the dissenters rely heavily on *Zadvydas v. Davis*, 533 U.S. 678 (2001). But *Zadvydas* involved the distinct situation where an alien sought release from detention because there was no country to which he could be removed. *See*, *e.g.*, *id*. at 695 ("[T]he issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States.").

The decision is also wrong. Justice Scalia dissented in *Zadvydas*, joined by Justice Thomas. He rejected the majority's notion that "[a] criminal alien under final order of removal who allegedly will not be accepted by any other country in the reasonably foreseeable future [can] claim[] a constitutional right of supervised release into the United States." *Id.* at 702. As Justice Scalia rightly noted, "[t]his claim can be repackaged as freedom from 'physical restraint' or freedom from 'indefinite detention,' but it is at bottom a claimed right of release into this country by an individual who *concededly* has no legal right to be here." *Id.* at 702–03 (citation omitted). "There is no such constitutional right." *Id.* at 703.

As an inferior court, we're bound to follow *Zadvydas*—but not to extend it. *See*, *e.g.*, *id.* at 682 ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present *a very different question.*") (emphasis added). Having sworn an oath to uphold the Constitution, we are duty-bound to apply the text and original understanding

of the Constitution to the maximum extent permitted by (errant) Supreme Court precedent. *See*, *e.g.*, *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from the denial of rehearing en banc).

**V.**

Throughout our history, the American people have welcomed countless foreigners who have come to our shores in search of a better life, and in pursuit of the American dream.

I'm one of them. For my first nine years on this planet, I was an alien under U.S. law. So I have a profoundly personal reason to hold a deep and abiding appreciation for the generosity of the American people.

And that's precisely the point: Immigration is an act of grace, not a guarantee. "[T]he generosity of the American people is a matter of political discretion—not duty." *Guerra Quezada v. United States*, 187 F.4th 727, 736 (5th Cir. 2026) (Ho, J., concurring). "[I]t was my exquisitely good *fortune*—not some right I could force upon the American people over their wishes—that I was admitted into this country as an alien." *Id.* (cleaned up).

Every family tries to pass down its most poignant and meaningful stories to the next generation. Growing up, I was often told that, when my mother brought me to this country as an infant to seek admission into the United States, I was crying incessantly—so much so that she feared that we'd be detained by immigration officials for further inspection (whether she had any actual basis for such fear is another matter). But when our number was finally called, I'm told that I smiled at the inspection officer—and we were let through without incident.

Not once in the countless retellings of that story was it ever said that my mother could have forced our way into this country simply by retaining counsel to file suit before a sympathetic federal judge.

And that brings me to my final concern with the dissenters' theory of liberty. If we're going to repay the generosity of the American people with rampant lawlessness, then the people may consider how they should respond. If federal judges are going to constitutionalize the criminal acts of illegal aliens who show no respect for the laws of the United States, citizens may wonder why they should respect the judgments of federal judges. *See*, *e.g.*, *In re Westcott*, 135 F.4th 243, 250–51 (5th Cir. 2025) (Ho, J., concurring).

* * *

What the Supreme Court has said about abortion applies equally to immigration. "It is time to heed the Constitution and return the issue of [immigration] to the people's elected representatives. The permissibility of [immigration], and the limitations, upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting. That is what the Constitution and the rule of law demand." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022) (cleaned up).

Congress has the power to close the borders to foreigners altogether. It also has the power to close the borders to certain aliens, and to direct their detention pending their removal proceedings. Nothing in the Constitution prevents Congress from doing so.

The majority opinion explains all of this in the author's typically scholarly fashion. Of course I concur.

ANDREW S. OLDHAM, *Circuit Judge*, concurring:

I join the majority opinion in full. The Government placed three aliens in immigration detention pursuant to 8 U.S.C. § 1225(b)(2)(A). Section 1225(b)(2)(A) "says [no]thing whatsoever about bond hearings." *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 502 (5th Cir. 2026) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018)). So our precedent says the aliens have no statutory right to bond. The question presented here is whether § 1225(b)(2)(A) is unconstitutional. The majority correctly explains it is not.

I write separately to clear up some confusion about the privilege of habeas corpus, the right to due process, and the aliens who clandestinely enter our country. With greatest respect to my esteemed colleagues in dissent, their constitutional objections are deeply ahistorical. One dissent says bail existed for certain criminal cases since 1789, and that this should somehow inform non-criminal removal cases in 2026. *See post*, at 110–11 n.5 (SOUTHWICK, J., dissenting). *But see Demore v. Kim*, 538 U.S. 510, 523 n.7 (2003) ("[P]rior to 1907, there was no provision permitting bail for *any* aliens during the pendency of their deportation proceedings."). The dissent also compares modern-day immigration detention to the Tower of London, where English monarchs would "secretly hurry[ a man] to gaol, where his sufferings are unknown and forgotten," and where clandestine detention was worse than "open despotism." *Post*, at 110–11 n.5 (SOUTHWICK, J., dissenting) (quotation omitted). Another dissenting opinion says detention of aliens "unlawfully present" in our country is a modern phenomenon—and hence constitutionally illegitimate—because (1) it generally did not exist before 1907, and (2) even then, "the general rule was that bail would be available." *Post*, at 136 (DOUGLAS, J., dissenting). This dissent concludes with the melodramatic assertion that Americans now must travel the interior of the country with their passports in hand. *Id.* at 139. From these premises the dissents conclude the writ of habeas corpus *ad subjiciendum* must issue to

release these aliens from immigration custody—and to enjoin the Government from re-arresting the aliens without bond hearings.

I share the dissenters' reverence for the Great Writ. It changed the course of Western civilization. England's greatest lawyers and jurists—including legal giants like Selden and Coke—developed the writ to check the Crown's abuses. It hastened the end of odious institutions like the Star Chamber and the Court of High Commission. It was foundational to early conceptions of judicial independence in Stuart England. And it was a cornerstone of the greatest documents in our Anglo-American legal tradition—from Magna Carta to the Petition of Right to the Habeas Corpus Act of 1679 (which Blackstone called "the second *magna carta*") to the English Bill of Rights to our Constitution.

But what, you might reasonably ask, does this noble legal history have to do with this case? This case involves three aliens. Petitioner Alejandro Villegas Angel, for example, is a Mexican national who entered the United States illegally and was detained on February 10, 2026, for driving without a license. ROA.26-50219.11. The Government held him in immigration detention for precisely three weeks before he was released on March 3, 2026, by order of a federal district judge sitting in habeas. ROA.26-50219.91. But for every single day of his three-week detention, Villegas Angel held the keys to his detention room: He was free to walk out the door and return to Mexico at our Government's expense. That does not resemble being locked in the Tower of London, forgotten in some Stuart dungeon, or dragged from Fleet Prison to the pillory like John Lilburne.

The petitioners and the dissenters nevertheless want to talk about England—so I welcome that invitation. English history, the history of our Founding, and the history of habeas corpus in the United States prove that the writ itself has changed little if at all since it emerged in England. The writ

is protected by the general law that predates our Founding. And it guarantees the aliens before us the same thing today that it guaranteed four centuries ago: the privilege to have a neutral decisionmaker review the justification for their detentions and to ensure they comport with due process. True, federal courts have changed the definition of "due process" in some detentions. *See, e.g.*, *infra* n.22 (describing substantive due process that attaches to postconviction review). But those changes say nothing about aliens and non-criminal, pre-removal detention. From the earliest fog of English history to present-day America, the process due to unadmitted aliens facing deportation is precisely what the Legislature deigned to afford them in statutes. The Constitution's Due Process Clause requires no more than that.

While I disagree with virtually everything the dissents say, they are right about this: The aliens before us must lose unless the court is willing to find new substantive rights lurking in the penumbras and emanations of the Fifth Amendment's Due Process Clause. The dissenters forthrightly acknowledge this—repeatedly invoking the concept of "substantive due process," *post*, at 134–135 & n.3 (DOUGLAS, J., dissenting), and vague conceptions of "liberty" that are untethered from constitutional text or meaning, *post*, at 101–06 (SOUTHWICK, J., dissenting). So this is a case about John Hart Ely's green pastel redness[1]—and the Great Writ has nothing to do with it.

## I

One of my esteemed colleagues says today's decision rests on "sham history." *Post*, at 137 (DOUGLAS, J., dissenting). So let's get the history

[1] JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 18 (1980) ("'[S]ubstantive due process' is a contradiction in terms—sort of like 'green pastel redness.'").

straight. I describe (A) the Great Writ, (B) the blood spilled to make it great, and (C) its application to aliens.

A

Habeas corpus provides zero substantive liberty guarantees. Rather, it's a procedural mechanism. A very important mechanism, but a purely procedural one nonetheless. Alien detainees' substantive rights come from elsewhere—namely, the Legislature. Parliament or Congress says: "Unadmitted aliens may be detained for X reasons but not for Y reasons." Habeas corpus then gives a judge the power to summon the alien's jailer; ask for an explanation of the alien's detention; and ensure it's for X and not for Y. Thus, habeas corpus allows judges to ask questions, but the writ never purports to answer them. The answers come solely from positive law—and when it comes to unadmitted aliens, that means the last word comes from the Legislature alone.

To use the overwrought baseball analogy, the Great Writ does not define the strike zone. The League or the Legislature uses positive law to define a strike. The League's rulebook says a strike is X and not Y, just as Congress's statutory definition says detention is lawful for X and not Y. No judge, umpire,[2] or writ can change these definitions. *Only* the League or the Legislature can change them over time. *See Strike Zone*, MLB, https://perma.cc/JD6S-8858 (listing various definitional changes enacted by the League over the decades). The writ simply provides a mechanism—be it

[2] Angel Hernandez being one obvious exception. *See, e.g.*, Miles Schachner, *The Top-10 Worst Angel Hernandez Calls in MLB History*, N.Y. Post (May 28, 2024), https://perma.cc/MR8R-A5V2. The same is true with judges: some are obviously not good at judging. But the point remains true that the definition of a strike is exogenous to the umpire or judge. It is defined in a book by a lawmaking body, even if some umpires or judges are reluctant or poorly equipped to read or apply that book.

a judge, umpire, or video review—for looking at a given pitch and calling it X or Y in a given game at a given time.

None of this downplays the importance of neutral decisionmakers looking at pitches and making neutral calls. To the contrary, the entirety of sport and law depends on that. And for the latter, much blood was spilled to guarantee the writ and hence the neutral decisionmaker. *See* Part I.B, *infra*. But it is painfully undertheorized to say "bail was available for X in 1907, so therefore these aliens must be released in 2026, and federal district judges have roving commissions in habeas to enjoin the Government from re-arresting and removing aliens." *Cf. post*, at 110–11 n.5 (SOUTHWICK, J., dissenting); *post*, at 133–37 (DOUGLAS, J., dissenting); Part II.B, *infra* (collecting district court decisions to the same effect). The Legislature is free to give unadmitted aliens X rights in 1907 and then Y rights in 2026. Where habeas review is available, it allows a judge to measure X and to measure Y. But the Great Writ does not itself create some sort of inviolate substantive floor below which the Legislature cannot dip. Nor does it give federal district judges power to countermand the Legislature's definitions.

B

To understand what the Great Writ is—and, perhaps as importantly for today's dissenters, what it is not—you must understand at least three things: (1) how the writ arose in common law, (2) how the writ worked in England, and (3) how America inherited it at the Founding. This history is far too rich, bloody, and august to treat comprehensively here. But the most general and rudimentary explanation of it is enough to prove the dissenters' errors.

1

At common law, the Crown was the font of all law. All sovereign power was "vested by [law] in a single person, the king or queen." 1 WILLIAM BLACKSTONE, COMMENTARIES *183; *see also Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 446 (1793) (IREDELL, J., dissenting) (The Crown was "the sovereign of the Kingdom."). This meant that the Crown was "immediately invested with all the ensigns, rights, and prerogatives of sovereign power." 1 BLACKSTONE, *supra*, at *183.

In his sovereign prerogative, the King gave his subjects certain rights. For example, in 1215, King John famously met with the Archbishop of Canterbury Stephen Langton and a collection of disgruntled nobles in the fields of Runnymede. There the King signed the charter we today call Magna Carta. It purported to placate the nobles, to redress their long list of grievances, and to give them certain rights. Magna Carta's original chapter 39 of 63 provided: "No free man shall be arrested or imprisoned . . . except by the lawful judgment of his peers or by the law of the land." That text was later renumbered as chapter 29 in the reissued Magna Carta of 1225, which became "the first English statute" and "as close to scripture as English law comes." PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 15 (2010).

Because the King was the alpha and omega of sovereignty, the nobles could not force the King to do anything or to override him if he disagreed. So Magna Carta could have sovereign effect only if the King chose to approve it. This is how Magna Carta begins:

> Henry,[3] by the Grace Of God, King of England, Lord of Ireland, Duke of Normandy and Aquitaine, and Earl of Anjou, to the archbishops, bishops, abbots, priors, earls, barons, sheriffs, governors, officers, and all bailiffs, and his faithful subjects, who see this present Charter,—Greeting. Know ye, that in the presence of God, and for the salvation of our own soul, and of the souls of our ancestors, and of our successors, to the exaltation of the Holy Church, and the amendment of our kingdom, that we [the royal "we"] spontaneously and of our own free will, do give and grant to the archbishops, the bishops, abbots, priors, earls, barons, and all of our kingdom,—these underwritten liberties to be held in our realm of England for ever.

Magna Carta 1225, 9 Hen. 3, pmbl. The underwritten liberties were from the King—the sovereign. He granted them, in his own (purportedly) free will as the font of all rights, liberties, and sovereign power. And hence, the King wrote them in England's first statute.

Habeas corpus was not listed in Magna Carta—and that should be unsurprising. Habeas was not a substantive right or liberty held by individuals. It was instead a procedure that the King, through the Crown's judges and in the Crown's courts, used to ensure that English subjects enjoyed the substantive liberties granted to them elsewhere—in Magna Carta and subsequent statutes. Those statutes defined the strike zone; in subsequent centuries, England's judges would invoke various writs (including habeas) to call balls and strikes.

The King's prerogative writs were amongst the "prerogatives of sovereign power" held by the Crown. 1 BLACKSTONE, *supra*, at *183. The

---

[3] King John died in October 1216. The Crown passed to his nine-year-old son Henry. And King Henry III was crowned on October 28, 1216. Henry III reissued Magna Carta in 1225.

King's prerogative writs included mandamus, quo warranto, prohibition, certiorari, and of course habeas corpus. *See* Halliday, *supra*, at 74. The King appointed judges to sit in the King's courts (hence the literal title "King's Bench") and to issue prerogative writs in the King's name to protect the King's subjects. *See* Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 Va. L. Rev. 575, 594 (2008) ("The king's rights were performed by his greatest common law court, the court of King's Bench, the only one of his courts in which he was theoretically always present."). As Sir Edward Coke explained it, the King used his judges to administer the King's laws and to judge the King's subjects in the King's name: "[T]he king doth judge by his judges (the king having distributed his power judiciall to severall courts) and the king hath wholly left matters of judicature according to his lawes to his judges." Edward Coke, The Fourth Part of the Institutes of the Laws of England 71 (1644). Just as the King possessed all powers and incidents of sovereignty, so too did his judges possess near limitless prerogatives to do justice in the King's name for the King's subjects:

> [T]his court [King's Bench] hath not only jurisdiction to correct errors in judiciall proceeding, but other errors and misdemeanours extrajudiciall tending to the breach of the peace, or oppression of the subjects, or raising of faction, controversy, debate, or any other manner of misgovernment; so that no wrong or injury, either publick or private, can be done, but that this shall be reformed or punished in one court or other by due course of law.

*Ibid.*

Coke's first example of the court's power to prevent any "wrong or injury" was the writ of habeas corpus *ad subjiciendum*. *See ibid.* This is what Blackstone called "the great and efficacious writ in all manner of illegal confinement." 3 Blackstone, *supra*, at *131. And it's the one Chief

Justice Marshall called "the great writ." *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95–96 (1807). But there were numerous other forms of habeas corpus at common law. They included habeas corpus *ad deliberandum et recipiendum*, *ad respondendum*, *ad testificandum*, *ad prosequendum*, *ad faciendum et recipiendum*, and *ad standum rectum*. *See* HALLIDAY, *supra*, at 40-49. English common law courts (and sometimes the courts of equity[4]) used these and other related writs, including the writ of *corpus cum causa*. *See id.* at 47. And many of these writs could be used to review the capture and order the release of the King's subjects. *See, e.g.*, *id.* at 47–48.

What made the writ of habeas corpus *ad subjiciendum* special—what made it great[5]—was that it allowed the judge to inspect and test the thinking and rationale of the jailer. Habeas corpus was a "writ of the prerogative by which the [K]ing demands account for his subject who is restrained of his liberty." *Habeas Corpus al Cinque-Ports pur un Borne Imprison La* (1619) 81 Eng. Rep. 975 (KB) ("*Palmer's Case*"); *see also* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1335, at 207 (1833) (Habeas secured the King's prerogative "to have an account [of] why the liberty of any of his subjects is restrained."). The King's subjects could find themselves in all sorts of different detentions, "either publick or private." Criminals are an obvious example but far from the only one. Lunatics, naval impressment objectors, religious nonconformers, political dissidents, and even family members could seek relief through habeas corpus at common law. *See* HALLIDAY, *supra*, at 101, 115, 125–27.

[4] "The writ also issued from Common Pleas and from the common law side of the Courts of the Exchequer and of the Chancery. Unlike in King's Bench, using the writ from one of these other courts required a claim of privilege: that the writ's user be an officer of, or litigant in, the issuing court." Halliday & White, *supra*, 94 VA. L. REV. at 598 n.49.

[5] Unless otherwise specified, I use the terms "habeas corpus," "the writ," and the "Great Writ" interchangeably to refer to the writ of habeas corpus *ad subjiciendum*.

How so? The King delegated to his jailers (be it a ship captain, a criminal jailer, or a husband) the power to detain his subjects according to his laws. But the King also delegated to his judges the prerogative writs, including habeas, to demand that a jailer lawfully justify a detention. *See* Sir John Baker, *The Beginnings of Judicial Review*, *in* LAW AND CONSTITUTIONAL CHANGE 63, 65–70 (D. Capper et al. eds., 2025).

In sum, the writ of habeas corpus *ad subjiciendum* allowed the King's judge to demand that the King's custodian produce the King's subject along with a cause for the detention pursuant to the King's laws.

2

How did the Great Writ work in England? Someone (often the detainee, but not always) complained to a court that a detention was unlawful. HALLIDAY, *supra*, at 45–47. That's the petition. The court would issue the writ to the custodian and demand that the custodian present the prisoner's body (habeas corpus) and a justification for the detention. *Id.* at 48. That's the writ. Then the custodian would comply, bringing the body and the justification as ordered. *Ibid.* That's the return. The court would have a hearing on the return. That's called traversing the return. *Id.* at 53–55. Then, at the end of the hearing, the body would receive one of three remedies: remand to prison, bail, or release. *Id.* at 59. Thus, the writ of habeas corpus entails five things:

i. The petition
ii. The writ
iii. The return
iv. The traverse
v. The remedy

Critically, none of these says *anything* about the detainee's substantive rights. And none says *anything* about which of the three habeas remedies the

detainee would receive. That's because habeas corpus guarantees a five-part procedure. It does not guarantee and never has guaranteed any substantive outcome. The substantive outcome instead comes from some exogenous body of law—like criminal law, the law of war, the alien acts, &c. Those substantive bodies of law tell the jailer: "The King allows (or commands) you to detain for X but not Y." And the purpose of habeas corpus is and always has been to ensure the jailer toes that line. It is not the purpose of habeas to give the detainee *any* substantive rights of *any* kind. That's why the inestimable Professor Paul Halliday says that "habeas corpus was fundamentally an instrument of judicial power . . ., a power more concerned with the wrongs of jailers than with the rights of prisoners." *Id.* at 14; *see also id.* at 186–87.

Consider a few examples. In 1554, the Queen's Bench issued two writs of habeas corpus to order the production of Thomas Wyatt and 97 other participants in Wyatt's Rebellion, all of whom were held in the Tower of London by Queen Mary's jailer. *See id.* at 29. The jailer produced the bodies and the obvious cause for their detentions. Halliday describes the traverse and the remedy:

> In the margin of the enrolled copies of their writs we can still read the clerk's simple notes that they should hang, then endure all the other horrors performed on the bodies of traitors. It is unlikely any of the prisoners thought of habeas corpus as a writ of liberty as they approached their executioners.

*Ibid.* The writ of habeas corpus provided a procedure to review the legality of the traitors' detention—but it did precisely nothing to guarantee their liberty.

So too with *Darnel's Case* (1627) 3 How. St. Tr. 1 (KB). Charles I imprisoned five knights who refused to pay his forced loans. The five knights petitioned for habeas corpus. The King's jailer, represented by the King's Attorney General Sir Robert Heath, produced the bodies and a return—

stating simply that the knights were being held on the King's special command. John Selden represented the knights. He did not contend that the writ somehow provided substantive rights to his clients. He instead contended that Magna Carta's twenty-ninth chapter—the one that prevented imprisonment except by "*legem terrae*" or "the law of the land"—supplied the knights' rights. *See* Linda S. Popofsky, *Habeas Corpus and "Liberty of the Subject": Legal Arguments for the Petition of Right in the Parliament of 1628*, 41 THE HISTORIAN 257, 262–63 (1979). Habeas simply provided the mechanism for vindicating the prisoners' rights that were guaranteed elsewhere.

The knights famously lost and were remanded to prison. But they did not lose because habeas failed to do its job. To the contrary, the petition, writ, return, traverse, and remedy all functioned precisely as the law required. Indeed, Selden is one of the greatest lawyers and jurists ever to live in the Anglosphere, and his traverse was one of the most powerful and elegant ever performed in the writ's history. Rather, the knights lost because the substantive law of England governing forced loans and the King's commands required them to lose. Some think the King's Bench erred, and to support that view, they point to the Petition of Right, 3 Car. 1, c. 1, §§ V, X (1628), which Parliament passed in part because Sir Edward Coke and others objected to the outcome in *Darnel's Case*. *See, e.g.*, J.A. Guy, *The Origins of the Petition of Right Reconsidered*, 25 HIST. J. 289, 311 (1982). But none of that conventional wisdom suggests the King's Bench misapplied the Great Writ. If the judges misinterpreted the *legem terrae*, or if they interpreted it correctly and Parliament reacted by changing its substance, the writ functioned precisely as it was supposed to function. It allowed the prisoners to challenge their detention, and it empowered the judges to say: "You lose." That's why Professor Halliday says *Darnel's Case* was correctly decided: "[B]y examining legal practice before 1627, it is hard to see the court's

judgment as mistaken." HALLIDAY, *supra*, at 139. And for what it's worth, Parliament's attempted reform of the underlying substantive law didn't have its desired effect. Halliday explains: "By examining practice after 1628, it is almost equally difficult to see how the Petition of Right fixed any apparent problem." *Ibid.*

Nor did habeas corpus (or the Petition of Right for that matter) help one of the most famous legal martyrs in English history: John Lilburne a/k/a "Freedom John." In 1637, Lilburne was arrested for shipping seditious books. When he refused to confess to the crime, the Attorney General turned him over to the Court of Star Chamber. In the Star Chamber, the accused was forced to take an oath *ex officio* and answer questions.[6] Self-accusation would guarantee punishment; lying would damn the accused to Hell; and silence was tantamount to a confession.[7] Facing this "cruel trilemma," *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964),

---

[6] The oath was so called because a judge could compel it by virtue of his office. *See, e.g.*, ROLAND G. USHER, THE RISE AND FALL OF THE HIGH COMMISSION 76–77 (1913).

[7] The court "took its name from a spacious room, decorated with gold stars on its ceiling, located in the Palace of Westminster. The king's council had long attempted to exercise extralegal judicial power, outside the regular courts, and its judicial meetings, in the Star Chamber, developed into a distinct court—not one of the courts of law, but the leading prerogative court, which implemented royal policy as well as law." PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 55 (2014).

Sir Edward Coke—then the Queen's Attorney General—was particularly brutal in using the Star Chamber's *ex officio* oath. *See, e.g.*, *Rede v. Boothes* (1597), *in* HAWARDE'S LES REPORTES DEL CASES IN CAMERA STELLATA 1593 TO 1609, at 90 (William Paley Baildon ed. 1894) (holding, on Coke's motion, "that if the defendant will not answer [interrogatories], *tenetur pro confesso* [it is held to be confession]"). On Coke's dramatic change in posture toward both the oath and the Great Writ after he took the bench, see CATHERINE DRINKER BOWEN, THE LION AND THE THRONE: THE LIFE AND TIMES OF SIR EDWARD COKE 1552–1634 (1990).

Lilburne refused the oath altogether, LEONARD W. LEVY, ORIGINS OF THE FIFTH AMENDMENT 274–76 (2d ed. 1986).

For his disobedience, Lilburne was censured by the Star Chamber, ordered to pay £500, imprisoned at Fleet, and "whipt through the streets, from the Prison of the Fleet unto the pillory" two miles away. *Trial of John Lilburn* (1637) 3 How. St. Tr. 1315, 1327 (Star Ch.) (footnote omitted). On that long walk from Fleet to the pillory, Lilburne was stripped to the waist, tied to the back of a cart, and lashed 500 times with a three-thronged knotted whip. *Id.* at 1345, 1349. By the time Lilburne reached the pillory, the welts on his back "were swelled almost as big as a penny-loaf."[8] *Id.* at 1350. A large and supportive crowd was waiting at the pillory, shouting words of encouragement to Lilburne. In response, he gave a lengthy speech while hunched over in the pillory, bleeding profusely, and baking in the hot sun. He passionately denounced the "inquisition Oath tendered unto me," which he equated to the "High-Commission oath." *Id.* at 1331–32. "It is an oath against the law of the land," and "it is absolutely against the law of God; for that law requires no man to accuse himself." *Id.* at 1332. The warden eventually gagged Lilburne to shut him up. But still the crowd roared in his favor while he remained pilloried and bleeding from his mouth for the next hour-and-a-half. *Id.* at 1340, 1350. The warden returned Lilburne to Fleet, where he was starved, beaten, and shackled to the floor of a dungeon. Still, he never relented and never took the oath.

Lilburne's 1637 Star Chamber trial was neither the last time he would stand trial nor the last time he would be imprisoned. In 1649, Lilburne was

---

[8] The Assize of Bread purported to standardize the size of bread for approximately 450 years of English history. *See* Assisa Panis et Cervisie 1266, 51 Hen. 3, stat. 1. The penny loaf was the largest standard size of bread at the time. *See* Alan S.C. Ross, *The Assize of Bread*, 9 ECON. HIST. REV. 332, 332–36 (1956).

charged with high treason for writing and publishing political pamphlets that criticized the government. *See* LEVY, *supra*, at 300–09. He again refused to answer "questions against" himself. *Id.* at 304. Again the people sided with Lilburne; when the jury returned with a verdict of acquittal, "[p]andemonium struck the courtroom." *Id.* at 309. Lilburne was eventually released, only to be re-charged, re-tried, and re-imprisoned on other charges. In 1652, Lilburne was banished to the Netherlands; he returned to England in 1653, was tried for violating his banishment order, and was again acquitted by a jury of his peers. *See* THOMAS A. GREEN, VERDICT ACCORDING TO CONSCIENCE: PERSPECTIVES ON THE ENGLISH CRIMINAL TRIAL JURY, 1200–1800, at 192–99 (1985). In the end, Lilburne stood "trial for his life four times," "spent most of his adult life in prison[,] and died in banishment." LEVY, *supra*, at 272. That didn't prevent him from publishing ninety political pamphlets—nine of which were published during his first prison term following his brutal pillorying. *Id.* at 278.

The Great Writ did nothing to prevent any of this. Lilburne repeatedly petitioned for the writ. *See, e.g.*, HALLIDAY, *supra*, at 227–29. But each time he did, the substantive law of England said: "You lose." Despite the Great Writ's greatness, the Crown could jail Lilburne in the Tower, in Dover Castle, and on the Isle of Jersey. *See ibid.* & n.50. Crucially, Lilburne's travails prompted Parliament to make statutory changes to the substantive rules in England. His fanaticism, eloquence, popularity, and suffering created a wave of political opposition to the Star Chamber, the High Commission, and the oath *ex officio*. Parliament abolished all three in 1641. *See id.* at 224–26. And abuses like Cromwell's decision to move Lilburne to the Channel Islands before trial to avoid further legal process led Parliament to prohibit such machinations in the Habeas Corpus Act of 1679, 31 Car. 2, c. 2, §§ XI–XII, which Blackstone called the "second magna carta," 1 BLACKSTONE, *supra*, at *133.

The important point, however, is that *all* these changes required substantive amendments to the laws passed by Parliament. As far as I know, no one thinks the writ of habeas corpus guaranteed Lilburne a remedy that England's courts denied him. Rather, the substantive law of England—authorizing the Star Chamber, the oath *ex officio*, banishment, transportation beyond seas pending trial, &c.—allowed the government to try, jail, and abuse Lilburne. Habeas corpus provided the umpire, but Parliament (and the Crown/Lord Protector Cromwell) provided the strike zone. That is, habeas corpus gave Lilburne the right to ask a judge to look at the substantive law and say: "You lose."

3

America's experience with the Great Writ confirms what England's history teaches. Here, as in our mother country, habeas is a privilege protected by the general law. And here, as in our mother country, an individual's rights against arrest or detention come from *substantive* law—not from habeas corpus. Habeas instead is just a general-law *procedure*. An important procedure, of course. But nonetheless a procedure that authorizes a judge to look at the prisoner's detention, test the custodian's justification for it according to the substantive law supplied elsewhere, and remedy it with release if the detention is unlawful.[9]

---

[9] To be clear, I am referring only to the history of the Great Writ, or habeas *ad subjiciendum*, when I speak of the remedy of release. I am not discussing other common-law habeas writs like *ad deliberandum et recipiendum*, which was used to transfer an accused prisoner from a confinement facility in one county to another jurisdiction for trial. HALLIDAY, *supra*, at 40; 3 BLACKSTONE, *supra*, at *130. The latter writ proceedings also allowed prisoners to contest these transfers. *See, e.g.*, *R. v. Crane* (1848) 11 L.T. (O.S.) 249, 249–50. Relatedly, the English Habeas Corpus Act of 1679 authorized habeas proceedings to challenge a prisoner's transfer beyond seas. *See Trump v. J.G.G.*, 604 U.S. 670, 674 (2025) (KAVANAUGH, J., concurring).

Consider, for example, the case of Ethan Allen. Allen led the Green Mountain Boys during their legendary capture of Fort Ticonderoga from the British in May 1775. Willard Sterne Randall, *Ethan Allen's Ill-Fated March on Canada*, AM. HERITAGE (Fall 2011), https://perma.cc/P3JK-6GUF. Within a few short months, though, Allen's courage led to his downfall. In September 1775, Allen carried out a bold but ill-fated attempt at leading an American invasion of British Canada. *Ibid.* The British and their Native American allies easily defeated Allen and took him and his men into custody. *Ibid.*

Allen and his unit faced harsh treatment from their British captors. They spent the first several months of their captivity shackled in a seated position so they could neither "stand up [n]or lie down." *Ibid.* The British then boarded the still-shackled men onto a boat bound for England, where they were held without criminal charges. AMANDA L. TYLER, HABEAS CORPUS IN WARTIME: FROM THE TOWER OF LONDON TO GUANTANAMO BAY 66–69 (2017). The mistreatment of Allen and his men became something of a cause célèbre for the American Revolutionaries. George Washington and Thomas Jefferson angrily wrote that the British had violated the laws of war by shackling prisoners of war and treating them like "common felons." *Id.* at 67 (quotation omitted). And even if the British were right to insist on treating the men as criminals rather than soldiers, British law required that the Crown bring criminal charges to justify the detention. Amanda L. Tyler, *The Forgotten Core Meaning of the Suspension Clause*, 125 HARV. L. REV. 901, 950 (2012). No charges came. TYLER, HABEAS CORPUS, *supra*, at 66–69. The British instead treated Allen as inhabiting a kind of legal gray area: Not a criminal, but not a prisoner of war either.

Eventually, rumors began to swirl that a prominent opposition leader in Parliament intended to file a petition for habeas corpus on behalf of Allen and his men. *Id.* at 70–71. The British, terrified that Allen would win habeas

relief, responded by hurriedly putting the Americans on a boat to Boston. *Id.* at 68–69. This "quickly became the stuff of American lore," and Americans credited the Great Writ and the Habeas Corpus Act of 1679 with securing the freedom of one of the Revolution's first war heroes. *Id.* at 71–72.

Two aspects of Allen's case are relevant for present purposes. First, the case demonstrates that from the beginning, Americans viewed themselves as inheriting the same privilege of habeas that had existed in England. *See ibid.* American judges pointed to Allen's case to justify granting habeas relief to unpopular prisoners. *Ibid.* After the Revolution, almost all States passed habeas statutes closely mirroring—and sometimes even directly incorporating—the English Habeas Corpus Act of 1679. *See id.* at 120–21. And although the Constitution did not itself expressly incorporate those rights, its Suspension Clause necessarily presumed that preexisting body of general law when it discussed the "Privilege of the Writ of Habeas Corpus." U.S. CONST. art. I, § 9, cl. 2. That is why Hamilton wrote that the privilege of habeas corpus and the 1679 Act are secured in "the plan of the [constitutional] convention." THE FEDERALIST NO. 83, at 499 (Clinton Rossiter ed., 1961); *see also* THE FEDERALIST NO. 84, at 511 (similar). In this general-law sense, the Constitution should be understood to protect the habeas privilege. *See DHS v. Thuraissigiam*, 591 U.S. 103, 144 (2020) (THOMAS, J., concurring).[10]

[10] This is not the only constitutional provision that references an external source of law. Although the Eleventh Amendment's text "says nothing about a suit brought by a citizen against her home state," the Supreme Court has long understood it to sweep in the forms of sovereign immunity recognized by the general law at the Founding. *See Cutrer v. Tarrant Cnty. Loc. Workforce Dev. Bd.*, 943 F.3d 265, 269 n.3 (5th Cir. 2019); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 495 n.2 (5th Cir. 2020) (OLDHAM, J., concurring). In a similar way, the Suspension Clause presumes the general-law habeas privilege that existed at the Founding.

Second, Allen's case makes clear that from the beginning, Americans understood the habeas privilege as a procedural entitlement to a neutral decisionmaker. When Washington, Jefferson, and other American leaders complained about Allen's treatment at the hand of the British, they pointed to British violations of substantive law: the law of war on the one hand, and the law of British criminal detention on the other. Allen was either a prisoner of war (in which case he was entitled to the protections of the laws of war), or a British subject (in which case he had a substantive right to be free of detention absent criminal charges). *See* TYLER, HABEAS CORPUS, *supra*, at 69–71. Habeas represented a procedure—and a very important one at that. But from the beginning, it has served only to protect the substantive rights extended by positive law.

Or consider *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866). On March 3, 1863, Congress passed the Habeas Corpus Suspension Act, ch. 81, 12 Stat. 755. That statute authorized the President to suspend the privilege of habeas corpus "during the present rebellion."[11] On September 15, 1863, President Lincoln exercised his statutory power and formally proclaimed "that the privilege of the writ of habeas corpus is suspended throughout the United States . . . ." Proclamation No. 7, 13 Stat. 734, 734. On October 5, 1864, while President Lincoln's suspension was in effect, the United States military

[11] The statute provided: "That, during the present rebellion, the President of the United States, whenever, in his judgment, the public safety may require it, is authorized to suspend the privilege of the writ of habeas corpus in any case throughout the United States, or any part thereof. And whenever and wherever the said privilege shall be suspended, as aforesaid, no military or other officer shall be compelled, in answer to any writ of habeas corpus, to return the body of any person or persons detained by him by authority of the President; but upon the certificate, under oath, of the officer having charge of any one so detained that such person is detained by him as a prisoner under authority of the President, further proceedings under the writ of habeas corpus shall be suspended by the judge or court having issued the said writ, so long as said suspension by the President shall remain in force, and said rebellion continue." 12 Stat. at 755.

arrested a U.S. citizen named Lamdin P. Milligan at his home in Indiana. *Milligan*, 71 U.S. at 107. Milligan was a Copperhead Democrat who politically opposed both Lincoln and the Civil War. John Yoo, *Lincoln and Habeas: Of* Merryman *and* Milligan *and* McCardle, 12 CHAP. L. REV. 505, 522 (2009). And he was a civilian with no ties to the military. *Milligan*, 71 U.S. at 107. The Military Department nevertheless detained him in the brig; tried him before a military commission on October 21, 1864; and ordered him to be hanged. *Ibid.* On May 10, 1865, Milligan filed a petition for habeas corpus in the federal circuit court in Indiana. *Ibid.* Apparently confused as to the effect of the suspension of the writ, the two circuit judges divided over whether the writ should issue based on the facts in Milligan's petition. *Id.* at 108–09.[12] The circuit court certified the question of whether to issue the writ to the Supreme Court. Meanwhile, Milligan sat in the brig. On December 1, 1865, President Johnson rescinded the suspension as to Indiana, thus restoring Milligan's privilege of habeas corpus. *See* 8 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 3531 (James D. Richardson ed., 1897). The Supreme Court heard oral argument on the matter in March 1866 and held that Milligan was entitled to discharge in April 1866.

[12] Habeas corpus follows a five-part procedure: petition, writ, return, traverse, and remedy. *See supra*, at 49–50. But that does not mean the writ always issues. The Great Writ is a writ "of right, though not a writ of course." HALLIDAY, *supra*, at 112. Even in the absence of a suspension, the writ cannot issue before the court is "informed of the merits of the cause." *Id.* at 48 (quotation omitted). In Britain, courts would not issue the writ except "upon probable cause verified by an affidavit." *Opinion of Justice Wilmot on the Writ of Habeas Corpus* (1758) 97 Eng. Rep. 29, 31–32 (HL) (opining on the Habeas Corpus Act of 1679, 31 Car. 2, c. 2). American courts followed a similar practice, declining to issue the writ when the petition itself established that the prisoner would not be discharged. *See, e.g.*, *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 201 (1830). *Milligan* recognized this practice and concluded the writ should issue. 71 U.S. at 111, 130–31.

Three aspects of *Milligan* are crucial here.

First, the privilege of habeas corpus is the judge's power to discharge a prisoner from custody. Recall that habeas corpus is a five-part procedure: petition, writ, return, traverse, and remedy. *See supra*, at 49. The suspension of the privilege of habeas corpus suspends only the fifth and final one of these. Milligan petitioned for the writ during Lincoln's suspension—as he was entitled to do. The circuit court was obligated to issue the writ to Milligan's military custodian. The military custodian should have provided a return—as he was obligated to do under the terms of the statute authorizing Lincoln's suspension. *See supra* n.11 (obligating custodian to provide "certificate, under oath" that prisoner was being held "under authority of the President"); *compare Darnel's Case*, 3 How. St. Tr. at 3, 5–6 (return stating five knights were held under authority of the King's special command). And the federal court in Indiana should have traversed that return, determined that Milligan was in military custody, and then done nothing—as it was obligated to do by the suspension of the privilege (read: remedy) of habeas corpus. The Supreme Court explained this in answering the certified question: "The suspension of the privilege of the writ of habeas corpus does not suspend the writ itself. The writ issues as a matter of course; and on the return made to it the court decides whether the party applying is denied the right of proceeding any further." *Milligan*, 71 U.S. at 130–31. That is, even when faced with a suspension of habeas corpus, the petition, writ, return, and traverse all work as normal. It's only the remedy that is suspended—which effectively puts the case on ice during the period of the suspension. For Milligan, when President Johnson rescinded the suspension, the case sprang back to life.

Second, the lawfulness of Milligan's custody was *not* determined by the law governing habeas and its suspension. And that was a great boon to Milligan because if habeas corpus supplied his substantive rights, he would

have been hanged by the military. Recall that he was arrested, tried, convicted, and sentenced to death while the privilege of habeas corpus was suspended. If habeas was the source of his substantive rights, Milligan's rights during the relevant time period would've been precisely zero, and his petition would've been dismissed as moot at the end of a hangman's rope. Thankfully for Milligan's sake, "[t]he suspension of the writ does not authorize the arrest of any one, but simply denies to one arrested the privilege of this writ in order to obtain his liberty." *Id.* at 115. The power to arrest, detain, and try someone comes from *outside* habeas—from some exogenous source of law like the Constitution, congressional statutes, or the law of war. *See id.* at 125–26 (emphasizing suspension did nothing to authorize the military to try a citizen "otherwise than by the course of the common law"). As it turned out, once President Johnson restored Milligan's privilege of habeas corpus, the Supreme Court held Milligan's custody was unlawful and ordered him discharged. That result was only possible because the suspension took away the privilege of an umpire (read: judge) to call balls and strikes; it did nothing to change the definition of a ball or a strike.

Third, lest there be any doubt that habeas is a procedure and not a font of substantive rights, consider the coda to *Milligan*. After the Supreme Court discharged Milligan from military custody, he sued his former custodians for false imprisonment and won $5. *See The Chase Court, 1864–1873*, SUP. CT. HIST. SOC'Y, https://perma.cc/C7NQ-BR9D. That proves Milligan's custody was unlawful even when he had no habeas privilege to rectify it during Lincoln's suspension. And it proves the suspension, while valid, did nothing to legalize the detention. Rather, the lawfulness *vel non* of the detention stood or (in Milligan's case) fell based on the exogenous law of war.

The law of war, of course, gives unadmitted aliens no rights, so the relief Milligan won provides zero support to our petitioners.[13]

Or consider *Ex parte Quirin*, 317 U.S. 1 (1942). In June 1942, eight Nazi would-be saboteurs landed German U-boats on American beaches in New York and Florida. *Quirin*, 317 U.S. at 21–22. One of those Nazis was Herbert Hans Haupt, who the Court assumed was a U.S. citizen. *Id.* at 20. The United States military detained all eight men, including Haupt. *Id.* at 21. On July 2, 1942, the President issued a proclamation that all subjects of a warring nation who were charged with, *inter alia*, attempted sabotage could be tried by military commission. *See* Proclamation No. 2561, 7 Fed. Reg. 5101 (1942). So the military tried all eight would-be saboteurs before a military commission. *Quirin*, 317 U.S. at 23. While that military commission was ongoing, the Nazis petitioned for habeas corpus in the United States District Court for the District of Columbia. *Id.* at 18, 23. After the district court and the D.C. Circuit denied relief, they petitioned for relief in the Supreme

[13] My esteemed colleague in dissent agrees that habeas provided Milligan *zero* "substantive right[s]" and recognizes that whether a U.S. citizen can be tried in a military commission turns on the law of war—as the Supreme Court again reiterated in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). *Post*, at 120 n.10 (SOUTHWICK, J., dissenting). But my colleague contends that, while our aliens are not U.S. citizens like Milligan and are not held in a brig like Milligan and are not facing a military commission like Milligan, our aliens are nonetheless entitled to discharge like Milligan. *See ibid.* My colleague's argument is evocative of the "elegant (but obviously absurd) theories" that folks offered to justify substantive due process in the 1980s. Walter Berns, *Judicial Review and the Rights and Laws of Nature*, 1982 SUP. CT. REV. 49, 51. "One example of such absurdities: aliens, according to Kenneth L. Karst, are covered by the 'principle of equal citizenship [under the Fourteenth Amendment],' even though they 'lack citizenship in the narrow sense [under that same Amendment].' This is like saying a definition of cat that excludes dog is a narrow definition of cat." *Id.* at 51 n.9 (quotation omitted). *Milligan* interpreted the law of war to mean that the "civil safeguards of the Constitution have application" in criminal trials "[w]here peace exists." 71 U.S. at 137, 140. But it said nothing whatsoever about whether or how those "civil safeguards" apply to unadmitted aliens requesting release into our country after entering clandestinely.

Court. *Id.* at 18–19. The Court granted certiorari, heard argument on July 29, 1942, and denied relief on July 31, 1942, with the promise to write an opinion explaining why at a later date. *See id.* at 11 (per curiam). On August 3, 1942, the military commission sentenced all eight to death. LOUIS FISHER, NAZI SABOTEURS ON TRIAL: A MILITARY TRIBUNAL & AMERICAN LAW 77 (2003). The military executed six of them (including the U.S. citizen Haupt) by electric chair on August 8, 1942.[14] *Id.* at 78–79. The Supreme Court issued a unanimous opinion by Chief Justice Stone on October 29, 1942, almost three months after the six Nazis were dead. *See Quirin*, 317 U.S. at 18.

Two dimensions of the *Quirin* opinion are relevant. First, the Court again disconnected the law of habeas from the substantive law that governed the Nazis' rights. As detainees in the custody of the United States Government, the Nazis had the privilege to petition for habeas corpus: "[N]either the [President's] Proclamation nor the fact that they are enemy aliens forecloses consideration by the courts of petitioners' contentions that the Constitution and laws of the United States constitutionally enacted forbid their trial by military commission." *See id.* at 25. Thus, the district court, the D.C. Circuit, and the Supreme Court all had jurisdiction in habeas to review the Nazis' legal claims. *See id.* at 24–25. But second, and crucially, habeas did nothing to make those claims winners. To the contrary, whether the Nazis (including the U.S. citizen Haupt) could be detained and tried by the military turned on the substantive law of war. *See id.* at 26–37. The law of war authorized those trials, and "[c]itizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war." *Id.* at 37; *see also*

[14] President Roosevelt commuted the death sentences of the other two Nazis. FISHER, *supra*, at 79.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 522–24 (2004) (plurality opinion) (reaffirming *Quirin*).[15]

Thus, the Nazi prisoners in *Quirin* had the privilege of habeas corpus. They filed their petitions, and they had a privilege to have those petitions heard by an umpire-*cum*-judge. But when the umpire looked at the Nazis' claims, it applied an exogenous source of substantive law (the law of war) and remanded them to custody. The procedural mechanism of habeas had nothing to do with that loss. Similarly, the Great Writ's procedures were not to blame when Wyatt was hanged, the five knights ended up in the Tower, and Lilburne was pilloried in London. In every case, the substantive law dictated the prisoners' detentions. Habeas merely created a procedure for the prisoners to ask a court to review those detentions and hear the court say: "You lose."

C

So how does all of this apply to aliens? The answer proceeds in three parts: (1) aliens' privileges to petition for habeas corpus, (2) aliens' substantive rights against detention in England, and (3) aliens' substantive rights against detention in America. The upshot is that aliens and non-aliens generally have similar privileges of habeas corpus. But unadmitted aliens in both England and America generally have no substantive right to demand release into their host country. So habeas provides a procedure for

[15] How to reconcile *Quirin* (military commission may try U.S. citizen) with *Milligan* (military commission may not try U.S. citizen) is a source of never-ending debate in the academy and in the courts. *See, e.g.*, Amanda L. Tyler, *Judicial Review in Times of Emergency: From the Founding Through the COVID-19 Pandemic*, 109 Va. L. Rev. 489, 516–18 (2023); *Hamdi*, 542 U.S. at 522–23 (plurality opinion); *id.* at 570–72 (Scalia, J., dissenting). What matters for present purposes is that that debate hinges on the law of war—not on the law of habeas.

unadmitted aliens to ask a court to review their detentions and hear the court say: "You lose."

1

First, English law made numerous distinctions between aliens and non-aliens. As Blackstone put it: "The first and most obvious division of the people is into aliens and natural-born subjects." 1 BLACKSTONE, *supra*, at *354. But English law recognized shades of gray in between. For example, a denizen was an alien who received letters patent from the King, which entitled him "to enjoy all privileges as an Englishman." HALLIDAY, *supra*, at 202. Likewise, Coke said not all people born in England were subjects: Birth "within the king's dominions, may make a subject born; but any place within the king's dominions without obedience can never produce a natural subject." *The Case of the Postnati* (1608) 2 How. St. Tr. 559, 640 (Exch. Ch.); *see also id.* at 615 (distinguishing between allegiance "by nature and birth-right"; acquired allegiance or denization; "local obedience"; and legal obedience by oath); *compare* SIR MATTHEW HALE, THE PREROGATIVES OF THE KING 54 (D.E.C. Yale ed., 1976).

The key in England thus turned on some form of mutual allegiance: A person who lawfully pledged allegiance to the King was in return owed the King's protection, including the King's prerogative writs like habeas corpus. *See* HALLIDAY, *supra*, at 203. Thus, with plenty of complications that could fill many tomes, at least some aliens enjoyed at least some rights on par with at least some men born English subjects. Or as Halliday puts it, where the alien demonstrated a sufficient level of allegiance to the King—the key being *sufficient allegiance*—that alien could "use habeas corpus . . . [i]n virtually all the same ways, in the same instances, and with the same results as the king's other subjects." *Id.* at 205.

As we know from the cases of Wyatt, Darnel, Lilburne, Milligan, Quirin, and Hamdi, however, the privilege to petition for habeas corpus is not the same as the right to get relief. For aliens, the right to get relief turned on the substantive English law applicable to them. And that law was stingy at best.

First, it has long been well established that the King could exclude anyone from his kingdom for any reason and at any time. *See* 2 E. de Vattel, The Law of Nations §§ 94, 100 (Joseph Chitty ed., 1834) (1758). This was true even for so-called "alien friends"—that is, aliens who came from countries at peace with England for some lawful purpose like trade. The King generally allowed such aliens to travel freely through his kingdom, *see id.* § 135, but he always had the right to expel them without cause. As Chitty put it: "Alien friends may lawfully come into the country without any licence or protection from the Crown[,] though it seems that the Crown even at common law and by the law of nations . . . possesses a right to order them out of the country or prevent them from coming into it whenever his Majesty thinks proper." Joseph Chitty, A Treatise on the Law of the Prerogatives of the Crown 49 (1820).

Second, the King's power to exclude people from his kingdom included the right to banish people—including those born in England (as he did with John Lilburne, *see supra*, at 54). And the King's prerogative to banish included the prerogative to release them from jail by banishing them. Take for example *Queen v. Batcheldor* (1839) 1 Per. & Dav. 516 (QB) ("*Case of the Canadian Prisoners*"). In that case, nine men from Canada were arrested and charged with high treason for their roles in the Canadian Rebellions of 1837–1838. Facing trial, detention, and death, the men requested and received conditional pardons: They were permitted to confess their treasons before

arraignment in exchange for a pardon that spared their life but banished them to Van Diemen's Land (modern-day Tasmania). *See* ALFRED A. FRY, REPORT OF THE CASE OF THE CANADIAN PRISONERS 79–80 (1839). The prisoners received conditional pardons to that effect, and then they challenged their detentions based on the pardons. The court held the conditional pardons were valid and upheld the Canadians' discharge to Tasmania.

The King's power to let people out of jail by banishing them was well established before the *Case of the Canadian Prisoners*. For example, Chitty explains it this way:

> A pardon may be extended to the subject on any *condition* which his majesty thinks fit to annex, whether precedent or subsequent, on the performance of which the pardon will depend. And this prerogative is daily exerted in the pardon of felons, on condition . . . of transportation to some foreign country for life, or for a term of years, such transportation being allowed by the act of habeas corpus and subsequent acts.

1 JOSEPH CHITTY, A PRACTICAL TREATISE ON THE CRIMINAL LAW 773 (1816) (footnote omitted); *see also* 2 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN, ch. 37, § 45 (6th ed. 1787) (1716) ("[T]he king may extend his mercy upon what terms he pleases, and consequently may annex to his pardon any condition, precedent or subsequent, on the performance whereof the validity of the pardon will depend."). Of course, such conditional-banishment pardons generally required the prisoner's consent.[16] *See* 1 SIR EDWARD COKE, THE

[16] The consent requirement appears to have been set aside by the Transportation Act of 1784. *See* Simon Deveraux, *Imposing the Royal Pardon: Execution, Transportation, and Convict Resistance in London, 1789*, 25 L. & HIST. REV. 101, 105 (2007) ("In June 1797

SECOND PART ON THE INSTITUTES OF THE LAWES OF ENGLAND 46–47 (1642); Habeas Corpus Act of 1679, 31 Car. 2, c. 2, §§ XII, XIV. But the important point remained: Because the King could exclude anyone from his kingdom for any reason, anyone who found himself in the King's prison and not at liberty to stay in the kingdom could nonetheless try to use habeas to get out of jail on condition of leaving the country.

Third, consider British law at the time of the American Founding.[17] In 1792, as revolutionary France descended into chaos, thousands of French émigrés sought refuge in England. J.R. Dinwiddy, *The Use of the Crown's Power of Deportation Under the Aliens Act, 1793–1826*, *in* RADICALISM AND REFORM IN BRITAIN, 1780-1850, at 149 (1992). Their arrival provoked anxiety among British officials, who feared that some of these foreigners were Jacobin agitators seeking to spread revolutionary ideas. *Ibid.* The British government initially investigated whether the Crown already possessed the authority to exclude and expel foreigners without parliamentary authorization. Although Crown lawyers generally believed that the King possessed such authority, they recommended statutory authorization because the prerogative had so rarely been exercised. *Ibid.* After much debate, *id.* at 150, Parliament passed the Aliens Act of 1793, 33 Geo. 3, c. 4.

---

the Attorney and Solicitor General informed the government that a clause of the 1784 Transportation Act rendered unnecessary the longstanding custom of requiring London's capital convicts formally to accept in open court the offer of a conditional pardon. From that time forward, judges were empowered to treat a 'pardon' on condition of transportation as tantamount to a sentence to that effect."); *see also* Transportation Act of 1784, 24 Geo. 3, sess. 2, c. 56.

[17] In the Acts of Union, the Kingdom of England (including Wales) united with the Kingdom of Scotland into a single sovereign state, the Kingdom of Great Britain. *See* Union with Scotland Act 1706, 6 Ann., c. 11; Union with England Act 1707, c. 7 (Scot.). Thus, I use "British" instead of "English" when referring to actions of the government after 1707.

The Aliens Act established an extensive system for registering, supervising, and expelling foreigners. Shipmasters were required to report the aliens arriving aboard their vessels, and arriving aliens had to disclose identifying information to customs officials. 33 Geo. 3 c. 4, pmbl., §§ III–IV. Parliament required all aliens entering England to present themselves to an official. The official then recorded the aliens. Aliens were also required to obtain documentation before traveling inland, and the government could restrict their movements and places of residence. *Id.* §§ VIII, IX. New and recent arrivals were given designated places of residence that could not be changed without the state's permission. *Ibid.* Importantly, the Act empowered the King to issue a proclamation or order directing any alien to depart within a specified period. *Id.* § XIV. An alien who knowingly disobeyed could be arrested and committed to "gaol without bail or mainprise"—that is, they could be held indefinitely. *Id.* § XV. Further, whenever the King deemed it necessary for public security, he could send out of the realm an alien already committed to jail, or imprisoned for an offense against the Act, or admitted to bail. *Id.* § XXIX.

No alien was safe from the reach of the 1793 Act—not even the legendary Prince of Talleyrand, Charles Maurice de Talleyrand-Périgord. Talleyrand was a French diplomat who would later become one of Europe's most influential statesmen. Talleyrand had served as an unofficial head of the French embassy in London in spring of 1792 before returning to England in a private capacity that September. British officials nevertheless suspected him of acting as an agent of the French Republic. Dinwiddy, *supra*, at 156–57. The act placed French émigrés like Talleyrand "under police supervision" and "g[ave] to the authorities necessary powers to expel them." MEMOIRS OF THE PRINCE DE TALLEYRAND 173 n.1 (The Duc de Broglie ed., Raphaël Ledos de Beaufort trans., 1891). Acting under the Aliens Act, the British Foreign Minister ordered Talleyrand to leave the country within five days.

Dinwiddy, *supra*, at 157. Talleyrand protested. He wrote to senior ministers and the King, insisting that no evidence supported the accusations against him. But his appeals secured only a brief extension to arrange his affairs. *Id.* at 157–158. As Talleyrand later recalled:

> [M]y dignity required of me to protest against the unjust persecution of which I was the victim. In consequence, I applied to Mr. Dundas [Lord Melville, the Home Minister], to Mr. Pitt [Prime Minister], and to the king himself; being unable to obtain satisfaction in any quarter, I had but to submit, and therefore went to sleep on board a ship which, I had been told, was the first to start for the United States.

MEMOIRS OF THE PRINCE DE TALLEYRAND, *supra*, at 173. Neither Talleyrand's diplomatic stature nor his protestations prevented the Government from insisting on his deportation.

Although Parliament initially enacted the Aliens Act as a temporary measure, the outbreak and continuation of war with France prompted successive renewals of the act. *See* Dinwiddy, *supra*, at 149–50, 163. The Aliens Acts became even more draconian over time, and especially during times of war. *See id.* at 163; Sara Caputo, *Alien Seamen in the British Navy, British Law, and the British State, c. 1793 – c. 1815*, 62 HIST. J. 685, 690–91 (2019). Parliament expanded the system of alien supervision with increases in passport requirements and border policing controls. In 1798, it authorized the King to impose license requirements on adult aliens who had long resided in Britain and restricted aliens' ability to depart the realm without official permission, with imprisonment as punishment if they traveled without a license. Aliens Act of 1798, 38 Geo. III, c. 50, pmbl., § VIII. In 1803, Parliament authorized the King to seize unlicensed arms from aliens. *See* Aliens Act of 1803, 43 Geo. III, c. 155., § XX; *see also id.* § XII (barring aliens from importing arms "other than as Merchandize"). It also empowered the

King to search aliens' homes for weapons and summarily deport any thought to be a danger to public order. *Id.* §§ II, IV, XXI. The government even developed an "Aliens Office" to administer these restrictions, monitor foreign residents, and facilitate detention and deportation. *See* Dinwiddy, *supra*, at 151–65; *see also* Thomas C. Jones, Erecting and Dismantling Borders During Transitions Between War and Peace 2–3 (July 12, 2024), https://perma.cc/MJ2D-NCZH (citing Records and correspondence that can be found in The National Archives (TNA), London, Home Office Papers (HO) 1/1-5) (transcript available with the Centre for History and Economics at Cambridge University)).

Even the introduction of an administrative appeal did not necessarily entitle an alien to learn the accusations against him. Under the Aliens Act of 1814, an alien ordered to depart could appeal to the Privy Council. *See* Aliens Act of 1814, 54 Geo. 3, c. 155, § IV; Dinwiddy, *supra*, at 163 n.5. But a successful appeal was not a safe bet. Consider the fate of Baron d'Imbert, a French émigré who arrived in England around 1800 and subsequently worked with the British War Office as an intermediary with royalist agents in France. *See* Dinwiddy, *supra*, at 160. British officials eventually suspected him of acting as a double agent and ordered him deported in 1807. *Ibid.* Upon returning to France, d'Imbert was himself imprisoned by French officials who distrusted him and later placed him under police surveillance. *Ibid.* After being released, he returned to England, apparently hoping to discover why he had been expelled. But British authorities promptly ordered him to depart once again. This time, d'Imbert appealed to the Privy Council under the later Aliens Act of 1814. *Ibid.* But the Privy Council quickly dismissed his appeal, concluding that he was entitled neither to learn the accusations against him

nor to representation by counsel. *Id.* at 160, 163 n.5.[18] The Great Writ did nothing to prevent any of this.

In sum, at the time of the American Founding, the substantive law applicable to aliens in Britain was stingy to say the least. Aliens were deportable for any reason or no reason. They could be detained indefinitely without bail. And even the most powerful and prestigious foreigners in Britain were not immune from the law's reach. So even if an alien could petition for habeas, the Great Writ only gave them the opportunity to hear a judge say: "You lose."

3

America directly inherited this legal tradition. For example, the Fifth Congress enacted the Alien Friends Act of 1798. It authorized the President to remove from the United States "all such aliens as he shall judge dangerous to the peace and safety of the United States." An Act Concerning Aliens, ch. 58, § 1, 1 Stat. 570, 571 (1798). It authorized the President to give licenses to aliens, and those licenses would allow the aliens to remain in our country. *Ibid.* But the President could condition those licenses on a bond, and he could revoke them at any time:

> [The President] may also require of such alien to enter into a bond to the United States, in such penal sum as he may direct, with one or more sufficient sureties to the satisfaction of the person authorized by the President to take the same, conditioned for the good behavior of such alien during his residence in the United States, and not violating his license,

[18] Parliament eventually allowed the Act to lapse in 1826. Even so, however, then-Home Secretary Sir Robert Peel warned that he would seek its renewal if political refugees from allied countries were to "make this country the scene of cabals or conspiracies against their own governments." Dinwiddy, *supra*, at 166 (quotation omitted).

> which license the President may revoke, whenever he shall think proper.

*Ibid.*

The Alien Friends Act further authorized the President to arrest and summarily deport any alien who did not have the required license. *Id.* § 2. And if an alien re-entered the United States after being removed, the President could try the alien, convict him, and then imprison him for "so long as, in the opinion of the President, the public safety may require." *Ibid.* The parallels between this statute and Britain's contemporaneous Aliens Acts are obvious. *See Sessions v. Dimaya*, 584 U.S. 148, 211 (2018) (THOMAS, J., dissenting).[19]

The Alien Friends Act was only in effect for two years, and Congress let it expire in 1801. It generated substantial political opposition. *See, e.g.*, Thomas Jefferson, *Draft of the Kentucky Resolutions* (Oct. 1798), https://perma.cc/TN64-NH8Q. And President Adams later famously disclaimed enforcing the act in a letter to Thomas Jefferson. *See* Letter from John Adams to Thomas Jefferson, June 14, 1813, *in* 10 THE WORKS OF JOHN ADAMS 42 (Charles Francis Adams ed., 1856).

That ignores the real import of the Alien Friends Act, however. First, as Congress's first statute regulating aliens in our country, it's highly

---

[19] The Fifth Congress also borrowed from the British legal tradition in authorizing the detention of certain illegal aliens without bond in the Alien Enemies Act. *See* An Act Respecting Alien Enemies, ch. 66, §§ 1–2, 1 Stat. 577, 577–78 (1798). While the Alien Enemies Act targeted a narrower class of aliens than the Alien Friends Act, it further establishes that Congress did not understand the Constitution to prohibit the government from detaining illegal aliens pending their removal. The two statutes together show that early congresses, staffed by the same Founders who helped draft and ratify the Constitution, understood that Congress could authorize the Executive to detain aliens without bail or mainprise, just as the King could in England.

probative of the rights (or the lack thereof) held by aliens under our Constitution. *See Printz v. United States*, 521 U.S. 898, 905 (1997) ("[E]arly congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning.") (quotation omitted); H. Jefferson Powell, *The Province and Duty of the Political Departments*, 65 U. Chi. L. Rev. 365, 376 (1998) (reviewing David P. Currie, The Constitution in Congress: The Federalist Period, 1789–1801 (1997)); *see also Ludecke v. Watkins*, 335 U.S. 160, 171 (1948) (Frankfurter, J.) (holding that the 1798 Alien Enemies Act "is almost as old as the Constitution, and it would savor of doctrinaire audacity now to find the statute offensive to some emanation of the Bill of Rights").

And second, it would be inaccurate to say that the Alien Friends Act had no effect on aliens in the eighteenth century. Members of the Adams Administration, including the Secretary of State and the President himself, diligently sought at various points to enforce the law against aliens they considered dangerous. James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85, 103 (1954). The President signed several warrants for the seizure of notable aliens, and the Administration kept "a close watch . . . on [the] activities" of other prominent foreigners in the hope of finding more potential agitators to target for deportation. *Id.* at 91, 95, 103. In the end, no formal enforcement actions occurred, but that was in large part a result of aliens self-deporting rather than waiting for the government to force the issue. *Id.* at 103. The Act, along with the Government's threatened enforcement, led to a "mass exodus" of aliens from the country even before it passed, including "the newly appointed consul general of the French Republic to the United States." *Id.* at 88, 103. To put it simply, the Act was far from a nothingburger.

Nor was the Alien Friends Act an isolated episode in America's history of conditioning liberty on departure. Even after the Alien Friends Act

expired, the States continued the English practice of banishment, under which the executive could grant prisoners their freedom on the condition that they leave the State or the United States—either for a term of years or forever. Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 1833, 1844–45 (1993).[20] The States too were regulating virtually all immigration matters at this time, until about 1875. *See Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875). The States recognized that their Governors inherited the King's power to release prisoners by ordering them banished. *See People v. Potter*, 1 Edm. Sel. Cas. 235, 242–45 (N.Y. Sup. Ct. 1846); *Kavalin v. White*, 44 F.2d 49, 51 (10th Cir. 1930).

State Governors were often expressly or impliedly empowered to conditionally pardon prisoners. *See* Neuman, *supra*, at 1845–46 & n.65 (collecting early state laws that authorized state governors to grant pardons conditioned on leaving the state or country). State courts recognized that the Governor would have the power to impose such terms following the rules of the common law of England, even under a limited Constitution like that of the United States. *See State v. Smith*, 1 Bail. 283, 289–90 (S.C. Ct. App. L. & Eq. 1828); *Potter*, 1 Edm. Sel. Cas. at 242, 254. Importantly, this practice of banishment was not a punishment imposed on an unwilling prisoner; banishment as a conditional pardon required acceptance by the prisoner, who could reject the condition and remain subject to his original sentence. *Potter*, 1 Edm. Sel. Cas. at 240–44. In practice, because many crimes were

[20] Our own colonies were the recipients of many subjects banished from Great Britain. *Schick v. Reed*, 419 U.S. 256, 261 (1974). Upon winning independence, we turned around and banished a great many British loyalists from our newly established States. Neuman, *supra*, at 1844 n.62. This practice was endorsed by two Supreme Court Justices in *Cooper v. Telfair*, 4 U.S. (4 Dall.) 14, 19 (1800) (opinion of PATERSON, J.); *id.* at 20 (opinion of CUSHING, J.).

punishable by death in the eighteenth and early-nineteenth centuries, prisoners were likely to accept and comply with conditional pardons. Neuman, *supra*, at 1846. In most cases, the prisoner was simply "agreeing" that his life should be spared. *Schick v. Reed*, 419 U.S. 256, 260 (1974).

The same English inheritance informed the President's pardon power under our federal Constitution. Article II empowers the President to grant reprieves and pardons for offenses against the United States. U.S. CONST. art. II, § 2., cl. 1. The Framers adopted the English model with little discussion or debate at the time of drafting and adopting our Constitution.[21] Recognizing this "unbroken practice" since 1790, the Supreme Court consistently understood the constitutional power to pardon absolutely as including the lesser power to pardon conditionally. *Schick*, 419 U.S. at 264–66 (invoking early cases like *United States v. Wilson*, 32 U.S. (7 Pet.) 150 (1833), and *Ex parte Wells*, 59 U.S. (18 How.) 307 (1855), in addition to later cases). So the English practice of offering detainees release from their confinement on condition of banishment survived American independence and remained a means by which both state Governors and the President could exercise mercy.

*

At America's Founding, general law established three important substantive legal propositions for aliens. First, the Legislature could exclude an alien for any reason. Parliament did that in its 1793 Alien Act, and Congress did it in the Alien Friends Act. Second, while executing the

---

[21] Much of the debate that did occur concerned whether there should be an exception to the President's pardon power in cases of treason or impeachment. *See* 2 RECORDS OF THE FEDERAL CONVENTION OF 1787 564, 575, 580, 626–27, 639 (Max Farrand ed., 1911).

Legislature's limitless power to exclude aliens, the Executive could detain aliens indefinitely—without bail or mainprise. Again, Parliament did that in 1793, and Congress did it in 1798. And third, the Executive's power to detain included a subsidiary power to release detainees onto a boat bound for another country. Britain did that in the *Case of the Canadian Prisoners*, and our courts did it in cases like *Potter*.

These propositions together mean that aliens sometimes did not even have the privilege of an umpire. Even when aliens did have the privilege of an umpire, habeas usually gave them the opportunity to hear: "You lose." And insofar as a detainee wanted to win, he always had the right to request a conditional pardon and to leave his cell for a boat bound overseas.

Even after centuries of history, today's Great Writ operates more or less[22] as it did at the Founding. It provides a detained, unadmitted alien with

---

[22] The enormous and obvious exception is postconviction habeas. When a prisoner challenges pretrial, immigration-related, or other forms of executive detention, modern habeas does the same thing it's done since the 17th century: It provides the prisoner with judicial review of the reasons for his detention. No more, no less. The modern innovation of *postconviction* habeas, on the other hand, stands on significantly shakier historical ground.

Noted scholars and jurists—including two recent majority opinions of the Supreme Court—have marshalled historical evidence suggesting that prisoners at the Founding generally could not use habeas to challenge a final judgment of conviction except to contest the convicting court's jurisdiction. *E.g.*, *Jones v. Hendrix*, 599 U.S. 465, 483–84 (2023); *Brown v. Davenport*, 596 U.S. 118, 128–30 (2022); *Edwards v. Vannoy*, 593 U.S. 255, 283–85 (2021) (GORSUCH, J., concurring); *Ex parte Watkins*, 28 U.S. at 202–03 (MARSHALL, C.J.); Micah S. Quigley, *What is Habeas?*, 173 U. PA. L. REV. 453, 464–66, 498–518 (2025); Dallin H. Oaks, *Legal History in the High Court—Habeas Corpus*, 64 MICH. L. REV. 451, 458–61, 468 (1966); Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 HARV. L. REV. 441, 465–69 (1963). That would mean that modern postconviction habeas review violently ruptures from historical practice.

Other judges and scholars have pushed back on this account. They argue that habeas sometimes permitted prisoners to bring challenges even to a valid conviction. *E.g.*,

judicial review of his detention. But the underlying law that the judge must apply during that review—the strike zone that the judge must employ—comes from our Nation's immigration statutes. Congress has decided exactly how much process to extend to illegal aliens. The Great Writ does not alter that reality.

---

*Davenport*, 596 U.S. at 146–52 (KAGAN, J., dissenting); *Jones*, 599 U.S. at 526–27 (JACKSON, J., dissenting); Lee Kovarsky, *Habeas Myths, Past and Present*, 101 TEX. L. REV. ONLINE 57, 67–77 (2022); HALLIDAY, *supra*, at 117–20. But even the most ardent skeptic admits there's at least a reasonable historical argument that the modern postconviction habeas apparatus represents a more free-wheeling enterprise than anything permitted by English or early American practice. *See* Stephen I. Vladeck, *The New Habeas Revisionism*, 124 HARV. L. REV. 941, 984–85 (2011).

Still other scholars take a middle ground between the two extremes. These academics contend that while early habeas practice did allow some challenges to final judgments of conviction, such challenges could occur only when a judgment was void. David Kinnaird, *Habeas Corpus and Void Judgments*, 100 NOTRE DAME L. REV. 1045, 1049–51 (2025); William M. M. Kamin, *A More Luminous Beacon*, 59 U.C. DAVIS L. REV. 1, 8–9 (2025); Ann Woolhandler, *Demodeling Habeas*, 45 STAN. L. REV. 575, 602–03 (1993). This posited voidness rule would allow more postconviction review than a strict jurisdictional limitation would, but it would nonetheless prevent most forms of postconviction review permitted today.

While this is an important historical debate, it doesn't matter for today's purposes. For one thing, this is not a postconviction case. For another thing, the driving force behind the explosion of postconviction review during the 20th century was the Warren Court's discovery of new substantive due process rights and its creative reimagining of the Constitution's criminal-procedural protections. *See Brown v. Allen*, 344 U.S. 443, 532–34 (1953) (JACKSON, J., concurring in the result). That revolutionary revision of the Constitution's meaning apparently did not extend with the same enthusiasm to newly arrived immigrants. *See, e.g.*, *Abel v. United States*, 362 U.S. 217, 233 (1960) (declining to extend Fourth Amendment protections to an alien because of a long history of legislative and judicial "recognition of the propriety of administrative arrest for deportable aliens").

II

Petitioners and the dissenters nonetheless contend that the Constitution somehow sets a substantive floor below which neither Congress nor the President can dip. It's unclear whether this purportedly substantive constitutional floor is supposed to sound in the Suspension Clause, Article III, the Due Process Clause that actually appears in the Fifth Amendment, or in some substantive judge-made variant of "due process" untethered from the Constitution. JUDGE SOUTHWICK, for example, says "liberty from physical restraint" is a right "enumerated" in the Fifth Amendment. *Post*, at 101-02. Of course, that phrase does not appear in the Fifth Amendment, nor does that Amendment (or any other part of the written Constitution) create a freestanding "liberty from physical restraint." If it did, query how we'd have any jails at all. Such invocations of "liberty" recall Lincoln's famous observation: "We all declare for Liberty; but in using the same word we do not all mean the same thing." Address at Sanitary Fair at Baltimore, Md. (Apr. 18, 1864), *reprinted in* 7 THE COLLECTED WORKS OF ABRAHAM LINCOLN 301 (R. Basler ed., 1953) (quoted in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239 & n.20 (2022)).

JUDGE DOUGLAS, by contrast, eschews the written Constitution entirely and openly acknowledges that the constitutional floor should be created by judges as "substantive due process." *Post*, at 134. While recognizing that the right she urges appears nowhere in the Constitution itself, JUDGE DOUGLAS also proclaims that denying an unwritten judge-made substantive due process right would "detonate[] the core of the Due Process Clause." *Post*, at 133. If the Clause is a donut with an invisible and unwritten core, query how its core can be "detonate[d]."

The real question is this: What precisely does the Constitution require for unadmitted aliens and immigration-related detention? The short answer,

with potential complications not relevant here, is *nothing*. The process Congress chooses to provide is, by definition, all the process an unadmitted alien is due. This conclusion (A) follows from eight propositions that the Supreme Court has repeatedly reaffirmed, and (B) it cannot be countermanded by inferior federal courts.

A

Let's begin with eight propositions that the Supreme Court has announced and reaffirmed for centuries. These reduce to one incontrovertible point: Congress defines the aliens' strike zone.

First, the Constitution allows the political branches to exclude or expel any and all aliens—full stop. "[T]he power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953). "[A]nd a concomitant of that power [to exclude or expel all aliens] is the power to set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139. If the political departments determine that an alien should be removed from our country, the alien has no constitutional right to direct judicial review of that decision: "No judicial review is guaranteed by the Constitution." *Carlson v. Landon*, 342 U.S. 524, 537 (1952); *see also id.* at n.28 (collecting decisions dating back to 1904 for that proposition). The alien may petition for habeas relief, but that is the only procedure the Constitution requires.

Second, the Government's power to detain aliens is a necessary corollary to its power to remove them. "[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of

the deportation process." *Demore*, 538 U.S. at 523. Deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." *Wong Wing v. United States*, 163 U.S. 228, 235 (1896); *see also Reno v. Flores*, 507 U.S. 292, 305–06 (1993) ("Respondents do not dispute that Congress has the authority to detain aliens suspected of entering the country illegally pending their deportation hearings."). As the Court put it in *Carlson*: "Detention is necessarily a part of this deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings." 342 U.S. at 538.

Because the Government can exclude all aliens, it necessarily can detain all unadmitted aliens pending their removals. The Court made this point explicitly in *Demore*. *See* 538 U.S. at 523–28. And Congress can deny bail to all aliens—as it did for all aliens before 1907. *See id.* at 523 n.7; An act to regulate the immigration of aliens into the United States, § 20, 34 Stat. 898, 905 (1907) (creating bail for immigration detainees for the first time in American history). To argue that the Constitution requires bail for aliens even when no statute permitted it before 1907, *see post*, at 136 (DOUGLAS, J., dissenting), is to argue that the Supreme Court was wrong in *Demore*, that all federal immigration laws were unconstitutional for our Nation's first 118 years, or both.

Third, the general-law privilege to petition for habeas corpus is the only limit on Congress's power to authorize the detention of unadmitted aliens pending their deportations. *See, e.g.*, *Thuraissigiam*, 591 U.S. at 141–50 (THOMAS, J., concurring).[23] The Due Process Clause—in either its

[23] JUSTICE THOMAS refers to "the writ of habeas corpus" as "a substantive right." *Thuraissigiam*, 591 U.S. at 144 (THOMAS, J., concurring). But he also says habeas

procedural or substantive varieties—adds nothing. That is because Congress can constitutionally exclude or expel all aliens (proposition one) and aliens have no constitutional right to the review of any exclusion or expulsion decision (proposition two). Together, that necessarily means that unadmitted aliens have no right under the Due Process Clause to challenge whether and how Congress and the Executive exclude or expel them. The Supreme Court has so held time and time and time again. *See Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (As to unadmitted aliens, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." (emphasis added)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."); *Landon*, 459 U.S. at 32 ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.");

---

"play[s] only a procedural role" and simply ensures that "no man can be confined without inquiry." *Id.* at 143, 144 n.2 (quoting, in part, 4 Debates in the Several State Conventions 171 (J. Elliot ed., 1891) (James Iredell)). And he also "express[es] no view on the question whether" the writ can even issue to an unadmitted alien. *Id.* at 141 n.1. I believe we are saying the same thing in different ways: The writ of habeas corpus is protected by the general law predating the Constitution. *See supra*, at 57. In that sense, habeas corpus (and sovereign immunity, *see supra* n.10) are part of "the plan of the convention" and hence protected by the Constitution in a meaningful way. *Thuraissigiam*, 591 U.S. at 145 (Thomas, J., concurring) (quotation omitted). And in that sense, the Constitution's general-law foundation protects habeas and hence gives detainees a privilege to challenge arbitrary detention. What counts as arbitrary detention can change based on the underlying substantive law: What counts as arbitrary for civilians in peacetime might not count as arbitrary for enemy aliens, for example. The important point, however, is that habeas corpus is a procedural mechanism for vindicating substantive rights secured elsewhere.

*Thuraissigiam*, 591 U.S. at 138–39 (reaffirming all of this and invoking "more than a century of precedent" to support it).

Fourth, the Constitution guarantees certain rights to citizens—but those guarantees do not apply to unadmitted aliens. "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976).[24] And since *Diaz*, the "Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 522; *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (same); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990) (same); *Flores*, 507 U.S. at 305–06 (same); *Zadvydas*, 533 U.S. at 718 (KENNEDY, J., dissenting) (same).[25] Congress plainly could not authorize the arrest and indefinite detention of citizens without bail or mainprise, for example. But Congress did precisely that to aliens in 1798, *see supra* n.19 and accompanying text, just as England did in its Aliens Acts.

True, the Supreme Court has said that aliens may not be held "indefinite[ly]," without trial, and in "potentially permanent" immigration detention. *Zadvydas*, 533 U.S. at 690–91. That's because an alien may be

---

[24] This is why denying pretrial bail to all citizens would raise a due process concern, while denying pre-adjudication bail to unadmitted aliens does not. Congress has plenary power over immigration and thus may define the rights of unadmitted aliens. The same is not true for citizens.

[25] Importantly, the Supreme Court has long held that the Constitution requires more process when deporting someone who credibly claims to be a United States citizen. *See, e.g.*, *Chin Yow v. United States*, 208 U.S. 8, 12–13 (1908). That rule aims to protect "the right[s] of citizens" rather than those of aliens. *Id.* at 12. This is a complete answer to JUDGE DOUGLAS's suggestion that American citizens are somehow at risk from today's decision, and that we must carry our passports to protect ourselves. *Post*, at 139 (DOUGLAS, J., dissenting).

detained as a part of effectuating his removal. But if the Government cannot actually remove the alien—as in *Zadvydas*—then "detention no longer bear[s] [a] reasonable relation to the purpose for which the individual [was] committed." 533 U.S. at 690. Detaining an alien forever, without trial, implicates the core purpose of habeas: ensuring the Government has a valid reason for jailing someone. The Constitution does not grant Congress any power that would permit it to authorize the Government to indefinitely detain someone for no reason. When the Government detains an alien pending his removal proceeding, by contrast, that detention "*necessarily* serves [an immigration] purpose." *Demore*, 538 U.S. at 528 (emphasis added). Because Congress has plenary power over immigration, that reason suffices to justify detention.

This necessarily means that Congress can choose, in its legislative prerogative, to give aliens rights. It can create procedural protections, craft a bail system, and even extend legal status to otherwise illegal aliens. But it's not obligated to do so.[26] And if Congress says "no individualized hearings" or "no bail or mainprise," that's that. Illegal aliens are entitled to the process that Congress gives them, and nothing more. *See Demore*, 538 U.S. at 526–27, 531 (holding that the Constitution permitted Congress to detain aliens without bail pending removal proceedings); *Flores*, 507 U.S. at 297, 313–15 (holding that the Constitution permitted Congress to permit the release of detained alien minors only into the care of their parents, legal guardians, or

[26] This reasoning lends itself to an important corollary: Because the political branches' plenary power extends only to exclusion and expulsion proceedings, Congress's ability to define the process due to aliens is also limited to that context. *See Thuraissigiam*, 591 U.S. at 103; *Demore*, 538 U.S. at 523. By contrast, Congress does not have plenary power to impose criminal punishment on aliens. That's why the Supreme Court has long held that aliens and citizens alike are entitled to the Constitution's criminal-procedure guarantees. *See, e.g.*, *Zadvydas*, 533 U.S. at 694; *Wong Wing*, 163 U.S. at 236–37. Obviously, "deportation is not a punishment for crime." *Wong Wing*, 163 U.S. at 236.

certain other adult relatives); *Carlson*, 342 U.S. at 542 (holding that the Constitution permitted Congress to grant the Attorney General discretion to deny aliens bail pending removal proceedings because they were Communists).

Thus, the dissenters are conflating distinct legal concepts when they claim that "liberty" rights and "habeas" privileges are held by all people—citizen and alien alike—in equal measure. Under current law, aliens have access to the Great Writ in the same way that citizens do—in the sense that they can both petition for a court to review their detentions. But underlying substantive rights do not travel hand-in-hand with the procedural privileges afforded by habeas. When judges evaluate the immigration detention of unadmitted aliens, the Constitution fully delegates the definition of the strike zone to Congress in a way that is not true of citizens. If Congress says that for unadmitted aliens it's all balls and no strikes, judges have no choice but to call the game that way. And that remains true even if it offends modern sensibilities to know citizens have a different strike zone. To hold otherwise is to underrule *Demore*, *Fiallo*, *Verdugo-Urquidez*, *Diaz*, and more.

Fifth, the Supreme Court has rejected the idea that aliens can use the "substantive" component of the due process clause to invent new alien rights not created by Congress. In *Demore*, for example, the Ninth Circuit invoked "substantive" due process to demand that the Government justify the choices Congress made in the INA. *See* 538 U.S. at 515 (citing *Kim v. Ziglar*, 276 F.3d 523, 528, 531–38 (9th Cir. 2002)). The INA said permanent resident aliens get X rights and not Y rights. But in the Ninth Circuit's view, federal judges could act as roving commissions employing "substantive" due process to test Congress's choices. The Supreme Court emphatically rejected that contention. *Id.* at 531.

And that makes perfect sense. If Congress said "the clean air standard for pollutant Z is X parts per billion (ppb)," a coal-fired powerplant could not use the "substantive" due process clause to demand that a court set it at X+Y ppb on the theory that Congress didn't think about the problem hard enough or relied on bad science. Nor could the company use its "substantive" due process suit to relitigate in federal court any other legislative choices that Congress made—as if federal courtrooms were substitutes for congressional committee rooms. So too here: Congress said aliens get X rights. No part of "substantive" due process allows a court to give aliens X+Y.

Sixth, an alien can be forced to choose between pursuing his procedural remedies under the INA and getting out of immigration detention. In *Demore*, the Court discussed the alleged unfairness in requiring aliens to pursue their INA remedies from detention. Before Congress enacted § 1226(c), aliens were able to file "frivolous appeals in order to delay their deportation," and they could do it cost-free because they were at liberty inside the United States. 538 U.S. at 530 n.14. Once the aliens were forced to remain in detention while they pursued their INA remedies, however, the alien in *Demore* worried that "the length of detention required to appeal may deter aliens from exercising their right to do so." *Ibid.* The Supreme Court rebuffed the concern: "As we have explained before, . . . the legal system . . . is replete with situations requiring the making of difficult judgments as to which course to follow, and, even in the criminal context, there is no constitutional prohibition against requiring parties to make such choices." *Ibid.* (quotation omitted).

An alien can be asked to choose between (A) staying in detention while exhausting his remedies under the INA and (B) dropping his INA appeals and walking out of jail, *see ibid.*, just as an alien can be asked to choose between (A) staying in detention while completing his removal proceedings and (B) walking out of the detention center to board a plane back to his home

country (or, for that matter, a third country). As the banishment cases in both England and America illustrate, the choices put to detainees used to be significantly more difficult. The English Habeas Corpus Act of 1679 prohibited abusive and evasive pretrial transfers like Lilburne's—but it *permitted* banishment if the detainee agreed to it as a condition of his pardon. Habeas Corpus Act of 1679, 31 Cha. 2 c. 2, § XIV. That history, which informed our Framers' understanding of the Great Writ and the liberty it protects, reinforces *Demore*'s teaching that the Constitution does not prohibit difficult choices. So the choice facing today's petitioners between remaining in detention to pursue their remedies under the INA and departing the country of their own free will does not, without more, offend the Constitution. That is why Thuraissigiam was entitled to release—"provided the release occurs in the cabin of a plane bound for [his home country of] Sri Lanka." 591 U.S. at 119.

Seventh, the Court has said that once the Government allows an alien to enter the United States through a port of entry, the Constitution guarantees certain minimal procedures before the Government can deport him. Take *Mezei* for example. "He was admitted to the United States on December 23, 1923, for permanent residence and has lived for the past twenty-five odd years in Buffalo, New York, where he owns his own house. He is married to a native-born American and his children were also born in this country." *United States ex rel. Mezei v. Shaughnessy*, 195 F.2d 964, 966 (2d Cir. 1952), *rev'd*, 345 U.S. 206 (1953). "[D]uring World War II he sold United States War Bonds[] and acted as a civilian defense air-raid warden." *Ibid.* The Attorney General later determined that Mezei should be deported based on classified information that undermined his admission, and the Government detained Mezei at Ellis Island for 21 months pending his removal. 345 U.S. at 209. In reviewing Mezei's habeas petition, the Supreme Court said: "It is true that aliens who have once passed through our gates,

even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Id.* at 212. But the Attorney General denied Mezei *any* hearing to contest the grounds of his exclusion. The Supreme Court nevertheless held the Constitution did nothing to guarantee Mezei such a hearing. *Id.* at 212–13. Nothing in the Constitution or the Due Process Clause required the Attorney General to disclose the factual basis for his exclusion decision. *Id.* at 212. And the Court held that Mezei's prior, lawful, permanent residence in the United States for *25 years* did nothing to give him any additional constitutional rights. *Id.* at 213. Accordingly, it denied Mezei's habeas petition. *Id.* at 215–16.

It makes some sense to say that, once the Government gives someone something, it must comport with minimal due process to take it away. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *accord Mathews v. Eldridge*, 424 U.S. 319 (1976) (holding the Government must provide constitutional due process to take away social security benefits once they're given). The key point in *Mezei* was that he was previously admitted to the United States. The Government gave him something—namely, a piece of paper authorizing his lawful permanent residence. Even if it later turned out that he was admitted in error or that he lied in his entry paperwork or that the Attorney General otherwise decided to exclude him, Mezei was owed some minimal due process to take away his immigration status. The emphasis is on *minimal*: Mezei got no hearing and no opportunity even to know (much less challenge) the factual basis for the Attorney General's decision. But he got some constitutional due process nonetheless.

Crucially, however, the Court has also said the Constitution guarantees *nothing* to "aliens who . . . entered clandestinely." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950). The Court has reiterated this point many times—both before and after *Mezei*. *See, e.g.*, *Ng Fung Ho v. White*, 259 U.S. 276, 282 (1922) (due process requirements do not apply to "persons who entered surreptitiously" into the country); *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903) ("*The Japanese Immigrant Case*") (declining to extend due process to those who have "entered the country clandestinely"); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 & nn.5–6 (1953) (similar); *see also Johnson v. Eisentrager*, 339 U.S. 763, 770–71 (1950) (alien entitled to "full and fair hearing" before deportation if he is "lawful[ly] presen[t] in the United States"). Nor does it matter if the alien sneaked into the country and then lived here unlawfully for some period of time. The Supreme Court has said that an alien's "absor[ption] into our community life" is a powerful policy argument for *Congress* to provide statutory protections for removal hearings—as it did in the INA. *Carlson*, 342 U.S. at 537–38. But the only thing an Executive official must do to satisfy due process in removing such long-residing aliens is to comply with Congress's statutory commands. *Ibid.*

This also makes sense. As already established, aliens facing deportation receive fewer due process rights than citizens, and Congress has plenary power to exclude anyone from entering the United States for any reason. *See supra*, at 80-83. The alien who cheats the system by smuggling himself into the country does *not* win more rights as a result of his law-breaking. Because such aliens remain legally unadmitted, they receive exactly the same due process rights that they would have if they had come through a legal port of entry—which are whatever rights Congress chooses to give them. *See Thuraissigiam*, 591 U.S. at 139. To hold otherwise would be to endorse an "adverse-possession theory" of constitutional rights. *Ante*, at 22 (majority opinion) (quoting *W.M.M. v. Trump*, 154 F.4th 207, 295 n.29 (5th

Cir. 2025) (Oldham, J., dissenting)). That theory would "undermine the sovereign prerogative of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location." *Thuraissigiam*, 591 U.S. at 140 (quotation omitted). To put it simply: The Constitution does not require the United States Government to give up control of its immigration policy and to reward scofflaws for their lawlessness. Our fundamental law is neither "a suicide pact" nor a blank check for rule-breakers. *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

Eighth, it is true that the Supreme Court recently said that aliens (including, presumably, unadmitted aliens) "must have sufficient time and information" to "actually seek habeas relief" before deportation. *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025) (per curiam) (quotation omitted); *accord Trump v. J.G.G.*, 604 U.S. 670, 672–73 (2025) (per curiam). To support this statement, the Supreme Court cited the Fifth Amendment, *Mullane*, and *Yamataya* (*The Japanese Immigrant Case*). *See A.A.R.P.*, 605 U.S. at 94; *J.G.G.*, 604 U.S. at 673.

Both *A.A.R.P.* and *J.G.G.* arose on the Supreme Court's emergency docket and were decided without full briefing and argument. I suppose it's possible that the Court meant to use those emergency matters to overturn *Nishimura Ekiu*, *Mezei*, *Kwong Hai Chew*, *Ng Fung Ho*, *Yamataya*, *Knauff*, *Wong Yang Sung*, *Landon*, *Carlson*, and *Thuraissigiam*—which all together stand for the proposition that the procedures provided by Congress *are* due process as to unadmitted aliens, even if those aliens infiltrate the country undetected. I suppose it's also possible that the Court meant to overturn all of these cases in two emergency orders *sub silentio*. But that would be quite a large elephant to hide in quite a tiny mousehole.

When faced with such seemingly conflicting precedents, the best approach is to read them in harmony rather than dissonance. The only immigration case the Court cited in either *A.A.R.P.* or *J.G.G.* was *Yamataya* (*The Japanese Immigrant Case*). And in *Yamataya*, the alien was lawfully admitted. She was allowed to land at the port of Seattle, and she entered the United States after inspection. *See* 189 U.S. at 87. Then, after she was admitted, the Secretary of the Treasury invoked his statutory power to investigate potential public charges within one year of their admission. *See id.* at 99. The Secretary found that Yamataya was likely to be a public charge, arrested her, and then ordered her removed. The Court left "on one side the question whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely." *Id.* at 100. Yamataya, by contrast, presented herself to immigration officers and was allowed to enter the country like Mezei was. So Yamataya had a right sounding in "due process" to be heard on any objections to her exclusion. *Id.* at 101. This is consistent with plenty of other cases that have recognized that aliens have minimal due process rights *only after* they've been allowed to enter the country in accordance with Congress's laws. *See, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 187, 188 n.5 (1958) (alien lawfully paroled into the country in accordance with INA's parole provision). It is unclear what that means for aliens like A.A.R.P., J.G.G., or the petitioners in our case—all of whom snuck across the border and never were admitted or paroled or otherwise allowed to set foot in the country for even one second.

Moreover, even if the short emergency orders in *A.A.R.P.* and *J.G.G.* overturned every immigration decision in America's history dating back to the Alien Friends and Alien Enemies Acts, it would not justify the dissenters' position here. It is true that the Constitution and general law protect the aliens' privileges to "actually seek habeas relief." *A.A.R.P.*, 605 U.S. at 94; *see supra*, at 57 & n.233. But the habeas privilege says nothing about whether

any alien is entitled to release. Much less does the habeas privilege ever—even in *A.A.R.P.* and *J.G.G.*—entitle an alien to demand release into the United States. *See Thuraissigiam*, 591 U.S. at 119 (Government can release an alien into "cabin of a plane bound for Sri Lanka"). And much less still does the habeas privilege ever entitle any alien to ask for or receive an injunction banning his arrest and removal from the United States. *But see post*, at 101 (SOUTHWICK, J., dissenting) (defending district courts' use of habeas to enjoin petitioners' arrests and hence to interfere with their removals); *post*, at 138–39 (DOUGLAS, J., dissenting) (similar). While an alien can petition for habeas corpus, Congress retains its plenary power to set aliens' substantive legal rights (to stay in the country, to be removed, to be held in immigration detention, &c.) at whatever level the political departments deem wise. No part of Congress's substantive law authorizes federal district judges to enjoin aliens' removals. In fact, Congress affirmatively prohibits it. *See* 8 U.S.C. § 1252(a)(1), (a)(5), (b)(9) (requiring challenges to final order of removal to be brought in courts of appeals and stripping courts of habeas jurisdiction); *id.* § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to . . . execute removal orders.").

*

The upshot of these eight propositions is that Congress, and Congress alone, defines an unadmitted alien's strike zone. Congress can expand it or contract it, as it has over time. But what Congress says goes, and the Constitution does nothing to change what counts as a ball or a strike. It's not clear that such aliens in immigration detention are entitled to an umpire at all. Again, Congress can provide an umpire, and it can give the umpire more or less power—as it did in the Alien Friends Act (little or no substantive rights) and the 1891 Immigration Act (greater substantive rights). But the

Constitution does nothing to regulate or constrain this choice, except to protect whatever habeas rights predated the American Founding. And as explained in Part I and in the eight propositions listed here, no part of England's habeas privilege or ours come close to prohibiting the Government from detaining an alien for three weeks pending his removal proceeding.

B

JUDGE DOUGLAS refers to all of this as "sham history." *Post*, at 137 (DOUGLAS, J., dissenting). While she's entitled to her opinion on the history, the same cannot be said for Supreme Court precedent. Even if law professors and student law-review editors at Yale can say "Supreme Court precedent is wrong and should not be followed," *see* Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. 1533 (2026), inferior federal court judges cannot. Yet JUDGE DOUGLAS relies on this Nash article to say *Demore* was wrong, that bail *was* available to aliens before 1907 notwithstanding the Supreme Court's holding to the contrary, *see Demore*, 538 U.S. at 523–25 & n.7, and that we should follow Professor Nash's views rather than the Supreme Court's, *see* Nash, *supra*, at 1543, 1612–13 (article's historical analysis "provid[es] a strong basis for [*Demore*'s] reconsideration" as well as "a powerful rejoinder for dissenting Justices" in future cases applying *Demore*).

I respectfully disagree. We "are bound by the Supreme Court's explications of law." *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 513 (5th Cir. 2026) (DOUGLAS, J., dissenting) (quotation omitted). And exotic theories that grab attention in New Haven are not substitutes for Supreme Court precedent or the way habeas and immigration law actually developed in England and America over more than 400 years. To paraphrase Holmes, a page of Anglo-American history is worth a volume of law review articles. *See N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921).

Even if law review articles were substitutes for law, Nash's is unconvincing. The article's basic premise is that bail was generally available to aliens before it was formally authorized by statute in 1907. Nash, *supra*, at 1617. Nash points to a few district court cases from the late 1800s and early 1900s as proof that "federal courts around the [N]ation consistently concluded that they possessed the authority to grant pretrial release" to aliens. *Id.* at 1565–66 & nn.154–60. As an initial matter, these cases date to the "finality era," during which Congress gave district courts strikingly broad powers to review immigration decisions. *See Nishimura Ekiu*, 142 U.S. at 660. And the Supreme Court has already told us not to follow those expansive conceptions of habeas corpus in the post-IIRIRA world. *See Thuraissigiam*, 591 U.S. at 128–36.

And insofar as a few district judges inferred the existence of bail when Congress did not authorize it, that is hardly proof that *the Constitution* requires it. That's particularly true given that some of Nash's citations point to district courts that inferred the existence of bail *only to deny relief*. *See, e.g.*, *In re Chin Wah*, 182 F. 256, 259 (D. Or. 1910) (court felt it had the power to grant bail but decided not to because "bail is not a matter of right" and the alien appeared to be dilatory); *United States v. Fah Chung*, 132 F. 109, 113 (S.D. Ga. 1904) (similar). Haupt and Hamdi also had a privilege to petition for habeas corpus, but only to hear the court say: "You lose." The idea that a few district judges gave aliens like Chin Wah and Fah Chung the same privilege—even if they gave it illegally, *see Thuraissigiam*, 591 U.S. at 141 n.1 (THOMAS, J., concurring)—is hardly the stuff of a new substantive due process rule when the aliens ultimately *lost* and were remanded to immigration detention.

Finally, Nash points to administrative decisions by the Executive to grant pretrial bail to aliens awaiting removal proceedings. Nash, *supra*, at 1586–87. This is perfectly consistent with the point that the political

departments have plenary authority over deportation decisions. If the Executive wants to bail an alien, that's the Executive's prerogative. It says nothing about whether courts have the power to do so. Nor does it say anything about whether the Constitution gives aliens an extratextual right to bail. To put a finer point on things: The article contends that the policy decisions of a few obscure bureaucrats from the late 19th century should trump hundreds of years of Anglo-American history and the Supreme Court's considered judgment regarding the meaning of the Constitution. To describe that argument is to defeat it.

An additional problem with following law review articles over Supreme Court precedent is that it encourages district courts to likewise disregard Article III's structure. Numerous district courts raced to grant petitions before we could hear argument and issue a decision in this case. *See, e.g.*, *Mercado Levya v. U.S. Dep't of Just. Immigr. Ct.*, No. 26-CV-01196, 2026 WL 2211321 (S.D. Tex. July 23, 2026); *Tolentino-Rodriguez v. Blanche*, No. 26-CV-05611, 2026 WL 2214131 (S.D. Tex. July 29, 2026); *Tiquiram-Us v. Warden*, No. 26-CV-04473, 2026 WL 2242499 (W.D. Tex. July 31, 2026); *Lerma-Huipio v. Mullin*, No. 26-CV-1766, 2026 WL 2415270 (W.D. Tex. Aug. 18, 2026); *Rosas Garcia v. Blanche*, No. 26-CV-01805, 2026 WL 2519134 (W.D. Tex. Aug. 24, 2026); *Luna Jimenez v. Ortega*, No. 26-CV-1738, 2026 WL 2518011 (W.D. Tex. Aug. 24, 2026); *Jaramillo Hernandez v. Mullin*, No. 26-CV-2009, 2026 WL 2519136 (W.D. Tex. Aug. 24, 2026); *Torres Crispin v. Vergara*, No. 26-CV-2079, 2026 WL 2519476 (W.D. Tex. Aug. 24, 2026); *Ortiz Garcia v. Ortega*, No. 26-CV-2149, 2026 WL 2519477 (W.D. Tex. Aug. 24, 2026); *Ibarra Perez v. Blanche*, No. 26-CV-2217, 2026 WL 2519138 (W.D. Tex. Aug. 24, 2026); *Azogue Atacushi v. Collins*, No. 26-CV-2259, 2026 WL 2518008 (W.D. Tex. Aug. 25, 2026); *Diaz Malavar v. T. Don Hutto Det. Ctr.*, No. 26-CV-2267, 2026 WL 2519137 (W.D. Tex. Aug. 26, 2026); *Chen Choy v. Warden*, No. 26-CV-00774, 2026 WL 2597945 (S.D. Tex. Sept. 2, 2026);

*Diaz Fossi v. Warden*, No. 26-CV-00864, 2026 WL 2620573 (S.D. Tex. Sept. 4, 2026); *Argilagos v. Warden*, No. 26-3181, 2026 WL 3001013 (S.D. Tex. Oct. 5, 2026).

The Government attempted to stop this race to the courthouse. It moved for a "precedential stay" in our court. We granted the stay in a published order on July 21, 2026. *Sosnava Rodriguez v. Ortega*, No. 26-50183, Dkt. No. 178-1 at 13. But some district courts told us to kick rocks. One district judge replicated an identical footnote in several of his opinions acknowledging the "precedential" stay order from this court. Yet each time, the district court decided to underrule us and forge ahead with granting habeas relief anyway. *See, e.g.*, *Jimenez*, 2026 WL 2518011, at *1 n.2; *Lerma-Huipio*, 2026 WL 2415270, at *1 n.2; *Rosas Garcia*, 2026 WL 2519134, at *1 n.1. That is deeply problematic. *See NIH v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part). I worry that even today's decision will not stop this conduct. And the rule of law will suffer as a result.

* * *

It's an amateurish caricature of originalism to search for a word or phrase in *The Federalist Papers*, wrench it from context, paste it into a brief or opinion, and declare erudition with a citation from the eighteenth century. But the petitioners' briefs exude this historically sophomoric energy. They cite this or that quotation from Magna Carta, Coke, and Blackstone and then declare that, voilà, aliens have some freewheeling "core constitutional right to physical liberty" that renders unconstitutional a three-week immigration detention. En Banc Red Br. at 2; *see also id.* at 2–3 (citing Magna Carta, Coke, and Blackstone). The dissents replicate this category error: They declare "Liberty!"; divorce it entirely from constitutional text and context; and then pretend that this case does not implicate substantive due process.

That is wrong coming and going. As to the scope of the writ of habeas corpus, today's aliens have the same privileges that Wyatt, Darnel, Lilburne, Milligan, Haupt, and Hamdi had: They have the general-law privilege to ask a court of competent jurisdiction to review the legality of their detentions. All of them have the privilege to ask for an umpire. But none of them have a habeas right to demand this or that pitch be called a ball or a strike. The definition of balls and strikes instead comes from the substantive rules promulgated by Congress. Congress commanded the Executive to arrest these three aliens and to hold them without bond under 8 U.S.C. § 1225(b)(2)(A), just as Congress commanded in 1798 and as Parliament demanded in the Aliens Act of 1793. So when a federal court sits in habeas to review the legality of these aliens' detentions, the privilege of habeas corpus entitles them to hear a federal judge say: "You lose." No part of the Great Writ or the Due Process Clause authorizes federal district courts to create exotic new injunctions that prohibit the Government from re-arresting unadmitted aliens to remove them from the United States.

The Supreme Court, of course, could change that. The Court could say "we are recognizing a new substantive due process right to hold § 1225(b)(2)(A) unconstitutional." But even if the Court were to do that, it would have nothing at all to do with the Great Writ or originalism. It would instead add a new shade to John Hart Ely's color wheel.

Priscilla Richman, *Circuit Judge*, concurring:

I concur in the judgment denying habeas relief.

First, I agree with the majority opinion that under 8 U.S.C. § 1225(a)(1), each Petitioner in the cases before us is "deemed" to be "an applicant for admission" into the United States. It is also clear from § 1225 that Congress expressly contemplated that some aliens who illegally entered would make their way far beyond our borders and live within our country more than two years without apprehension by immigrations authorities. This is evident from § 1225(b)(1)(A)(iii)(II). Aliens like Petitioners are expressly described in that clause as aliens who have "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." Congress provided in § 1225(b)(1)(A)(iii)(I) that aliens in this category would not be subject to the expedited removal procedures set forth in § 1225(b)(1). Petitioners are instead covered by the procedures in § 1225(b)(2), which provides in (b)(2)(A) that if the "alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." Petitioners were detained under this statutory provision.

Second, I agree with the majority opinion that the Due Process Clause does not require that aliens like Petitioners be given a bond hearing or other hearing prior to being detained pending removal proceedings under § 1229a, if they are apprehended and detained under § 1225. I express no opinion as to whether immigration officials might instead proceed to detain aliens like Petitioners under 8 U.S.C. § 1226, and if so, whether a hearing would be required. Those questions are not before the en banc court.

Third, as the majority opinion explains, "Petitioners have not challenged the duration of their detention as unconstitutional." I therefore

concur that habeas relief should be denied. To the extent the en banc court opines on what due process might require under different circumstances, it seems clear from the Supreme Court's decisions in this area that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."[1]

[1] *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).

LESLIE H. SOUTHWICK, *Circuit Judge*, joined by STEWART, GRAVES, HIGGINSON, DOUGLAS, and RAMIREZ, *Circuit Judges*, dissenting:

This en banc court is divided on whether the Constitution allows every alien who is in this country without authorization and in removal proceedings to be detained for the length of those proceedings, however long, with no right to seek release. A decision is necessary because the court recently issued a precedential opinion that a statute mandates that detention. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026) (interpreting 8 U.S.C. § 1225(b)(2)(A)). That is the minority position among the circuits.[1]

Should the Supreme Court eventually determine that this court was wrong as to the statute, then the constitutional issue we address here will have far less significance. It certainly has significance at the moment.

Concluding that a due process right exists is straightforward. The Supreme Court has been consistent that even those in this country without authorization have rights under the Fifth Amendment. I commend the en banc majority for stating "there is no dispute that Petitioners enjoy the protections of the Fifth Amendment." Majority opinion at 11. The details of those rights in the context of this case are matters for which only limited direct guidance exists. We cannot avoid the issue, so I begin.

The majority has clearly and carefully explained its conclusion that those who have entered this country illegally, even those who have resided in this country for two decades, can be detained indefinitely during removal proceedings because of their illegal presence. With respect, I conclude this court has constructed an impenetrable wall between the Constitution and

---

[1] *See* Kemal Hepsen, *Noncitizen Detention Circuit Split Is Built for Supreme Court*, BLOOMBERG LAW (Aug. 25, 2026, 10:00 AM), https://perma.cc/MH7D-GNTE. JUDGE HIGGINSON's dissent explores the statutory issue in detail.

these long-term residents, a wall not designed, recognized, or even suggested by the Supreme Court.

My able colleagues in the majority also are concerned that district courts have been overwhelmed by immigration detainees seeking relief in their courts due to *Buenrostro*'s closing of other options for release. It is a genuine, nearly intractable situation. The role for us remains to apply the Constitution, and if the answer does not solve or even ameliorate the crisis, that means the answer must come from elsewhere.

The Supreme Court has told us for over a century what "liberty" means at its core, and that aliens improperly residing here have an interest in it. The Court has also recognized that detention is a valid part of the removal process while the Government reaches a decision on whether the person will be removed. What its opinions do not support, however, is the proposition that an alien may be held for as long as that decision takes, however delayed, with no right to be considered for release. I conclude that those decisions, reasonably interpreted, prohibit detention of these individuals without more justification than the Government has offered here. Consequently, with respect, I dissent.

*I. The Liberty Interest*

Petitioners assert an interest in "[f]reedom from bodily restraint," which the Supreme Court has called "the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The majority answers that Petitioners have framed that interest "at too high a level of abstraction." *See* majority opinion at 21. "Correctly viewed," it says, they assert something else — "the right to freedom from custody pending removal proceedings" — which is "unenumerated" and so must satisfy *Washington v. Glucksberg*, 521 U.S. 702 (1997). *See* majority opinion at 24. The majority's analytical progression is this: no such right is deeply rooted

in history; there is no fundamental interest at stake; rational-basis review applies; and the statute "easily clears" that low barrier. *See* majority opinion at 24–27. To rephrase, the majority is saying that these individuals have no fundamental interest in freedom from physical detention because of their illegal presence. I cannot agree.

*Glucksberg* concerned a claimed right to physician-assisted suicide, a right found nowhere in the constitutional text. Its "careful description" requirement was announced to restrain courts who might be tempted to "break new ground in this field." *Glucksberg*, 521 U.S. at 720–21. The Court was explicit about what ground was already settled: "The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Id.* at 719. History and tradition are the guideposts for identifying the rest. *Id.* at 720–21.

Here, we are dealing with a right the Court has already described. It needs no additional careful description from us. *Glucksberg* itself distinguished "the specific freedoms protected by the Bill of Rights," including the rights the Court had already recognized, from those it was being asked to recognize for the first time. *Id.* at 720. When a right falls in the former group, the Court applies its precedents rather than restarting the inquiry. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion) (parental rights). Freedom from physical restraint falls in that group. It is the historical core of the word "liberty" itself. *See Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977); 1 William Blackstone, *Commentaries* *130, *134.

Indeed, I agree with Justice Thomas that due process at its most basic concerns liberty from physical restraint:

> As used in the Due Process Clauses, "liberty" most likely refers to "the power of locomotion, of changing situation, or

> removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law."

*Obergefell v. Hodges*, 576 U.S. 644, 723 (2015) (THOMAS, J., dissenting) (quoting Blackstone).

The Court has used similar descriptions many times:

- "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha*, 504 U.S. at 80; *accord Kansas v. Hendricks*, 521 U.S. 346, 356 (1997).
- "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).
- "[T]he most elemental of liberty interests . . . [is] the interest in being free from physical detention by one's own government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion).
- "This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979).
- "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Starting in the same year as its *Glucksberg* opinion and continuing in following years, the Court decided four prominent opinions involving physical restraint by the Government: *Hendricks*, *Zadvydas*, *Demore v. Kim*, 538 U.S. 510 (2003), and *Hamdi*. In none did it consider whether the

detainee's interest in liberty had been "carefully described" or was "deeply rooted." It took the interest as given and asked whether the Government had "justified" the restraint.[2]

Justification for the physical restraints must be shown. The Supreme Court's decisions have consistently identified three requirements for such a justification before there may be physical restraint in the context of civil proceedings. The first is a permissible purpose. Confinement outside the criminal process must serve a "legitimate regulatory goal" rather than punish. *Salerno*, 481 U.S. at 746–47. The Court has catalogued the goals it has accepted: detention of persons believed dangerous in time of war, "mentally unstable individuals who present a danger to the public," "dangerous defendants who become incompetent to stand trial," "potentially dangerous resident aliens pending deportation proceedings," and arrestees to ensure their presence at trial. *Id.* at 748–49 (citing, among other cases, *Carlson v. Landon*, 342 U.S. 524 (1952)). In the immigration setting, the Court has identified the two purposes as "preventing flight" and "protecting the community." *Zadvydas*, 533 U.S. at 690–91; *see Demore*, 538 U.S. at 528.

The second requirement is a demonstrated connection between the person confined and that purpose. The Government must show that confining this person, or this carefully defined class of persons, actually

---

[2] None of the four decisions cites *Glucksberg*. Nor would the results differ if its analysis applied. Freedom from physical restraint is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721 (quotation omitted). Indeed, it was the right from which due process rights were conceived. The "Magna Carta decreed that no man would be imprisoned contrary to the law of the land," *Boumediene v. Bush*, 553 U.S. 723, 740 (2008), and the words "due process of law" in the Fifth Amendment "were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Charta." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 276 (1856).

serves the purpose. The Court has upheld civil-commitment statutes that "coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality,'" *Hendricks*, 521 U.S. at 358; a pretrial-detention statute that reached only "a specific category of extremely serious offenses," as to which Congress had found arrestees "far more likely to be responsible for dangerous acts," and that required "a full-blown adversary hearing" on the point, *Salerno*, 481 U.S. at 750; and, a detention statute limited to criminal aliens, as to whom Congress had before it evidence that discretionary release led to "large numbers" absconding, *Demore*, 538 U.S. at 528. The showing may be individualized, as in *Salerno* and *Addington*, or categorical, as in *Demore*.

What the Court has not accepted is confinement resting on a status that "bears no relation" to the danger or flight risk the Government asserts. *Zadvydas*, 533 U.S. at 691–92.

The third requirement is proportionality between the confinement and its purpose. "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). *Zadvydas* applied that principle to immigration detention, 533 U.S. at 690, 699–701, and *Demore* relied on it in upholding detention "of a much shorter duration," 538 U.S. at 528. The *Carlson* decision, which upheld detention without bond, was careful to state that "the problem of *habeas corpus* after unusual delay in deportation hearings is not involved in this case." 342 U.S. at 546. JUSTICE KENNEDY, whose vote made the *Demore* majority, described what happens when the problem of delay does in fact arise: "Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight

or dangerousness, but to incarcerate for other reasons." 538 U.S. at 532–33 (KENNEDY, J., concurring).

Section 1225(b)(2)(A), as the majority interprets it, supplies the first requirement. It may supply the second as well, because detention for a *reasonable period* during removal proceedings is "a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523. It never supplies the third requirement. The majority's interpretation requires no showing, individualized or categorical, that confining any particular alien or any defined class of aliens serves that purpose, and it sets no limit on duration other than the length of the proceedings themselves. More on this in the final section of this opinion.

The majority offers four responses to this line of authority.

*First*, it says that most of the cases just cited involved citizens. *See* majority opinion at 21. *Zadvydas* did not. The Court there stated the rule for civil detention — permissible only where "a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint'" — in the same opinion in which it held that the Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 690, 693 (quoting *Hendricks*, 521 U.S. at 356).

The majority then attempts to set *Zadvydas* aside because it concerned detention *after* a removal order, and because its holding reached only aliens the Government could not remove and who therefore faced indefinite confinement. *See* majority opinion at 27–29. Those are accurate descriptions of the holding. They do not respond to the point for which I cite the opinion. The *Zadvydas* Court held that Section 1231(a)(6) could not be read to authorize indefinite detention because such a reading would raise "a serious constitutional problem," and it identified that problem by applying its civil

confinement framework. 533 U.S. at 690, 692. That framework follows this line of reasoning: aliens within the country are protected by the Due Process Clause; freedom from imprisonment is at the heart of the liberty it protects; civil detention therefore requires a special justification; and an "alien's removable status itself, which bears no relation to a detainee's dangerousness," is not one such justification. *Id.* at 691–93. The facts the majority emphasizes — that removal was no longer attainable and the detention had no end — had no bearing on whether the aliens had a liberty interest under the Due Process Clause to begin with. They bore on whether the Government's *justification* for the subsequent restraint was sufficient. The Court explained that the statute's flight-prevention rationale was "weak or nonexistent where removal seems a remote possibility," and that the dangerousness rationale requires "strong procedural protections." *Id.* at 690–91. That is the second step of the inquiry. I agree that these Petitioners' circumstances differ from Zadvydas's at that step. Indeed, *Demore* came out differently from *Zadvydas* for exactly those reasons. 538 U.S. at 527–29. But it came out differently only *after* the Court considered whether Congress had justified detaining the class before it and determined that it had. *Id.* at 518–20, 528.[3] Neither precedent supports the leap the majority takes, which is to deny that the liberty interest exists in the first place.

[3] Each requirement of the justification described is on the face of the *Demore* opinion. *Purpose*: the "detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing." 538 U.S. at 528. *Connection between the class and the purpose*: Congress acted against a "wholesale failure by the INS to deal with increasing rates of criminal activity by aliens," relying on a study showing that "77% [of criminal aliens] were arrested at least once more" and that "more than 20% . . . failed to appear for their removal hearings" after release. *Id.* at 518–19. That was a rate the Court found sufficient to conclude that discretionary release "would lead to an unacceptable rate of flight." *Id.* at

*Second*, the majority recasts the right at issue. Its authority is *Department of State v. Muñoz*, 602 U.S. 899 (2024). There the Court declined to treat a citizen's claim as one about "liberty" or "marriage" and described it instead as a claim to the admission of her noncitizen spouse. *Id.* at 909–11. The Court did the same in *Reno v. Flores*, explaining that freedom from physical restraint was "not at issue in this case. Surely not in the sense of shackles, chains, or barred cells," because the juveniles there had been placed in licensed programs and sought only release to unrelated adults. 507 U.S. 292, 302 (1993).

In both cases, the Court narrowed the description of the right because the claimant had lost less than the right claimed. Ms. Muñoz had not lost her liberty or her marriage; she had lost a visa for her husband. The *Flores* juveniles were not in "barred cells"; they were in licensed programs and wanted a different custodian. The careful description matched the right to the deprivation. Petitioners' case is the opposite. They *are* in "barred cells." What they have lost is exactly what they claim. It is neither statutory admission, which they concede may be denied them, nor release to a preferred custodian, but rather their physical liberty in the most literal sense.

The majority describes the right as one to "freedom from custody pending removal proceedings," and then treats the words "pending removal proceedings" as though they change the nature of the custody. *See* majority opinion at 24. They do not. Custody pending removal proceedings is custody. The Supreme Court has never suggested that the purpose for which

---

520. *Proportionality*: The detention had "a definite termination point" and in 85% of cases lasted an average of 47 days. *Id.* at 529.

The point is that the Court upheld the statute in *Demore* because Congress had shown, as to the class it selected, that detention served its purpose and lasted no longer than the purpose required.

the Government confines a person somehow alters the character of the interest confined.[4] The interest is freedom from physical restraint.

*Third*, the majority concludes from history that no fundamental right is at stake because Congress has not consistently provided aliens in Petitioners' position a statutory right to seek release on bond. *See* majority opinion at 24–25. That inquiry asks the wrong question, and even on its own terms it examines the wrong class.

The Supreme Court's civil-confinement decisions recognize the detainee's interest in liberty. The precedents then demand the Government justify the restraint. Where history and tradition have entered that analysis, they have done so by identifying the "carefully limited" circumstances in which confinement has been permitted. *See Salerno*, 481 U.S. at 748–49, 755; *Hendricks*, 521 U.S. at 357. The burden is on the Government to justify restraint, not on the prisoner to find history and tradition justifying physical freedom. Few of the Court's landmark liberty cases would survive the majority's methodology. There is no tradition of releasing persons found not guilty by reason of insanity from psychiatric commitment, *see Foucha*, 504 U.S. at 80–82, or of freeing citizens captured as enemy combatants from military custody, *see Hamdi*, 542 U.S. at 532 (plurality opinion). The Court did not look for one in either case. It had no need to, because freedom from physical restraint, in whatever form, is at the "core of the liberty protected

---

[4] The Court has said the opposite in case after case. Commitment for treatment of a "mental abnormality" is civil, but "freedom from bodily restraint" remains "at the core of the liberty protected." *Hendricks*, 521 U.S. at 356 (quoting *Foucha*, 504 U.S. at 80). Detention of an enemy combatant serves the war power, but the interest in being free from it is "the most elemental of liberty interests." *Hamdi*, 542 U.S. at 529 (plurality opinion). Detention to secure an alien's removal serves the immigration laws, but "freedom from imprisonment" still "lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. In each case, the purpose of the confinement bore on whether the confinement was justified, not on whether liberty was at stake.

by the Due Process Clause from arbitrary governmental action." *Foucha*, 504 U.S. at 80. That right may be limited, but only with a justification of the kind described above.

Even were history the measure, the history the majority recounts belongs to a different class of aliens. The detention requirements of the Immigration and Nationality Act of 1952 and of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") on which the majority relies governed aliens arriving at ports of entry and seeking to be let in. *See* majority opinion at 24–25; Pub. L. 82-414, 66 Stat. 163, 198–99 (June 27, 1952); Pub. L. No. 104-208, div. C, 110 Stat. 3009-546. Petitioners were not treated as members of that class until 2025. Indeed, before 1996, aliens who had entered without inspection were placed in deportation proceedings and were entitled to request release on bond. 8 U.S.C. § 1252(a)(1) (1994). For the twenty-nine years after 1996, the Government "allowed illegal resident aliens . . . to seek release on bond under § 1226(a)." *Buenrostro-Mendez*, 166 F.4th at 506. That practice was not new. In 1952, in the decision the majority relies on for categorical detention, the Supreme Court observed that "detention without bond has been the *exception*." *Carlson*, 342 U.S. at 538 n.31 (emphasis added). Six years later it repeated that "[p]hysical detention of aliens is now the *exception, not the rule*, and is generally employed only as to security risks or those likely to abscond." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (emphasis added). Whatever the tradition for aliens arriving at the border, the tradition for aliens living in the interior has been release on bond unless the Government shows danger or flight risk — the very showing Petitioners ask to have made.[5]

---

[5] The majority's footnote on Blackstone addresses only whether bail was assured. *See* majority opinion at 25 n.8. But Petitioners' claim does not depend on a right to bail. It

*Fourth*, the majority answers that any release Congress has permitted was "a matter of legislative grace rather than fundamental right," so only rational-basis review applies. *See* majority opinion at 26 (quoting *Muñoz*, 602 U.S. at 916). Admission is indeed a matter of grace; the Court has said so for more than a century. Physical restraint is constitutionally different. It cannot be imposed at the whim of Congress without justification. The cases holding that an alien has no right to be let in do not hold that an alien living here has no right to be let out of confinement even when the Government cannot justify the detention. The Court's civil-confinement decisions do not ask whether confinement itself, period, is "rationally related to legitimate government interests." *See* majority opinion at 26 (quoting *Glucksberg*, 521 U.S. at 728). They ask whether "the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed," *Jackson*, 406 U.S. at 738, and whether the Government has shown "a special justification" that "outweighs" the individual's interest,

---

depends on the older principle, which Blackstone placed among the "absolute rights of individuals," that personal liberty may not be restrained "unless by due course of law," and that arbitrary confinement — "by secretly hurrying [a man] to gaol, where his sufferings are unknown or forgotten" — is "a more dangerous engine of arbitrary government" than open despotism, precisely because it is less visible. 1 William Blackstone, *Commentaries* *134, *136.

As to bail itself, the majority notes that Blackstone acknowledged Parliament's power to forbid it. Whatever the English rule, the founding generation chose a different one. The Confederation Congress in the Northwest Ordinance, and the First Congress in the Judiciary Act of 1789, guaranteed bail in all but capital cases, as did nearly every State admitted after 1789. Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91; Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 HARV. L. REV. 1816, 1842–45 (2024). That history concerns criminal accusations and is, as its most careful students acknowledge, complex. *See* Funk & Mayson, *supra*, at 1895. I do not rely on it to establish a right. I note it only because the majority's footnote does not establish a tradition of confinement without cause.

*Zadvydas*, 533 U.S. at 690.[6] That is the inquiry *Demore* conducted when it examined the evidence Congress had before it. 538 U.S. at 527–28. It is also the inquiry the majority itself feels obliged to conduct in Part III(B)(3), where it asks whether Petitioners' detention still "served" its "immigration purpose," *see* majority opinion at 28–29 — a question that has no place under rational-basis review, but under *Zadvydas*. The majority's need to address that question suggests exactly what the Supreme Court's decisions establish: that the liberty interest is present, and what remains is whether the Government has justified the deprivation and what process is due before it may continue.

## *II. The Majority's Alternative Grounds*

The majority also gives three reasons that arguably defeat Petitioners' claim even if my understanding of their liberty interests is correct. First, Petitioners were never "admitted," so their constitutional status is that of aliens at the border, and the process Congress provided in Section 1225(b)(2)(A) is all the process due them. *See* majority opinion at 12–13. Second, they hold the keys to their own confinement because they may end it by leaving the country. *See* majority opinion at 22–23. Third, the facts they wish to prove are "not material" under the statute, so a hearing on those facts would be pointless. *See* majority opinion at 18–19. As I discuss, I believe each of those reasons fails.

### *A. Admission and sovereignty*

The majority holds that because Petitioners were never "admitted," as IIRIRA defines that term, they "may not assert a right to further process

---

[6] The Court has used the vocabulary of rational connection in one civil-custody case, and it did so only after holding that the juveniles' interest in freedom from physical restraint was not implicated. *Flores*, 507 U.S. at 302–03.

governing their admission beyond what Congress has provided in § 1225(b)(2)(A)," and so have received the process due them. *See* majority opinion at 14. On that view, statutory admission — not entry, not residence — fixes what the Constitution requires before the Government may confine an alien. The majority draws that rule from *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892), and *Landon v. Plasencia*, 459 U.S. 21 (1982).

*Thuraissigiam* reaffirmed that "aliens who have established connections in this country have due process rights in deportation proceedings," and rested its holding on the fact that an alien "detained shortly after unlawful entry cannot be said to have 'effected an entry.'" *Thuraissigiam*, 591 U.S. at 107, 140 (quoting *Zadvydas*, 533 U.S. at 693). Thuraissigiam was, by statute, an "applicant for admission" who had never been admitted. *Id.* at 140 (quoting 8 U.S.C. § 1225(a)(1)). Had his status been sufficient grounds for the opinion, the Court's entire discussion of entry would have been beside the point. The Court instead applied the "century-old rule regarding the due process rights of an alien seeking initial entry," and it did so because Thuraissigiam, apprehended twenty-five yards inside the border, could be treated "as if stopped at the border." *Id.* at 139 (quotation omitted). I do not read the Court to have said more than that. The Third Circuit, considering the argument the Government presses here, read *Thuraissigiam* the same way: the Government's reliance on *Thuraissigiam* "to argue that Petitioners are only entitled to due process as afforded by statute" is "misplaced as that case concerned the 'entry fiction' doctrine as applied to a noncitizen apprehended within twenty-five yards of the border." *Buele Morocho v. Warden Phila. FDC*, — F.4th —, 2026 WL 2546223, at *8 (3d Cir. Aug. 28, 2026). The Supreme Court does not usually overturn earlier authority *sub silentio*, and its decisions extending due process to aliens

residing here "remain binding precedent until [the Court] see[s] fit to reconsider them." *Hohn v. United States*, 524 U.S. 236, 252–53 (1998).

The majority draws two further statements from the Supreme Court's decisions in support of its determination. The first is the *Nishimura Ekiu* passage quoted in *Thuraissigiam*, which the majority interprets as making lawful admission the condition of due process. *See* majority opinion at 12; *Nishimura Ekiu*, 142 U.S. at 660. With respect, that is a serious misreading. The passage describes "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law." *Thuraissigiam*, 591 U.S. at 138 (quoting *Nishimura Ekiu*, 142 U.S. at 660). Domicil and residence are the second of the three conditions listed and both were clearly more important than having not "even been admitted." *Id.* Residence is just what these Petitioners satisfy — for fourteen, fifteen, and twenty-two years. The second is *Plasencia*'s statement that an alien's constitutional status changes once he "gains admission." *Plasencia*, 459 U.S. at 32; *see* majority opinion at 14. But the word "admission" under that statutory scheme referred to aliens' physical "entry" into the country — not legal admission, as a term of art. *Plasencia*, 459 U.S. at 32 (interpreting Section 235 of the Immigration and Nationality Act of 1952). The decision thus stands for the proposition the majority rejects. In addition, six months before its *Plasencia* ruling, the Court held that "aliens whose presence in this country is unlawful" are "'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

What remains is the majority's reliance on Congress's 1996 redefinition of "admission." This court has held that redefining changed what the statute requires. It could not change what the Constitution protects. We know that officials may not "disregard the fundamental principles that inhere in 'due process of law'" in dealing with an alien "who has entered the

country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here." *See Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903). Further, "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).

For more than a century, the Supreme Court has held that an alien's entitlement to due process arises from his or her presence and residence in this country, and no decision of that Court has allowed Congress to add some other requirements such as "admission."

The majority rests its holding on the principle, stated in *Thuraissigiam*, that for aliens not "admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *See* majority opinion at 12 (quoting *Thuraissigiam*, 591 U.S. at 138). I have quoted the sentence in which that principle appears, and it describes aliens who have "never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted." *Thuraissigiam*, 591 U.S. at 138 (quoting *Nishimura Ekiu*, 142 U.S. at 660). Petitioners here have acquired a domicil or residence, making that definition of due process inapplicable.

Nishimura Ekiu was a passenger refused permission to land at San Francisco. *Nishimura Ekiu*, 142 U.S. at 661–62. Thuraissigiam was stopped twenty-five yards past the border. The passage the majority quotes for the proposition that domicil or residence in the country does not matter says that the plenary-power doctrine would be "meaningless if it became inoperative as soon as an *arriving* alien set foot on U.S. soil." *Thuraissigiam*, 591 U.S. at 139 (emphasis added); *see* majority opinion at 13. Indeed, that is why the Court asked whether Thuraissigiam had "effected an entry." *Id.* at 140

(quoting *Zadvydas*, 533 U.S. at 693). The Court called it "the century-old rule regarding the due process rights of an alien seeking initial entry" — and the question is whether it extends to a person who has lived here for two decades. *Thuraissigiam*, 591 U.S. at 139.

The Supreme Court has already answered that question in *Zadvydas*. The Government there argued before the Court that *Mezei* — in which an alien held at Ellis Island was treated, for constitutional purposes, "as if stopped at the border" — permitted the detention of the aliens. *Zadvydas*, 533 U.S. at 693 (quotation omitted). The Court rejected the argument. *Mezei* "differs from the present cases in a critical respect," it explained, because the alien there had not effected an entry, and "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States." *Id.* at 692–93. *Thuraissigiam* did not disturb that holding; indeed, it even cited *Zadvydas* for it. *Thuraissigiam*, 591 U.S. at 140 (quoting *Zadvydas*, 533 U.S. at 693). Both cases the majority invokes for its rule hold that an alien who has *not* effected an entry is treated as if stopped at the border and receives only the process Congress provides. Both hold that an alien who has entered is a "person" to whom the Due Process Clause applies.[7]

[7] The majority appears to agree with that much. It accepts that Petitioners "enjoy the protections of the Fifth Amendment," *see* majority opinion at 11, and that aliens who enter and live here, even unlawfully, "may possess some constitutional due-process protection beyond whatever Congress provides by statute," *id.* at 13 (citing *Mezei*, 345 U.S. at 212; *Zadvydas*, 533 U.S. at 693). The majority opinion, however, does not say what that protection is. The opinion identifies no right Petitioners retain that Section 1225(b)(2)(A) does not already give them, and it holds that the one right they do assert — for the Government to show reason for their confinement — is not among them. That leaves the acknowledged protection seemingly without any content, despite the Supreme Court describing the Fifth Amendment "at the core" as protecting "[f]reedom from bodily restraint." *Foucha*, 504 U.S. at 80. A due process protection that does not reach the core

Further, "sovereignty" does not supply what *Thuraissigiam* did not. The Government made the same argument in *Zadvydas* — that Congress's "plenary power" over immigration meant its detention decisions required no further justification. 533 U.S. at 695. The Court rejected it. "[T]hat power is subject to important constitutional limitations," and what the Court "nowhere den[ied]" was "the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions." *Id.* That is a power over removal and its incidents. Detention is indeed "necessarily a part of" the deportation procedure, *Carlson*, 342 U.S. at 538, because removal "would be vain if those accused could not be held in custody pending the inquiry into their true character." *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). That is why the Government may hold Petitioners for a reasonable period while their removal is decided. Even so, the same decision that called detention a necessary part of the procedure reserved "the problem of *habeas corpus* after unusual delay in deportation hearings." *Carlson*, 342 U.S. at 546. When that problem arises, whether confining a particular petitioner serves his removal — whether he would flee, whether he is dangerous — is precisely the question a hearing would answer.[8]

---

of due process is not one the Court has recognized, and the majority cites no decision recognizing such.

[8] The majority says that in citing *Zadvydas* for this point, I "beg[] the threshold question" of whether a liberty interest exists, and that I assert "*ipse dixit*" that a hearing is among the constitutional limits the Court had in mind. *See* majority opinion at 15 n.3. The threshold question is the subject of Part I, and the majority's footnote does not engage with the decisions discussed there. As for the limits *Zadvydas* had in mind, the Court named them. It said that preventive detention must be "limited to specially dangerous individuals and subject to strong procedural protections," and it found the administrative review available in that case insufficient because "[t]he Constitution demands greater procedural protection even for property." *Zadvydas*, 533 U.S. at 691–92. Those are the limits on which I rely because they are the Supreme Court's limits.

*B. The keys to confinement*

The majority concludes that Petitioners' interest in freedom during removal proceedings is "surpassing strange" and, at most, minimal because "by agreeing to leave the country," and not awaiting removal, they would be released. *See* majority opinion at 22. There is more to it than that.

At the base level, this argument is that Congress can require detention while aliens are asserting statutory rights, such as to asylum, withholding of removal, or protections under the Convention Against Torture, because voluntary departure will allow their release. Such an argument would have applied to the lawful permanent resident in *Demore* and to the resident aliens in *Carlson*. In neither case did the Court suggest that the option of departure diminished the liberty at stake; in both it examined whether Congress had justified the detention.

Such an argument by the majority might have some relevance if voluntary departure does not have serious effects on statutory rights. Such departure, though, comes with significant penalties. A departure after more than a year of unlawful presence carries a ten-year bar on return, 8 U.S.C. § 1182(a)(9)(B)(i)(II), and forfeits the cancellation of removal for which Congress has made these Petitioners eligible on the basis of hardship to their citizen children, *id.* § 1229b(b)(1). Further, the alien would be forced to abandon any pending relief application, including any appeal to the BIA. *Id.* §§ 1229a(d), 1229c, 1231(a)(1).

The majority replies that this response proves its point: if Petitioners assert an interest in freedom from "restraint *qua restraint*," the availability of departure undermines it, and if they assert an interest in remaining here to pursue relief, that interest is unenumerated. *See* majority opinion at 23 n.7. Petitioners only assert the first interest, and the majority's premise about it is mistaken. A person held in a cell is deprived of his physical liberty whether

or not he could end the detention by giving up something else. The deprivation is the same. An offer of release on a condition does not supply the justification for confinement. It only identifies what the Government will accept in exchange for release.[9] Kim could have departed in *Demore*. So, too, could the *Carlson* detainees. The Court in both cases nonetheless required a justification for holding them. That is enough reason to reject the relevance of voluntary departure even without considering what else Petitioners would have to abandon by such departure.

I do not claim that Petitioners have a constitutional right to remain or to pursue relief. I claim only that their confinement, while they do what the statute permits, must be justified.

*C. The statute as the process*

The majority's remaining attempt to distinguish these Petitioners is that Petitioners' due process *is* Section 1225(b)(2)(A), so that a hearing on dangerousness or flight risk would establish facts "not material under [the] statute," and would therefore be, in *Doe*'s word, "bootless." *See* majority opinion at 15–18; *Connecticut Dep't. of Pub. Safety v. Doe*, 538 U.S. 1, 7–8 (2003).

---

[9] That has been the Court's view in many contexts. A civil contemnor, for example, can end his confinement at any moment by complying with the court's order. The Supreme Court has said that such contemnors "carry the keys of their prison in their own pockets." *Shillitani v. United States*, 384 U.S. 364, 368 (1966) (quotation omitted). Yet the Court has nonetheless held that a contemnor's interest in "freedom from bodily restraint" remains "at the core of the liberty protected by the Due Process Clause," and that he may not be confined without procedural safeguards addressed to whether confinement is warranted in his case. *Turner v. Rogers*, 564 U.S. 431, 445 (2011) (quoting *Foucha*, 504 U.S. at 80). If the contemnor's ability to free himself does not diminish his liberty interest, Petitioners' does not diminish theirs.

"The right to due process is conferred, not by legislative grace, but by constitutional guarantee," and a protected interest "cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (quotations omitted).[10] The majority does not cite *Loudermill.* It relies instead on *Thuraissigiam*'s statement that, for an alien at the threshold, the decisions of executive officers "are due process of law." *See* majority opinion at 12. That statement does not qualify *Loudermill*. *Loudermill* speaks to what follows once the Due Process Clause applies to an interest: "the question remains what process is due," and "[t]he answer to that question is not to be found in the . . . statute." *Loudermill*, 470 U.S. at 541. The *Nishimura Ekiu* rule

---

[10] This seems a reasonable place to address one colleague's argument. The post-Civil War *Milligan* opinion held that the Constitution forbade the trial of a civilian by a military commission where the civil courts were open, in time or war or peace; the Court did not order Milligan discharged because the writ gave him a substantive right, but rather because the Constitution overrode the statute authorizing military commissions and the military order under which he was held. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–22, 127 (1866).

It is certainly true that many distinctions exist between the context of this case and the use of a military commission. The Supreme Court, however, removed Milligan's detention from the laws of war: "the 'laws and usages of war' . . . can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed." *Id*. at 121. "Where peace exists the laws of peace must prevail." *Id*. at 140. Because the laws of war were inapplicable, then the "civil safeguards of the Constitution have application." *Id.* at 137. Because the military commission had no jurisdiction over Milligan, it was Article III and the Fifth and Sixth Amendments that guaranteed him indictment and trial by jury. *Id*. at 107, 120–23. No statute provided otherwise; indeed, "Congress could grant no such power." *Id*. at 122.

The Court closed its opinion by stating the use of a military commission in that situation would "cripple the constitutional powers of the government." *Id*. at 142. My opinion has sought to explain those constitutional powers and obligations. If the Constitution limited the authority to confine a man charged with conspiracy against the United States in time of civil war, it has a role to play as to those charged with immigration violations in time of peace.

that *Thuraissigiam* applied speaks to a class of persons to whom the Clause does not apply at all as to the interest they assert. "[A]n alien seeking initial admission . . . has no constitutional rights regarding his application." *Plasencia*, 459 U.S. at 32. For such a person there is no constitutionally protected interest for procedures to safeguard, and whatever Congress provides is therefore, by definition, enough.

The majority cannot invoke that rule here without contradicting its own premise. It recognizes that "Petitioners enjoy the protections of the Fifth Amendment." *See* majority opinion at 11. Yet it also says that, for Petitioners, the decisions of executive officers under the statute "*are* due process of law." *See* majority opinion at 12. Both cannot be true of the same confinement, at least where the interest confined is one the Constitution names. Once the Fifth Amendment applies, the process due is measured by the Constitution rather than by Section 1225(b)(2)(A).

*Zadvydas* shows what this means in practice. The statute there authorized the aliens' continued detention, and the implementing regulations provided periodic administrative custody reviews at which dangerousness and flight risk were considered. 533 U.S. at 683–84 (describing 8 C.F.R. § 241.4). Had the statute and its regulations defined what process was due to those aliens, that would have ended the matter. But the Court instead measured the scheme against the Constitution. It observed that "the sole procedural protections available to the alien are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous," and that "[t]he Constitution demands greater procedural protection *even for property*." *Id.* at 692 (emphasis added). The majority will say that the Court found the problem serious because the detention was potentially indefinite. So it did. As already described, however, that observation went to whether the Government's justification for its detention was sufficient, a question the majority's rule never reaches. On the question

the majority's rule does address — what determines the process due — *Zadvydas* answers that the Constitution does. The scheme in *Zadvydas* at least provided review of custody, and the aliens there had already been ordered removed. If that statutory scheme did not define the process due to those two aliens, then neither can Section 1225(b)(2)(A)'s silence define the process due to Petitioners. It provides no review at all and leaves release to the Secretary's unreviewable discretion to grant parole. 8 U.S.C. § 1182(d)(5)(A).

*Doe* requires closer attention. The majority reads the majority opinion there and JUSTICE SCALIA's concurrence to hold that "many statutes, by their nature, may only be challenged on the grounds of substantive, rather than procedural, due process." *See* majority opinion at 16. Certainly. *Doe* held that a hearing on a fact the statute makes irrelevant is pointless if the statute is valid. A validly enacted statute may abrogate a liberty interest "[a]bsent a claim . . . that the liberty interest in question is so fundamental as to implicate so-called 'substantive' due process." 538 U.S. at 8 (SCALIA, J., concurring).

JUSTICE SCALIA's example was a law providing that no one under sixteen may drive: it "suffices to abrogate that liberty interest," and the fifteen-year-old has no right to a hearing on whether he is a safe driver. *Id.* at 8–9. If the statute instead were one providing that anyone under sixteen caught driving shall be held in jail until turning sixteen, the need for some process is obvious. That is because what such a statute would take is not a license but physical liberty — one of the interests the Due Process Clause names. Section 1225(b)(2)(A), interpreted by this court to require detention, is a statute of that kind.

The majority says that "this is the precise argument the court of appeals espoused — and the Supreme Court rejected — in *Doe*." *See*

majority opinion at 18. Respectfully, it is not. The Second Circuit in *Doe* reasoned that the registry implicated a liberty interest in reputation and that the registrant was therefore entitled to a hearing on his current dangerousness. *Doe*, 538 U.S. at 6. The Second Circuit did not question Connecticut's authority to require registration of every convicted sex offender, dangerous or not. Neither did the registrant; he "expressly disavow[ed] any reliance on the substantive component" of the Due Process Clause. *Id*. at 8. His claim took the statute as valid and asked for a hearing anyway, on a fact the valid statute made irrelevant. That is why the hearing would have been "bootless." The Supreme Court framed its holding accordingly: "Unless respondent can show that that substantive rule of law is defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness is a bootless exercise." *Id*. at 7–8.

The Court thus conditioned its holding in *Doe* on the absence of the very claim Petitioners make here. Petitioners here do *not* ask for a hearing on a fact the statute makes irrelevant while accepting the statute as valid. They contend that a statute confining them for the full length of removal proceedings, however long, without any showing of flight risk or danger conflicts with the Fifth Amendment, and that a hearing is the means by which that requirement is met. That is precisely the claim *Doe* reserved, not the one it rejected. Nor is the argument that Petitioners' interest is "more profound" than the registrant's. *See* majority opinion at 18. It is that the interest is one the Constitution explicitly names, which is the circumstance JUSTICE SCALIA identified as placing a statute outside *Doe*'s rule. *Id*. at 8 (SCALIA, J., concurring).

Just as registration in *Doe* turned on conviction alone, the majority reasons, detention here turns on unadmitted status alone, so that dangerousness and flight risk are no more relevant than "whether [Petitioners] drive American-made automobiles." *See* majority opinion at 19.

As already noted, dangerousness and flight risk are not facts Petitioners have selected at random. They are the two justifications the Supreme Court has identified as capable of supporting civil immigration detention beyond a reasonable period necessary to the proceedings themselves, and the two on which *Demore* rested Congress's categorical judgment allowing the detention of convicted criminals: "Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Demore*, 538 U.S. at 528.

The Court has also held, when discussing detention of aliens who, unlike the petitioners here, have been determined to be removable, *i.e.*, the aliens have been finally determined to have violated immigration laws and are entitled to no relief, that unlimited detention cannot be justified absent flight risk or evidence of dangerousness solely on "the alien's removable status itself." *Zadvydas*, 533 U.S. at 691–92. Petitioners have a status they concede and a confinement they contest. The facts they seek to prove are, indeed, immaterial under the statute. To repeat the obvious, no statute may abrogate what the Constitution requires

The majority then holds that Petitioners' claims "must ultimately be analyzed . . . as a matter of substantive due process" because Petitioners "assert a right to procedure that Congress has not provided in the statute." *See* majority opinion at 20. That is no aid to the analysis, as it describes most every procedural due process claim. The employee in *Loudermill* asserted a right to a pretermination hearing that Ohio law did not provide. The Court did not treat his claim as substantive on that account. The distinction the Supreme Court draws is a different one. A substantive claim is that the Government "cannot deprive [the claimant] of [the] asserted liberty interest *at all*"; a procedural claim is that it cannot do so "on the basis of the

procedures it provides." *Flores*, 507 U.S. at 306. Stated otherwise, "the substantive issue involves a definition of that protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it," while "the procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills v. Rogers*, 457 U.S. 291, 299 (1982).

Petitioners' claim is of the second kind. As explained, their interest is one the Court has repeatedly called the "core" of "liberty" in the Fifth Amendment — freedom from physical restraint. *Foucha*, 504, U.S. at 80. Petitioners do not ask this court to recognize a new right, which is why *Glucksberg* is inapposite. They do not contend that the Government may never detain them. They concede that dangerousness and flight risk are conditions under which their liberty may be outweighed. What they seek is a procedure for determining whether those conditions exist in their cases. That is a procedural due process claim, as the district courts held. The majority's substantive analysis, and the *Glucksberg* inquiry that it applies, answers a question the Petitioners' claims do not raise. Once the claim is correctly identified, *Doe* has no role. *Doe* says nothing about whether Congress may abrogate a fundamental interest by statute. It says only that a hearing to prove a statutorily immaterial fact is pointless.

The majority offers one more response. Petitioners' liberty interest, it says, "might be germane in weighing what due process requires with respect to the substantive determinations of § 1225(b)(2)(A)," but "procedural due process does not entitle [them] to a hearing to establish a fact that is not material under [the] statute." *See* majority opinion at 18 (quoting *Doe*, 538 U.S. at 7). Yet again, it is relying on a statute to define the process due for a fundamental right to physical liberty, not for the process for getting a driver's license at a certain age, as in *Doe*. The right inquiry is

whether Congress may make dangerousness and flight risk immaterial to the confinement of this class. If it may not — if the Constitution requires a justification that the statute omits — then the statute's silence is irrelevant.

Since *Doe* is given such significance in the majority opinion, I continue but risk just adding to the words that are being said past each opinion writer. Two of the Court's decisions show why *Doe* cannot bear the weight the majority places on it. First is *Salerno*. The Bail Reform Act survived because it "operate[d] only on individuals who have been arrested for a specific category of extremely serious offenses," because Congress had found those individuals "far more likely to be responsible for dangerous acts," and because the Act required "a full-blown adversary hearing" at which the Government must prove dangerousness by clear and convincing evidence. *Salerno*, 481 U.S. at 750. Each of those features was a fact about dangerousness that the statute made material. Suppose Congress had instead provided that every person arrested for such an offense "shall be detained" until trial. On the majority's reading of *Doe*, that arrestee's request for a hearing on his dangerousness would be "bootless," because dangerousness would no longer be "material under the statute." *See* majority opinion at 16.

*Foucha* is also relevant. Louisiana permitted an insanity acquittee to be kept in a psychiatric hospital so long as he was dangerous, whether or not he remained mentally ill; under the statute, his present mental condition was immaterial. *Foucha*, 504 U.S. at 73. The Court held the continued confinement unconstitutional because the Constitution permits civil confinement of that kind only on a showing of both mental illness and dangerousness. *Id.* at 77–80. The statute's silence about mental illness was the constitutional defect, not an answer to the claim.

### *III. Whether Congress Has Justified Categorical Detention for This Class*

With the liberty interest properly identified, the remaining question is the one *Demore* and *Carlson* answered for the classes before them: whether Congress has supplied a justification for detaining this class without individual inquiries. Both cases upheld categorical detention. In each, the category was highly circumscribed, and Congress had evidence connecting it to the ends that detention served. *Carlson* concerned alien members of the Communist Party and rested on "Congress' understanding of their attitude toward the use of force and violence." *Carlson*, 342 U.S. at 541. The Court there added a caution: "Of course purpose to injure could not be imputed generally to all aliens subject to deportation." *Id.* at 538.

Likewise, *Demore* concerned "a subset of deportable criminal aliens," and it relied on the evidence Congress had gathered of their flight and recidivism. *Demore*, 538 U.S. at 518–19, 521, 528. It noted that their convictions reflected "'personal activity' that Congress considered relevant to future dangerousness," *id.* at 525 n.9, and it stressed that the detention was "of a much shorter duration" than the confinement in *Zadvydas*, *id.* at 528. Justice Kennedy's fifth vote in that case came with the reservation that a detainee "could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532 (KENNEDY, J., concurring).

Section 1225(b)(2)(A), as interpreted by *Buenrostro-Mendez,* 166 F.4th 494, shares none of those features. It reaches every unadmitted person in the country, however long a resident and whatever the criminal record, for the full duration of proceedings whose pace the Government controls. The majority responds that Petitioners' claim is therefore a facial one. *See* majority opinion at 20 n.5. Does not matter. Kim's was a facial challenge, and *Demore* did not fault him for that — it simply asked whether Congress's judgment about the class was adequately supported. The Government has

referred to no evidence before Congress that resident aliens with no criminal history are, as a class, likely to flee or to endanger anyone.

The majority responds that Congress "need not substantiate its reasons for enacting a law mandating detention" and that its "legislative power does not wax or wane according to the 'evidentiary' record that it compiles." *See* majority opinion at 26 n.9. I agree, and nothing in this opinion depends on the contrary. Congress's power to enact Section 1225(b)(2)(A) is not in question. What *is* in question is the Government's burden when it uses the statute to confine a person. The Supreme Court's civil-detention tradition places that burden on the Government: the restraint must be justified. When the Government has met the burden with a congressional judgment about a class rather than finding about an individual, the Court has consistently asked whether the judgment is supported — by the evidence that gave Congress "reasonable ground for action" in *Carlson*, 342 U.S. at 536; by finding that the arrestees covered were "far more likely to be responsible for dangerous acts" in *Salerno*, 481 U.S. at 750; or by the evidence that "certainly supports the approach [Congress] selected" in *Demore*, 538 U.S. at 528. The record matters in those cases not because it conditions Congress's power to legislate, but because it is the Government's proof that the categorical detention of a class of individuals is justified. Where Congress has made no such judgment, the statute stands. Conversely, once the proceedings themselves no longer justify confinement, the justification must then come from somewhere else — from a showing about the individual. That is what a hearing supplies.

Even crediting these cases, the majority continues, the IIRIRA record contains "ample findings" supporting the Government's invocation of Section 1225(b)(2)(A) to detain all aliens pending removal proceedings. *See* majority opinion at 26 n.9. Of significance, the majority does not identify the findings. Moreover, the purpose this court has attributed to the statute

does not supply one. Congress's aim, as we described it in *Buenrostro-Mendez*, was to place aliens who entered without inspection "on equal footing" with those who presented themselves at the border. 166 F.4th at 508. That is a judgment about which removal procedures the two classes should receive. It is not a finding that either class is dangerous or likely to flee. The Supreme Court has permitted the detention of arriving aliens without such a finding because, as discussed in Part II, under the entry doctrine, they have no constitutional rights regarding their admission. *Mezei*, 345 U.S. at 212, 215. Further, the fact of unlawful entry, standing alone, does not supply the missing finding. An alien's immigration status "bears no relation to a detainee's dangerousness," and for twenty-nine years after IIRIRA the Government treated this class as eligible for release on bond. *Zadvydas*, 533 U.S. at 691–92. Had Congress found that long-resident aliens with no criminal history were, as a class, likely to flee, that practice would be hard to explain.

What the Supreme Court has said of preventive detention is that it must be "limited to specially dangerous individuals and subject to strong procedural protections." *Id.* at 691. Since *Demore*, the Court has twice noted that as-applied constitutional challenges to mandatory immigration detention remain open. *Jennings v. Rodriguez*, 583 U.S. 281, 312–14 (2018); *Nielsen v. Preap*, 586 U.S. 392, 420 (2019).

The majority holds that "so long as removal remains a viable prospect, continued detention in the case of an alien previously released, does not violate due process." Majority opinion at 30. I read the Supreme Court's decisions differently. The Court has said that an alien's immigration status cannot alone justify detention. *Zadvydas*, 533 U.S. at 692. It has also referred more generally to the need for a reasonable relation between detention and its purpose. *Jackson*, 406 U.S. at 738; *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 527–28. I interpret these two principles to mean that when someone

is in this country without authorization and is in removal proceedings, there is Supreme Court support for detaining that person for some period, without any showing of flight risk or dangerousness, because detention during removal proceedings is "a constitutionally valid aspect of the deportation process" for "the brief period necessary" to complete them. *Demore*, 538 U.S. at 523, 513. That support ends when a decision becomes unreasonably delayed. *See Carlson*, 342 U.S. at 546. At that point the proceedings no longer justify the detention; immigration status is all that remains; and the Government must provide some other justification for civil detention particular to the individual.

Consequently, at some point, detention during removal proceedings violates due process. I make no effort in this opinion to quantify the period before the Government must provide additional justification for civil detention.[11] I acknowledge that two of these Petitioners had been confined for fairly short periods when the district court ordered release. My dissent is to the majority's conclusion that, so long as removal remains a prospect, detention may continue indefinitely.

### *IV. Conclusion*

The Government's interest in removal is substantial, and detention serves it for a time. The Constitution does not forbid the detention. It forbids the "mistaken or unjustified deprivation" of liberty. *Carey v. Piphus*, 435 U.S. 247, 259 (1978). It permits the Government to hold an alien while it

---

[11] My panel opinion did set a presumptive period, applying my best understanding of the Supreme Court precedents. *Rodriguez v. Ortega*, 180 F.4th 702, 727–28 (5th Cir. 2026), *vacated and reh'g granted*, 181 F.4th 608 (5th Cir. 2026). There is little Supreme Court guidance; the choice made in the panel opinion is certainly subject to debate. In addition, there is no explicit challenge by these petitioners to the length of confinement. I place that issue aside for those reasons and because of the majority's holding that the length of detention plays no role in its analysis.

decides, without unreasonable delay, whether removal will be ordered. The Constitution does not permit the Government to hold an alien for as long as that decision takes, with no obligation ever to justify continuing confinement.

I dissent.

Haynes, *Circuit Judge*, dissenting:

I respectfully dissent. I agree with the basic points set out in Judge Southwick's dissenting opinion. My thought is, however, that this analysis should be limited to people like Petitioners—individuals who have resided in this country for more than ten years, have no criminal history, and have close American relatives. In such situations, these individuals are entitled to important due process allowances, and the Government has not referred to evidence before Congress that would justify detaining individuals such as Petitioners. Accordingly, in these cases, I dissent.

DANA M. DOUGLAS, *Circuit Judge*, joined by STEWART, GRAVES, HIGGINSON, and RAMIREZ, *Circuit Judges*, dissenting:

Following the Government's lead, the majority opinion detonates the core of the Due Process Clause based on a case about whether sex offenders may be required to publicly register their names under state law (of course they can). Fortunately, constitutional law does not work on such rough analogies. Because the Due Process Clause has always protected against any arbitrary detention within the United States, and Petitioners challenged their detention without any meaningful procedure, I **respectfully dissent**.[1] I agree with JUDGE SOUTHWICK that a bond hearing is required to show that a special circumstance justifies continued detention. I write separately, however, to explain how my analysis differs somewhat from that of my esteemed colleagues, as informed by my participation in the panel decision interpreting the underlying statute in *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026).

I

The right not to be detained in the interior of the United States without good reason is deeply rooted in this nation's history. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at

---

[1] The majority's holding places our court in a minority position among the circuits. *See Guerrero Orellana v. Moniz*, 188 F.4th 1, 29 (1st Cir. 2026); *Barbosa da Cunha v. Freden*, 175 F.4th 61, 96 (2d Cir. 2026), *cert. granted sub nom. Rhoney v. Barbosa da Cunha*, No. 26-104, 2026 WL 2942994 (U.S. Oct. 1, 2026); *Buele Morocho v. Warden Phila. FDC*, No. 26-1150, 2026 WL 2546223, at *10 (3d Cir. Aug. 28, 2026); *Lopez Garcia v. Guadian*, No. 25-7044, 2026 WL 2661092, at *21 (4th Cir. Sept. 10, 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713, 735 (6th Cir. 2026); *Cirrus Rojas v. Olson*, 183 F.4th 909, 931 (7th Cir. 2026); *Padilla v. United States Immigr. & Customs Enf't*, No. 24-2801, 2026 WL 2822044, at *19 (9th Cir. Sept. 21, 2026); *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1251 (10th Cir. 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Mia.*, 175 F.4th 1258, 1285 (11th Cir. 2026).

the heart of the liberty th[e Due Process] Clause protects."). All government detention thus must be either "ordered in a *criminal* proceeding with adequate procedural protections" or in a civil proceeding "in certain special and narrow nonpunitive circumstances." *Id.* at 690 (citation modified). Historically, neither the possibility that a noncitizen will be deemed deportable, nor a noncitizen's unadmitted status alone, have been understood as special circumstances justifying detention without meaningful process. *See* Lindsay Nash, *Resurrecting Immigration Releases*, 135 YALE L.J. 1533, 1558 (2026) (describing the mandatory detention mandate for noncitizens involved in crimes under 8 U.S.C. § 1226(c) in terms of a "new exceptionalist category" (citation modified)). Because the asserted right is deeply rooted, rational basis review does not apply. *See Foucha v. Louisiana*, 504 U.S. 71, 86 (1992). Rather, as in *Zadvydas*, we must interpret the statute to require reasonable time limits to ensure that noncitizens with meaningful ties to this country are not detained for unreasonable periods pending a decision on their removability. *See* 533 U.S. at 693, 699–701. Because I believe the right not to be apprehended and detained in the interior of the country without good reason—here, reason beyond one's unadmitted status, past a reasonable period to determine removability—is a fundamental right deeply rooted in our nation's history, I would also hold that detentions in the interior under § 1225(b)(2)(A) violate substantive due process when unreasonably prolonged[2] without a hearing, and impose reasonable time

[2] Notably, although "Petitioners have not challenged the duration of their detention as unconstitutional," Maj. Op. at 29, the court holds that "so long as an alien's detention pending removal 'ha[s] a definite termination point'—removal or release—his or her continued confinement without bond hearing does not offend due process." Maj. Op. at 30. *Contra Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (discussing the "fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding

limits on the statute for much the same reasons that JUDGE SOUTHWICK does.[3]

A concurring colleague turns a blind eye to several Supreme Court cases and suggests that the Constitution requires "*nothing*" for aliens and immigration-related detention. As JUDGE SOUTHWICK notes above, that statement contradicts the majority's undisputed position that the Petitioners "enjoy the protections of the Fifth Amendment." Maj. Op. at 11. That also conflicts with what the Supreme Court has said in *Foucha*, *Zadvydas*, *Hamdi*, and *Addington*, which all state—in no uncertain terms—that freedom from governmental restraint is a liberty interest protected under the Fifth

---

it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied'").

[3] As Professor Jamal Greene has explained, there is "significant ambiguity on the margins" of the distinction between substantive and procedural due process. Jamal Greene, *The Meming of Substantive Due Process*, 31 CONST. COMMENT. 253, 262 (2016). Whereas substantive due process claims focus on the "importance" of the asserted life, liberty, or property interest that the challenged law allegedly deprives, procedural due process claims focus on the "regularity or consistency with the way in which meaningfully similar rights are deprived." *Id.* at 262. These are in essence "argument types" that appeal to the same basic protection, which—so far as we know—stems first from a 1354 English statute mandating that "[n]o man of what estate or condition that he be," may be "put out of land or tenement, nor taken nor imprisoned, nor disinherited, nor put to death, without being brought in answer by due process of the law," and from Magna Carta. *Id.* at 262, 265 (citation modified). The first explicit distinctions between "substantive" and "procedural" due process were made in law review articles from the 1920s and on. *Id.* at 269 (citing a student Note from 1928 as a possible first occurrence). Thus, although modern due process doctrine requires plaintiffs to argue substantive and procedural due process claims in distinct ways, it is important to note the difficult historical question of how exactly the *core* Due Process protection against arbitrary detention fits, or does not fit, neatly into these modern doctrinal boxes. *See id.* at 279 ("Although the phrase substantive due process has been around for nearly a century, the category of claims it describes was more often simply called 'due process' for much of that time."). As JUDGE WILSON's opinion demonstrates, when we lose sight of that core mandate, we risk losing the forest of due process for the trees of a modern distinction.

Amendment's Due Process Clause. *See* Ante at 103 (SOUTHWICK, J., dissenting).

II

As I noted in *Buenrostro-Mendez*, the majority is gravely mistaken about this nation's historic immigration practices. *See Buenrostro-Mendez*, 166 F.4th at 513–14 (DOUGLAS, J., dissenting). The Government and the majority repeatedly cite the Supreme Court's footnote in *Demore v. Kim*, 538 U.S. 510 (2003), that "prior to 1907 there was no provision permitting bail for *any* aliens during the pendency of their deportation proceedings." *Id.* at 523 n.7. That sounds significant, but, prior to 1907 this country simply did not detain persons potentially unlawfully present in the interior except in extraordinary circumstances and under narrowly drafted laws; and, when it did so, the general rule was that bail would be available. *See* Nash, *supra*, at 1540–41, 1564–76.[4] In other words, the practice of seeking out people unlawfully present in this country in the interior en masse is an invention of modern immigration law. The practice (challenged here) of seeking out persons unlawfully present in this country in the interior and subjecting them to detention without meaningful process or the possibility of bail—that is, to what was long understood to be the statute applicable at ports of entry, § 1225(b)(2)(A), rather than the interior detention statute, § 1226(c)—is a recent invention of the Department of Homeland Security in the last year or so contradicting its almost three decades old practice.

The majority's citation to the Immigration and Nationality Act of 1952 for the premise that "federal immigration law explicitly addressing

[4] One of the concurrences resorts to a straw man fallacy to rebut this argument. That executive officials did not exercise enforcement power to detain persons in the interior says nothing about whether bail for noncitizens was statutorily recognized in 1907. Those are two different things.

aliens who have never lawfully entered the country has consistently required detention pending removal" only reinforces the point: the provision cited applied to "aliens arriving at ports of the United States" and empowered the "examining immigration officer at the port of arrival" to detain noncitizens not clearly "entitled to land" for further inquiry. Immigration & Nationality Act of 1952 (INA), Pub. L. 82-414, § 235, 66 Stat. 163, 198–99.[5] In other words, like § 1225(b)(2)(A) (until recently), it was a border statute. Nothing in the INA provides anything regarding the treatment of noncitizens detained in the interior as if they were detained at the border. Rather, the Government proposes a seismic change in how this country's immigration law functions. It may come, but it cannot come wrapped in the mantle of history. Nor should judges do it the favor of wrapping it in the mantle of a sham history cobbled together by the Government.

At bottom, much like the majority in *Buenrostro-Mendez* with respect to the governing statute, the majority here believes the Constitution *must not* protect unadmitted noncitizens from detention without bond and with virtually no process, largely because then they would be treated better in some ways than noncitizens detained at the border. Whatever one thinks of what the Due Process Clause affirmatively requires with respect to unadmitted noncitizens apprehended in the interior, the Government and the majority's framing of mandatory detention without bond as a matter of treating unadmitted noncitizens presenting at the border and unadmitted noncitizens later detained in the interior *equally* is a policy argument, not a legal one. More importantly, it is a policy argument that flies in the face of

---

[5] The statute was later revised to introduce the ambiguity our court latched onto in *Buenrostro-Mendez*. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, § 302, 110 Stat. 3009-582 (referring to "an alien seeking admission," without the clear context clause from the original INA).

this country's historic immigration practices. Historically, the border and other ports of entry are exceptional places. There, the Executive's power is at its zenith, and intrusions are tolerated that would be intolerable in the interior of this country (imagine being required to explain your reasons for being here, present your passport, and turn over your cell phone for routine inspection—on your walk to work). *See United States v. King*, 517 F.2d 350, 353 (5th Cir. 1975) ("When crossing a border [travelers] accept as reasonable an intrusion which would offend their right to personal security if conducted elsewhere."). Historically, and for obvious reasons, courts have jealously guarded against executive attempts to claim sweeping detention mandates that, among other things, may make sudden, unannounced arrests and detentions a part of ordinary life in the interior of this country. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 554–55 (2004) (Scalia, J., dissenting) ("The very core of liberty secured by our Anglo-Saxon system of separated powers has been freedom from indefinite imprisonment at the will of the executive."). It is thus fortunate that the Supreme Court's due process case law rightly puts the burden on the Government to show that detention of persons in the interior of the United States without clear timeline or special reason is reasonable, outside of certain circumscribed presumptions. It is unfortunate that our court hastens to endorse this revisionist history and pretend that such practices are ordinary, or have ever been tolerated in this country.

Due Process has long been understood as the equivalent of "the law of the land"—that is, a collection of historic practices and traditions that protect the possibilities of lawfulness and decency in this country from arbitrary executive power. *See Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 28–30 (1991) (Scalia, J., concurring in the judgment). A country where a roaming police force must seek out millions of noncitizens for mandatory detention without meaningful process or recourse to even a rudimentary hearing is a less decent place for people like Petitioners who

have led law-abiding lives, committed no crimes, and raised United States citizens. It is also a less lawful place for those of us who prefer to travel the interior of this country without having to be prepared to show that we are "clearly and beyond a doubt entitled to be admitted" at any time, as if we were crossing the border every time we walk down the street. 8 U.S.C. § 1225(b)(2)(A). **I respectfully dissent.**

Stephen A. Higginson, *Circuit Judge*, joined by Stewart, Southwick, Graves, Douglas, and Ramirez, *Circuit Judges*, dissenting:

In 2018, the Supreme Court in *Jennings v. Rodriguez* summarized Congress's two-part statutory framework for detaining noncitizens: "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," and "to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." 583 U.S. 281, 289 (2018). The location of a noncitizen when they are encountered by immigration authorities determines which of these two, alternative statutory paths the government takes to detain them. Section 1225(b)(2) covers noncitizens at the nation's threshold, its "borders and ports of entry," *see id.* at 287, whereas Section 1226(a) covers noncitizens "once inside the United States," *id.* at 288. Sections 1225 and 1226 therefore provide DHS its interlocking statutory authority for executive detention and confinement.

The Supreme Court's statutory summation in *Jennings* reflects thirty years of consistent interpretation and application of this executive detention authority by all three branches of the federal government. Congress maintained the threshold/interior distinction throughout both the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) in 1996 and years of subsequent amendments (most recently, the January 2025 Laken Riley Act). The Executive Branch invoked Section 1226 when detaining noncitizens within the interior across five presidential administrations. *See Barbosa da Cunha v. Freden*, 175 F.4th 61, 91–92 (2d Cir. 2026), *cert. granted sub nom. Rhoney v. Barbosa da Cunha*, No. 26-104, 2026 WL 2942994 (U.S. Oct. 1, 2026); Detention and Removal of Aliens, 62 Fed. Reg. 10,312, 10,323 (Mar. 6, 1997) (stating, a year after IIRIRA, Executive Branch understanding that "[d]espite being applicants for admission, aliens who are present

without having been admitted or paroled ... will be eligible for bond and bond redetermination"); *Learning Res., Inc. v. Trump*, 607 U.S. 229, 250 (2026) ("[T]he fact that no President has ever found such power [in the statute] is strong evidence that it does not exist."). And when DHS departed from this settled practice last July, nine sister circuits reviewed the statutes anew, and concurred with the Supreme Court's articulation of Section 1225's and Section 1226's authority.[1] *See, e.g., Hernandez Alvarez v. Warden, Fed. Detention Ctr. Miami*, 175 F.4th 1258, 1279 (11th Cir. 2026) (following *Jennings* when deciding that Section 1226 applies to noncitizens detained in the interior because "there is dicta, and then there is Supreme Court dicta" (citation omitted)); *Barbosa da Cunha*, 175 F.4th at 84–85 (adhering to *Jennings* because "we are obligated to accord great deference to Supreme Court dicta" (citations omitted)).[2]

On appeal, only this court in *Buenrostro-Mendez v. Bondi* (and the Eighth Circuit, following us) has accepted the Executive Branch's statutory arguments for its recent about-face. *See* 166 F.4th 494, 502–05 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128, 1132–36 (8th Cir. 2026). Our statutory

---

[1] *See ante* at 133 n.1 (DOUGLAS, J., dissenting) (listing authorities).

[2] The Supreme Court is poised to weigh in on these competing interpretations of Section 1225. *Rhoney v. Barbosa da Cunha*, No. 26-104, 2026 WL 2942994 (U.S. Oct. 1, 2026) (granting certiorari); *see also* Kemal Hepsen, *Noncitizen Detention Circuit Split is Built for Supreme Court*, BLOOMBERG L. (Aug. 25, 2026), https://perma.cc/MH7D-GNTE (describing the majority approach). A petition for a writ of certiorari in *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026), in which this court held that petitioners apprehended in the interior were subject to mandatory detention under Section 1225(b)(2)(A) and not eligible for discretionary bond release under Section 1226(a)(2) remains under review. *Buenrostro-Mendez v. Blanche*, No. 26-43 (https://perma.cc/NZL9-F4LB). Congress too could step in. Indeed, bills offering competing clarifications to Section 1225 and 1226 have already been introduced. *See* Hillel R. Smith, CONG. RSCH. SERV., LSB11438, *Mandatory Detention During Removal Proceedings: Circuit Split* (Sept. 17, 2026), https://www.congress.gov/crs-product/LSB11438 (describing proposed legislation).

holding in *Buenrostro-Mendez* was a misstep, for the reasons JUDGE DOUGLAS convincingly sets out in her en banc dissent (which I gratefully join), and her earlier panel dissent. *See Buenrostro-Mendez*, 166 F.4th at 508 (5th Cir. 2026) (DOUGLAS, J., dissenting). We should correct this error. Doing so would adhere to the Supreme Court's construction of Congress's executive detention framework, a construction that comports with an understanding that Congress intended Section 1226—not Section 1225—to govern the detention of noncitizens seized within the United States.

It is vital to understand that our court's flawed statutory analysis in *Buenrostro-Mendez* is what compels the constitutional question we answer today, namely, what process is due to persons inside the United States arrested as noncitizens. The government answers that, after an Executive Branch immigration official detains noncitizens using Section 1225, the Constitution guarantees no further process. The majority agrees. I join in full JUDGE SOUTHWICK's dissent, which explains that because the Fifth Amendment applies to Petitioners, they have an interest in freedom from physical restraint and are entitled to an opportunity to seek release on bond, and that the majority's denial of that process belies Fifth Amendment case law.

I write separately to emphasize that we need not reach today's constitutional issues and strip Fifth Amendment protections from Petitioners. We should have applied constitutional avoidance in *Buenrostro-Mendez* as the last, critical step of our statutory interpretation of Sections 1225 and 1226. We also could have done so today. But because we do not, the majority runs headlong into a series of difficult, and avoidable, constitutional conflicts.

## I.

Our sister circuits have emphasized that this issue "is a textbook case for constitutional avoidance." *Lopez Garcia v. Guadian*, No. 25-7044, 2026 WL 2661092, at *20 (4th Cir. Sept. 10, 2026). Where multiple plausible statutory constructions are available, constitutional avoidance directs courts away from readings that would conflict with the Constitution. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (explaining "the elementary rule" that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" (citation omitted)); *Jennings*, 583 U.S. at 296 ("When 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (citation omitted)).

Constitutional avoidance puts judicial restraint into practice.[3] Courts cannot put unconstitutional words into Congress's mouth when a plausible alternative reading exists. When asked to address the due process implications of the government's interpretation of Sections 1225 and 1226 in their own opinions, three of our sister circuits applied constitutional avoidance in response. *See, e.g.*, *Barbosa da Cunha*, 175 F.4th at 93 ("Finally, even if there were ambiguity in the statutory text, we would reject the government's interpretation because of the grave constitutional concerns it raises."); *Lopez Garcia*, 2026 WL 2661092, at *12, *20 ("Finally, we

[3] The principle of constitutional avoidance is fundamental to our construction of a statute and therefore is available to us here regardless of whether it was invoked by the parties. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 22 (D.C. Cir. 2019), *overruled on other grounds by Garland v. Cargill*, 602 U.S. 406, 410 (2024) ("We, for example, would give no mind to a litigant's failure to invoke interpretive canons such as *expressio unius* or constitutional avoidance even if she intentionally left them out of her brief.").

consider the principles of constitutional avoidance. . . . The district court's interpretation is not only fairly possible; it has been the universal interpretation of the statute for decades."); *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1249 (10th Cir. 2026) ("[W]e close with a brief discussion on the doctrine of constitutional avoidance, which further supports our conclusion. . . . The mandatory detention of potentially millions of noncitizens without the potential for bond raises exactly such serious concerns."); *see also Cirrus Rojas v. Olson*, 183 F.4th 909, 931 (7th Cir. 2026) ("[T]here is a very real risk that the government's reading will sweep in others like Cirrus Rojas who have already been found not to be dangers or flight risks. The Due Process Clause forbids such arbitrary detention. This alone makes us doubt the government's interpretation as a matter of constitutional avoidance.").[4]

Our decision in *Buenrostro-Mendez* made us the first among the circuits to speak squarely about whether Section 1225 or 1226 governs noncitizen detentions in the interior. As the issue percolated further throughout the courts, the same objections raised in JUDGE DOUGLAS's

---

[4] In the two instances where courts have not applied constitutional avoidance and squarely addressed Due Process Clause arguments in this context, they have come to a conclusion opposite to that of our majority. *See Buele Morocho v. Warden Philadelphia FDC*, No. 26-1150, 2026 WL 2546223, at *8, *10 (3d Cir. Aug. 28, 2026) (holding procedural due process requires bond hearings); *see also Lopez-Campos v. Raycraft*, 175 F.4th 713, 734 (6th Cir. 2026) (declining to disturb a district court's grant of a bond hearing), *cert. filed sub nom. Putra v. Lopez-Campos*, No. 25-1415 (U.S. June 22, 2026).

The Supreme Court thus far has not accepted certiorari in the sole petition to squarely pose the due process question. *See* Petition for Writ of Certiorari, *Putra v. Lopez-Campos*, No. 25-1415 (U.S. filed June 22, 2026), https://perma.cc/8TXG-9S4J. Rather, it first will assess the full statutory picture. *See Rhoney v. Barbosa da Cunha*, No. 26-104, 2026 WL 2942994 (U.S. Oct. 1, 2026) (granting certiorari). This provides an additional, pragmatic reason for us to apply constitutional avoidance. We should not rush ahead to create a new circuit split while the Supreme Court and Congress are positioned to address threshold statutory questions.

dissent emerged as the majority approach. Our conclusion in *Buenrostro-Mendez* is now the minority position, evidencing that alternative plausible readings to Section 1225 exist. This alone should justify revisiting our prior interpretation en banc and applying constitutional avoidance.

II.

Today's majority opinion deepens *Buenrostro-Mendez*'s conflict with the Supreme Court's summation of statutory law in *Jennings*, conflicts with all other circuits that addressed this question (except one), and conflicts with thirty years of government-wide alignment on the authorities controlling executive immigration detention and confinement. More alarming still, the majority opinion goes further to create new clashes among the three branches of government and their distinct roles in administering this country's immigration laws.

Each of the new conflicts generated by the majority is concerning. All are avoidable. I will highlight just two. First, the majority's reasoning creates clashes between Congress's powers to legislate and Article III courts' obligation to enforce the Fifth Amendment. Second, it sets up institutional friction between Article II courts' administrative responsibilities and Article III courts' oversight of the lawfulness of immigration detention.

A.

i.

The majority first forces a showdown between Congress and Article III courts. The conflict goes like this: the majority agrees that the Fifth Amendment applies to Petitioners, as it must, but then goes on to imply that immigration detention is an area where Congress's powers are so absolute, that Congress's legislation on immigration detention (as reinterpreted by the Executive Branch) operates without check from the enumerated rights of the

Constitution.[5] The concurring opinion summarizes this point forcefully: "[T]his case amounts to a clear and stark choice. Either our Nation has the sovereign power to enforce its borders—or it doesn't." *Ante* at 35 (Ho, J., concurring). This categorical statement implies that any judicial inquiry into the constitutionality of executive immigration detention impermissibly injures Congress.

That proposition cannot be true. Congress's immigration legislation, and its enforcement by the Executive Branch, is still subject to the "paramount law of the Constitution." *Carlson v. Landon*, 342 U.S. 524, 534, 537 (1952). In suggesting instead that Congress's plenary power impliedly excludes courts from reviewing executive immigration detention, the majority contorts Supreme Court precedent in several ways. First, while the majority recognizes that the Constitution applies to Petitioners, it erroneously weakens the Constitution's application to Congress's immigration legislation. Second, it flattens the Supreme Court's precedent distinguishing between noncitizens encountered within, and at the threshold of, the United States. Last, it conflates judicial review of two separate

[5] The freedom from physical restraint is the relevant Fifth Amendment liberty interest. It is ironic that the majority criticizes the Fifth Amendment's protection against arbitrary detention (and the related minimum procedures offered to effectuate that detention) as "unenumerated" when the majority itself relies so heavily on Congress's plenary power, which is widely recognized to be constitutionally implied. *See Jean v. Nelson*, 711 F.2d 1455, 1465 (11th Cir. 1983) (acknowledging that "the Constitution fails to delegate specifically the power over immigration"); CONSTITUTION ANNOTATED, *Art I.S8.C18.8.1 Overview of Congress's Immigration Powers*, https://constitution.congress.gov/browse/essay/artI-S8-C18-4-21/ALDE_00001255 (explaining that there is no single constitutional source of plenary power); *see also* Diana G. Li, Note, *Due Process in Removal Proceedings After* Thuraissigiam, 74 STAN. L. REV. 793, 828 n.179 (2022) (explaining plenary power as implied). The majority and concurrence *read in* implied powers as the basis to *read out* constitutionally enumerated rights.

Executive Branch actions: the decision to detain and the decision to remove. Supreme Court case law undermines each of the majority's analytical errors.

First, the majority overstates how a citation to "plenary power" can limit courts' constitutional review. Foundational immigration cases confirm that courts have a role as an independent check on Congress and the Executive Branch. For example, *Chae Chan Ping v. United States* is frequently credited with establishing Congress's broad plenary power over the subject of immigration. 130 U.S. 581 (1889). Yet even that early opinion affirmed the Constitution's supremacy, explaining that congressional authority is limited "by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations." *Id.* at 604. More than a century later, the Supreme Court in *Zadvydas v. Davis* made a nearly identical statement. 533 U.S. 678, 695 (2001) ("[Plenary] power is subject to important constitutional limitations."). The Constitution does not drop away from executive detention simply because that detention relates to immigration.

In the century that passed between the government's detention of Chae Chan Ping and Kestutis Zadvydas, many aspects of our immigration law changed.[6] But what did not change is the relevance the Supreme Court

---

[6] One such change was the meaning of the term "admission," which, prior to IIRIRA's enactment, simply referred to physical entry. *See ante* at 114 (SOUTHWICK, J., dissenting) (explaining that the word "admission" under prior statutory schemes referred to noncitizens' physical "entry" into the country—not legal admission as a term of art). As has been explained comprehensively elsewhere, IIRIRA introduced a specialized meaning to "admission" as "lawful entry." *See, e.g., Barbosa da Cunha*, 175 F.4th 61 at 74–76; *Hernandez Alvarez*, 175 F.4th at 1268. A foundational error in *Buenrostro-Mendez* was the majority's disregard of Congress's defined term, a misstep made even more inexplicable given the highly technical and highly legislated nature of immigration. *See Buenrostro-Mendez*, 166 F.4th at 511 (DOUGLAS, J., dissenting). The majority diminishes the importance of Petitioners' longtime residence in the United States by relying on *Buenrostro-Mendez*.

ascribed to a noncitizen's physical location when locating that noncitizen's rights under the law. *See, e.g.,* Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 YALE L.J. 545, 560 (1990) (explaining the importance of "two basic lines of inquiry in the early plenary power decisions: the alien's location and the type of constitutional challenge"); Diana G. Li, Note, *Due Process in Removal Proceedings After* Thuraissigiam, 74 STAN. L. REV. 793, 805–06, 812 (2022) (explaining the enduring relevance of territoriality in Supreme Court case law). This is the second point blurred by the majority. Again, the Supreme Court has long viewed Congress's plenary power as strongest where noncitizens are not physically inside of the United States, or otherwise in an area considered at the threshold of the country under the entry fiction. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("The Court without exception has sustained Congress' plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden." (citation modified)); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (explaining how a noncitizen moved from Ellis Island was "still in theory of law at the boundary line and had gained no foothold in the United States"). Conversely, the Supreme Court has viewed Congress's power as decidedly less plenary when persons are physically inside the United States, as Petitioners are. *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (requiring due process and fair proceedings for noncitizens "who have once passed through our gates, even illegally" (citing *Kaoru Yamataya v. Fisher*, 189 U.S. 86, 100 (1950)); *cf. Dept. of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107, 140 (2020) (denying certain rights for a person found twenty-five yards over the border, but distinguishing this from a scenario where a noncitizen was not "at the threshold of initial entry" and thus covered by the Fifth Amendment).

A noncitizen's residence within the interior of our country matters because it determines what constitutional protections apply, and the resulting scope of Article III courts' potential enforcement of those rights against the Executive Branch.[7] The majority collapses distinctions established in case law between the rights afforded to noncitizens located inside, versus outside, the United States in order to further an extreme statement of Congress's (misdescribed) power. As far as the majority is concerned, "for purposes of immigration detention, the border is now everywhere." *See Buenrostro-Mendez*, 166 F.4th at 520 (DOUGLAS, J., dissenting).

A final, similar error from the majority is its treatment of Congress's power as equally absolute for any question about immigration admissions and procedure. But questions like "what must I do to receive asylum" are very different from questions like "why am I still being detained." The former questions are about the requirements for obtaining a lawful immigration status. Their answers sit firmly within the authority of congressional statutes

---

[7] The majority emphasizes throughout its opinion that noncitizens seeking entry into the United States are only entitled to whatever Congress (through statutes) and the Executive Branch (through regulations) give them. But *Mezei* expresses this viewpoint in the context of being on the "threshold," not the interior. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. . . . But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" (citing *United States. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)); *see also* Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 YALE L.J. 329, 417–20 (2024) (explaining the importance of *Mezei* in establishing the most expansive view of Congress's plenary power). And as JUDGE SOUTHWICK thoroughly explains, *Thuraissigiam* did not disturb *Mezei*'s clear distinction between noncitizens with residence in the interior of the United States and those arriving at exterior borders of the country.

and the Executive Branch's implementing regulations. The latter questions do not implicate any ultimate immigration determination. Instead, they address ongoing justifications of confinement. The Supreme Court has continuously recognized this distinction between final determinations of legal status and collateral questions of custody, as JUDGE SOUTHWICK explains. *Ante* at 111 (SOUTHWICK, J., dissenting) (explaining that "[t]he cases holding that an alien has no right to be let in do not hold that an alien living here has no right to be let out of confinement even when the Government cannot justify the detention"). Courts are equipped and practiced in reviewing detention without infringing on Congress's power to set admissions and removal criteria. The majority cannot box out courts' constitutional review merely by pointing out that immigration detention is procedurally upstream from an ultimate determination about legal admission—that has always been true, and courts have always provided a check on the constitutionality of government confinements, including immigration detention. *See Jennings* 583 U.S. at 295 (distinguishing detention, which is reviewable by courts, from unreviewable removal decisions).

The majority thus flattens precedent in three ways: it reads Congress's plenary power over immigration so broadly as to be unrecognizable; it ignores the Supreme Court's longstanding differing analysis of noncitizens' legal position based on physical position in the interior; and it conflates courts' oversight of detention with review of a final order of removal. These mischaracterizations of Congress's power lead the majority to limit courts' ability to constitutionally review the lawfulness of government arrests and detention.

ii.

This inter-branch conflict was a foreseeable concern when we decided *Buenrostro-Mendez*. *See* 166 F.4th at 520 (DOUGLAS, J., dissenting). But what was a concern in *Buenrostro-Mendez* has become law today. The majority now subjects noncitizens, many of whom are parents of citizen children, to mandatory, indefinite detention in the interior of the United States, as if they were at the threshold of entry into our country. *See* Pratheepan Gulasekaram, *The Borderline Constitution*, 135 YALE L.J. 2065, 2107–50 (2026) (detailing the separation-of-powers harms of extending the legal conditions of the border into the interior of the United States, among other harms). The majority conjures this world by misdescribing Congress's power to be in tension with courts' role in enforcing constitutional protections.

But this conflict between Congress and the Constitution—the combined result of *Buenrostro-Mendez* and today's decision—is a false one, because the statutory scheme of Sections 1225 and 1226 is clear. We should read the scheme as nine other circuits have. Namely that Congress, legislating against the backdrop of the Fifth Amendment, has afforded bond hearings to persons arrested in the interior even if they are noncitizens. *See* 8 U.S.C.A. § 1226(a). There is nothing alarming about reading Section 1226 to confer noncitizens with an entitlement to bond hearings. Congress provided a similar framework in the Bail Reform Act for all persons—even when they have been charged with heinous crimes. And the Supreme Court upheld that framework in *United States v. Salerno*. 481 U.S. 739 (1987). Regardless of their defiance of Congress-made law, persons arrested and charged with the most serious felony offenses get statutory rights to request release pending an ultimate trial and any determination of guilt. This clear statutory reading is also the reading that minimizes separation-of-powers conflicts. And as JUDGE SOUTHWICK observes, we should presume that Congress legislates in ways that reinforce, rather than undermine, the

Constitution. Under these principles, statutory release schemes such as Section 1226 and the Bail Reform Act are unremarkable. What is remarkable is to ignore Congress's statutorily enacted release opportunity in Section 1226, which is consistent with Fifth Amendment first principles and *Jennings*, but then accuse courts upholding that reading as conflicting with Congress by "constitutionaliz[ing] the criminal acts of illegal aliens." *Ante* at 39 (Ho, J., concurring)

There is no sign from Congress that it would view courts' application of Section 1226 to Petitioners as such an affront to its plenary powers. Congress did not allocate the resources to mandatorily and indefinitely detain large numbers of people residing in the United States, nor made any statement that it intended an abrupt, constitutionally questionable, reinterpretation of Section 1225 to do so. Yet that is the Executive Branch's argument, which we accepted in *Buenrostro-Mendez* and the majority accepts again today. Judge Douglas has already noted that the Executive Branch's reading of Section 1225 would be akin to finding "elephants in mouseholes," *Buenrostro-Mendez*, 166 F.4th at 515–16 (Douglas, J., dissenting). The same point has since been emphasized by other respected jurists across the country. *See, e.g.*, *Barbosa da Cunha*, 175 F.4th at 83, 93 (Bianco, J.) (rejecting the assertion that Congress would have "implicitly mandate[d] the detention of millions of noncitizens" because that reading would imply that Congress has been "hid[ing] elephants in mouseholes" (citation omitted)); *id.* at 96 (Cabranes, J., concurring) (expressing skepticism that "fifteen Congresses stood silently by as five presidents ignored the plain text of the statute," that "[i]mmigration officials also failed to grasp that Congress had told them to round up people by the millions," and that "capacity to carry out the largest detention in American history went unbuilt"); *Barbosa da Cunha v. Freden*, No. 25-3141, 2026 WL 2880761, at *1, (2d Cir. Sept. 25, 2026) (Bianco, Nathan, JJ., concurring in denial

of rehearing en banc, joined by LEE, ROBINSON, PÉREZ, & MERRIAM, JJ.) (similar); *id.* at *32 (CABRANES, J., separate statement) (writing, despite lacking the ability to vote en banc, to "express [his] solidarity with the views expressed by [his] colleagues, Judges Bianco and Nathan"); *see also Guerrero Orellana v. Moniz*, 188 F.4th 1 (1st Cir. 2026) (MONTECALVO, J.) (noting IIRIRA's "complete silence" about detention capacity); *Lopez Garcia*, 2026 WL 2661092 at *18 (BERNER, J.) (explaining that the government's argument would require finding that the government "hid[] elephants in mouseholes"); *Cirrus Rojas*, 183 F.4th at 929–30 (KOLAR, J.) (same); *Santillan Quiroz*, 180 F.4th at 1242–43 (FEDERICO, J.) (same); *Hernandez Alvarez*, 175 F.4th at 1275 (MARCUS, J.) ("[The government's theory] produces a paradigmatic 'elephant in a mousehole.'"). Congress has never approved authorization for the Executive Branch to detain millions of people seized in the United States for as long as it takes the government to establish that they are removable. Holding otherwise pits Congress against the Constitution, and the courts that uphold it.

B.

Undoing Congress's Section 1225/1226 architecture eliminates the statutory procedures for challenging ongoing detention, leaving Petitioners with only bedrock constitutional pathways to do so. This sets up a second, unnecessary separation-of-powers conflict playing out across America today—this time between Article III courts and Article II courts.

Challenges to the lawfulness of immigration detention[8] have always been overseen by two sets of courts, housed in different branches of government, and with different mandates. Article II immigration judges

[8] As contrasted with other detention-related claims, such as challenges to detention conditions.

("IJs") are civil servants appointed by, and serving at the discretion of, the Attorney General, and decide whether a noncitizen will be removed against a backdrop of Executive Branch priorities and binding Bureau of Immigration Appeals ("BIA") precedent (following the processes set out by those authorities).[9] Article III judges, appointed for life and sworn to uphold the Constitution, are bound to assess government confinements under the Constitution and federal law. Article II courts take the heavy burden of administering our country's immigration laws. Article III courts speak on the subject less frequently. In this way, Article II courts and Article III courts, until *Buenrostro-Mendez*, worked in concert to carry out the Executive Branch's immigration policy while simultaneously upholding statutory and constitutional standards.

The government's statutory inversion of Sections 1225 and 1226, however, has caused significant friction between these two, previously complementary, sets of adjudicators. Since the Executive Branch reinterpreted its Section 1225 detention authority last year to strip noncitizens of Section 1226(a) statutory bond hearings before an IJ, noncitizen petitioners arrested in the interior have sought bond hearings through habeas petitions in district courts instead. District courts initially sought to right the statutory ship, holding that Section 1226 still applied to such petitioners in a reported 9,300 rulings by more than 400 federal

---

[9] That is, unless a circuit court or the Supreme Court holds otherwise. Article II IJs generally are not bound by Article III district court precedent, just that of courts of appeal. The BIA has stated that it, "as well as Immigration Judges, [is] bound to follow [BIA] precedent, the Attorney General, and the circuit court of appeals with jurisdiction over the geographic region where a case occurs." *Matter of Garcia*, 28 I. & N. Dec. 693, 695 (B.I.A. 2023); *see Matter of Anselmo*, 20 I. & N. Dec. 25, 31 (B.I.A. 1989) (noting that the BIA has permitted intercircuit nonacquiescence, but "has not followed a practice of nonacquiescence in decisions of a circuit court in cases arising within the jurisdiction of that circuit").

judges.[10] There remained the question, though, of the remedy to which these habeas petitioners were entitled. Some district courts ordered that a petitioner receive a bond hearing before an IJ. But some IJs have refused to provide such a hearing, even after a district court has ordered one to be held, claiming to be bound by BIA's prior determination in *Matter of Yajure Hurtado*, which ratified the Executive Branch's reinterpretation of its detention authority under Section 1225. 29 I. & N. Dec. 216 (BIA 2025); *see, e.g.*, *Rivera Esperanza v. Francis*, 817 F. Supp. 3d 187, 200–01 (S.D.N.Y. 2025) (finding administrative exhaustion under Section 1225(b)(2)(A) futile where IJs considered themselves bound by *Yajure Hurtado* to deny requests for bond hearings).

Fortunately, this clash has now been avoided in the great majority of circuits, which have held that Section 1226 applies to noncitizens arrested in the nation's interior. In these circuits, courts of appeals have affirmed the correct statutory source for challenging executive detention after apprehension in the interior—a Section 1226 bond hearing. Noncitizens need not rely on habeas petitions to challenge the validity of their individual detention. Instead, that process is carried out in built-for-purpose Section 1226 bond hearings.

In contrast, our minority statutory approach only exacerbates inter-branch friction. Because we have read out Congress's tailored, statutory grant of a Section 1226 bond hearing for noncitizens within the interior,

---

[10] *See* Hepsen, *supra* note 2; Uriel J. García, *Inside the Legal Battle Over Undocumented Immigrants' Right to Challenge Their Detention*, TEX. TRIBUNE (May 21, 2026, 5:00AM CT), https://www.texastribune.org/2026/05/21/texas-immigrant-rights-due-process/. This is not the same thing as stating that there have been 9,300 releases because of Article III courts' habeas review—an application of Section 1226 would result only in a bond hearing *opportunity* before an IJ and pending removal, where, crucially, the burden rests on the noncitizen to justify release from confinement.

petitioners must ask Article III courts to reach the Fifth Amendment in order to assess the validity of their confinement. But the administrative futility problem remains. District courts within this circuit have found that remand to an IJ for a bond hearing would be futile. *See, e.g.*, *Alvarado v. Mullin*, No. 1:26-CV-2610-RP, 2026 WL 2978441, at *1 (W.D. Tex. Sept. 30, 2026) (granting habeas petition and ordering release after finding that Petitioner's exhaustion of administrative remedies would be futile due to the government's interpretation of 8 U.S.C. § 1225, as upheld in *Matter of Yajure Hurtado* and *Buenrostro-Mendez*); *Lopez v. Tate*, No. 4:26-CV-06401, 2026 WL 2958295, at *3 (S.D. Tex. Oct. 1, 2026) (similarly finding exhaustion before Article II courts futile, while denying the habeas petition). As a result, district courts have ordered relief for unlawful detention themselves and then spelled out a bond hearing procedure that the government must follow before any re-detention. *See, e.g.*, *Alvarado*, 2026 WL 2978441, at *5. District courts are forced to address constitutional conflicts while Section 1226's statutory scheme sits unused.[11]

Contrary to the majority and concurrence, the current tangle of habeas petitions is not the result of improper filings, irresponsible district court judges, or any irregularity in the application of bond hearings. A district court has the obligation to apply the Due Process Clause, just as the person

---

[11] Many such habeas petitions have arisen in our circuit. *See* García, *supra* note 10 (explaining that one in five habeas petitions filed in the first thirteen months of the current administration were filed in Texas federal courts); *see also* Liyan Qi, *How ICE Flights out of New York Shifted South*, https://liyanziqia.github.io/project_rerouted/ (describing data illustrating a shift in transfers from New York to Louisiana and Texas following this court's *Buenrostro-Mendez* decision); Scott Friedman et al., *ICE Transfer Flights Bring More Detainees to Texas Where Attorneys Warn of Longer Waits*, NBCDFW (May 11, 2026, 10:08 A.M.), https://www.nbcdfw.com/investigations/ice-transfer-flights-bring-more-detainees-texas-where-attorneys-warn-longer-waits/4021218/ (similarly describing Texas as a favored transfer location post-*Buenrostro-Mendez*). DHS has control over the location in which it detains noncitizens, and where it moves them.

detained has a right to ensure the validity of their confinement. But the disruption of the Section 1225/1226 statutory scheme has forced Article III to resolve these conflicts in confrontation with Article II, instead of in cooperation. This conflict between Article III courts and Article II courts generated the instant appeal, even leading us to issue an opaque en banc stay of district court judgments (which has raised its own rounds of emergency motions).

The majority's resolution comes at the expense of noncitizens, which warrants a final word. Like the government, the majority makes its legal holding that "Petitioners have received the process due to unadmitted aliens," *ante* at 15, without detailing what process the Constitution affords a noncitizen to protect their liberty interest. Instead, the majority concludes that Article III oversight of Petitioners' liberty interest is unnecessary because Petitioners "can vindicate [a liberty interest] by simply walking out of detention." *Ante* at 22.

This abrogation of Article III courts' role follows from a series of separation-of-powers negations from the majority. The first proposition by the majority confirms the assertion that, under *Buenrostro-Mendez*, there is no Fifth Amendment basis for Petitioners to file a habeas claim—not even for indefinite detention, since the majority interprets *Zadvydas* as expressing "no such reservations regarding detention *pending* removal."[12] *See ante* at 27(emphasis in original). The second proposition seemingly provides the majority's only statement about a path "out" of an unlawful detention—abandoning ongoing removal proceedings and self-deporting. But the Fifth Amendment does not generally apply outside of the country. And petitioners

[12] Indefinite detention is a real risk for at least one of Petitioners here, whom counsel explained has an IJ hearing set for more than a year from now.

in administrative removal proceedings may abandon their claims if they fail to attend immigration proceedings (which are located inside the country). Self-removal thus ends a petitioner's Article II process as well as their appellate right to Article III review of final removal itself. This may not have been the intended consequence of the majority,[13] but for Petitioners it is a grave one. Unchecked, executive authority to arrest and detain, indefinitely, echoes fearfully from history.[14]

## III.

As JUDGE SOUTHWICK observes, the majority today constructs an "impenetrable wall between the Constitution" and this country's long-term, noncriminal, noncitizen residents. *See ante* at 100–101 (SOUTHWICK, J., dissenting). My additional concern is that the majority creates (and continues) conflict between Article III courts and Congress, as well as conflict between Article III courts and Article II courts, that should not exist, and in fact do not exist under the proper interpretation of the law.

It cannot be emphasized enough that the Supreme Court's previous analysis of Sections 1225 and 1226 in *Jennings* eliminates all the inter-branch

---

[13] Confusion on this point was evident at en banc oral argument, with questions from judges that assumed ongoing review by immigration courts over a noncitizen's removal petition even should they choose to self-deport. Subsequent briefing has clarified that self-deportation from within custody would generally require withdrawal of applications for relief, and self-deportation while not detained would likely result in abandonment of relief applications.

[14] *See* Stephen H. Legomsky, *Fear and Loathing in Congress and the Courts: Immigration and Judicial Review*, 78 TEX. L. REV. 1615, 1632 (2000) (describing "legislative and judicial antagonism to judicial involvement in immigration matters" as "a disturbing pattern, for we can never be complacent about the vulnerability of immigrants to popular majorities" and arguing that "[t]he case for judicial review" rests on "procedural justice," not "charity"); *Cirrus Rojas*, 183 F.4th at 931 (expressing concern over the potential for arbitrary detention under the Executive Branch's new interpretation of Section 1225).

conflicts I have outlined. *Jennings* is still good law. *See Blanche v. Lau*, 609 U.S. 1, 6 (2026) (citing to *Jennings* when describing mandatory detention at the border under Section 1225(b)(2)); *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 580 (2022) (describing Section 1226(a) as governing detention for those "present in the country who were inadmissible at the time of entry" and citing *Jennings*). Congress has not made an abrupt reversal countenancing indefinite, mandatory detention of persons that our government arrests. Nor is there any evidence it intended to pit Article III courts against Article II courts; or intended that our court would deny district courts' use of the Great Writ to assess confinement of persons our government has seized.

To conclude, constitutional avoidance was needed in *Buenrostro-Mendez*, and it is more urgent now. I would correct our statutory interpretation errors in *Buenrostro-Mendez* and then apply constitutional avoidance. Failing that, I would stay our withholding of bedrock constitutional process for persons arrested in the United States until the Supreme Court resolves the necessarily antecedent statutory question, as it is poised to do.

For decades, Congress, the Executive Branch, and the courts, spoke with a singular voice to guarantee that all persons in the United States are protected by the Constitution when our government seizes and confines them. Today the majority speaks over that historical consensus. I respectfully DISSENT.